## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**MARCOS URENA and NELSON SANG,**

**Plaintiffs,**

v.

**HOME DEPOT U.S.A., INC., and BRIAN JOHNSON,**

**Defendants.**

Civil Action No. 05-10242 MEL

## DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. Plaintiff, Nelson Sang was employed at the Tewksbury Home Depot from July 21, 2001 to January 15, 2003 as a Freight Team Associate. (Deposition of Nelson Sang ("Sang Dep.") attached hereto as Exh. 1 at p. 64)

2. Plaintiff, Marcos Urena was also hired on June 21, 2001 and worked as a freight team associate on the nightshift. (Deposition of Marcos Urena ("Urena Dep.") attached hereto as Exh. 2 at p. 37, 51-52; Urena Dep. Exh 1).

3. Paul Nowlan was the Store Manager during plaintiffs' employment at Home Depot. (Deposition of Paul J. Nowlan ("Nowlan Dep.") attached hereto as Exh. 3 at p. 6, 32) Michael Condo was the Freight Department Supervisor and Greg Morris was the Night Operations Manager when the plaintiffs were hired. Mr. Condo left in September 2002 and was replaced by Donald Kitchens until December 2002 when Eric LeCam took over as the Freight Team Supervisor. (Sang Dep. at 79, 97; Urena Dep. at p. 60, 87; Deposition of Donald G. Kitchens ("Kitchens Dep.") attached

hereto as Exh. 4 at p. 5; Deposition of Eric M. LeCam ("Lecam Dep.") attached hereto as Exh. 5 at p. 13; Defendants' Response to Plaintiff, Marco Urena's First Set of Interrogatories ("Int.") attached hereto as Exh. 6 at p. 4) The plaintiffs never worked in the Receiving department nor were they ever supervised by co-defendant Brian Johnson, the Receiving Department Supervisor. (Int. 4; Deposition of Brian Johnson ("Johnson Dep.") attached hereto as Exh. 7 at p. 23, 40; Urena Dep. at p. 61, 134)

4. Plaintiffs' duties as Freight Team Associates included receiving merchandise and stocking the merchandise on the shelves. (Sang Dep. at p. 78-80; Urena Dep. at p. 54-55). They primarily worked in the paint department but occasionally they were asked by department supervisors to assist in other departments. (Sang Dep. at p. 78, 81; Johnson Dep. at p. 32-33)

5. Mr. Sang and Mr. Urena, like all of the associates, received semiannual performance reviews. (Nowlan Dep. at p. 12) Before filling out the written evaluations, the management team had a roundtable meeting in which they discussed the performance of each of the associates. (Nowlan Dep. at p. 12, Johnson Dep. at p. 23) The management team consisted of the store manager, operations manager, assistant managers and human resource manager. (Nowlan Dep. at p. 12-13) The assistant managers conferred with the department supervisors prior to the meeting and brought information about the associates to the roundtable meeting. (Nowlan Dep. at p. 17, 62, 63; Johnson Dep. at p. 23)

6. The management team collectively decided the overall rating for each associate and gave that feedback to the department supervisors. (Nowlan Dep. at p. 60; LeCam

Dep. at p. 76) The department supervisors then drafted the actual written evaluations for each of their associates based on the rating determined at the roundtable meeting and to accurately reflect the employee's performance for the review period. (Johnson Dep. at p. 23)

7.  Plaintiffs' January 2003 performance review rating was decided by the roundtable management committee. As a Department Supervisor, Mr. Johnson was not part of the management team, and he did not participate in the roundtable. Moreover, he did not provide any input or make any decisions regarding plaintiffs' January 2003 performance rating. (Johnson Dep. at p. 23, 61)

8.  Mr. Sang received poor performance ratings on his performance evaluations. (Nowlan Dep. at Exh. 10, 11 and 12) Mr. Sang's poor performance was first reflected in his June 20, 2002 review which was drafted by Greg Morris, Assistant Store Manager. (Nowlan Dep. at Exh. 10) Although Mr. Sang received an overall "C"(performer) rating, the evaluation rated Mr. Sang a "D" (improvement required) in Punctuality and Attendance on his June 20, 2002 review and cautioned Mr. Sang regarding his punctuality and attendance stating, "need to work on attendance issues." (Nowlan Dep. at Exh. 10)

9.  On November 18, 2002, Mr. Sang received a written warning drafted by Donald Kitchens, Freight Team Supervisor, documenting his poor punctuality and attendance. (Nowlan Dep. at Exh 11; Kitchens Dep. at 17-18; Sang Dep. at 91-92)

10. In January of 2003, Mr. Sang received a "D" rating on his performance evaluation. (Nowlan Dep. at Exh. 12) The review was drafted by his supervisor, Eric LeCam, and reflected Mr. Sang's poor performance. (Nowlan Dep. at Exh. 12; Nowlan Dep.

at p. 45) Mr. Sang was rated a "D" in a majority of categories including "Communicated Effectively," "Promotes Teamwork," "Demonstrates Inclusion," "Self Development," "Punctuality/Dependability," and "Enthusiasm." (Nowlan Dep. at Exh. 12) Mr. LeCam was familiar with Mr. Sang's work performance because Mr. LeCam had worked with the plaintiffs as a fellow Freight Department associate before he was promoted to supervisor. (LeCam Dep. at p.34-35)

11. Mr. Urena also received poor performance ratings in his January 2003 performance review.[1] (Nowlan Dep. at Exh. 5) Mr. Urena's review reflects his poor productivity, lack of initiative, inability to adapt to new areas of responsibility, and attendance problems. (Nowlan Dep. at Exh. 5, Nowlan Dep. at p. 73-74) Mr. Urena's comments were also noted on the performance review form. (Johnson Dep. at p. 71-73)

12. Mr Urena's poor attendance rating was due to a number of unexcused absences such as he had a cold, his car wouldn't start and he didn't have a ride. (Kitchens Dep. at p. 37)

13. Mr. Urena's Poor Attendance, Low Productivity and Lack of Initiative also resulted in repeated informal counseling by Mr. LeCam and Mr. Kitchens. (Kitchens Dep. at p. 17-20; LeCam Dep. at p. 43-44)

14. Also reflected in both of the plaintiffs' January 2003 evaluations was their inability to adapt to working in different departments. (Nowlan Dep. at Exh 5, 12) The Freight team employees were not assigned to a single department. On occasion, department supervisors would ask plaintiffs to assist in a different department other than the paint

---

[1] Because Mr. LeCam had never drafted an evaluation before this time, he asked Mr. Johnson to assist him in writing Mr. Urena's review. Mr. LeCam provided all of the information and ratings for the review. Mr. Johnson did not provide any substantive input for Mr. Urena with Mr. LeCam. (Nowlan Dep. at p. 75; LeCam Dep. at p. 36-37, 55-57, 48-49, 75; Johnson Dep. at p. 59-60; Int. 8)

department.  (Urena Dep. at p. 157, LeCam Dep. at p. 33-34, Kitchens Dep. at p. 35)

Plaintiffs did not like it when they were separated from each other and asked to work

outside of the paint department.  (Kitchens Dep. at p. 35, Nowlan Dep. at p. 96,

LeCam Dep. at p. 33-34)  When various supervisors assigned them to work in other

departments, they would get angry and their productivity level would decrease

considerably.  (LeCam Dep. at p. 33-34; Kitchens Dep. at p. 35) Mr. Urena would

oftentimes call out of work the day after he was asked to work in a different

department. (LeCam Dep. at p. 38-39).  The plaintiffs' conduct was noted by Mr.

LeCam in their January 2003 evaluations. (Nowlan Dep. at  Exh. 5, 12)

15. Mr. Urena was out of work from July 2002 – August 2002 for knee surgery.  (Urena

Dep. at p.66-68) He informed Mr. Condo of his need to take time off for his surgery.

Mr. Urena was never denied any time he requested to take off related to his knee

injury. (Urena Dep. at p. 78 ) When Mr. Urena returned from his knee surgery, he

gave Mr. Condo a medical note indicating that he had medical clearance to return to

work full time on August 13, 2002.  (Urena Dep. at p. 74)

16.  In September 2002, a short time after Mr. Urena returned to work from his knee

surgery, Mr. Kitchens became his supervisor.  On occasion Mr. Urena told Mr.

Kitchens that his knee was sore and Mr. Kitchens agreed to adjust his workload.

(Kitchens Dep. at p. 21-22) Mr. Urena never told Mr. Kitchens that any of his

absences were due to his knee.  (Kitchens Dep. at p. 23-25, 31-32; Urena Dep. at p.

75)

17. All of Mr. Urena's medical leave issues were supposed to go through the Human

Resource Manager.  (LeCam Dep. at p. 40).  After he returned to work in August

2002, Mr. Urena did not provide any medical documentation indicating that he needed any additional time off for his knee or that any of his absences were due to a need for a leave from his knee surgery. (Kitchens Dep. at p. 23-25, 31-32; Urena Dep. at p. 74-75; LeCam Dep. p. 38-40) After he returned from knee surgery, Mr. Urena never told anyone at Human Resources that he had any medical restrictions. (Urena Dep. at p. 75-76)

18. In January 2003, Paul Nowlan was directed that the Tewksbury store needed to commence a "pre-RIF", reduction-in-force process, using receipt of a "D" rating on a 2002-2003 performance review as the applicable criterion for termination. (Nowlan Dep. at p. 68-69; LeCam Dep. at p. 68)

19. Both Mr. Sang and Mr. Urena had received "D" ratings on their January 2003 performance reviews, and as a result, both were terminated by Mr. Nowlan for poor performance on January 15, 2003 during the pre-RIF process. (Nowlan Dep. at p. 69-70, 105; Int. at p. 3,5) Mr. Nowlan met with each of the plaintiffs and explained to them that there were being terminated. (Sang Dep. at p. 104-105; Nowlan Dep. at p. 72; Urena Dep. at p. 99-100) The plaintiffs were each given a discipline notice stating that they were being terminated for poor performance. (Nowlan Dep. at Exh 13, 6; Sang Dep. at p. 106) Five other white store employees, none of whom were Hispanic, were also terminated for poor performance in the pre-RIF process as a result of their "D" rating. (Defendants' MCAD Statement of Position and Affirmative Defenses, attached hereto as Exh. 8 at p. 13)

20. Over a year after their terminations, Mr. Sang and Mr. Urena first alleged that they

were terminated because of their national origin based on conduct by Mr. Johnson[2],

who was not their supervisor. (Amended Complaint attached hereto as Exh. 8 at p. 25,

31) Mr. Johnson vehemently denied making any type of discriminatory remark.

Significantly, Mr. Johnson never had any role in Home Depot's decision to terminate

Mr. Sang or Mr. Urena. (Johnson Dep. at p. 34, 59-62; Int. 7)


Respectfully Submitted,

Home Depot U.S.A., Inc, and Brian Johnson

By their Attorney,

____/s/ Joseph P. McConnell_____
Joseph P. McConnell, Esq. BBO # 566412
MORGAN BROWN & JOY, LLP
200 State Street
Boston, MA 02109
617-523-6666

Date:  December 15, 2005


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel for plaintiffs, James W. Donchess, Esq., 60 Main Street, Nashua, N.H.  03060, by first-class U.S. mail this 15th day of December, 2005.

_/s/ Joseph P. McConnell_____
Joseph P. McConnell

---

[2] Both plaintiffs testified that Mr. Johnson called Mr. Urena a "fucking spic" while Mr. Johnson was riding a forklift by the plaintiffs in the paint department. (Sang Dep. at p.  124, 134; Urena Dep. at p.109) Mr. Sang admits that Mr. Johnson did not make any comments directly to him. (Sang Dep. at  p. 123)

Page 1

Volume:  I

Pages:  1-171

Exhibits:  1-8

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10242MEL

- - - - - - - - - - - - - - - - - - x

MARCOS URENA and NELSON SANG,

              Plaintiffs,

vs.

HOME DEPOT U.S.A., INC. and BRIAN

JOHNSON,

              Defendants.

- - - - - - - - - - - - - - - - - - x

DEPOSITION OF NELSON SANG

Friday, July 8, 2005

Morgan, Brown & Joy

200 State Street

Boston, Massachusetts

Commencing at 10:06 a.m.

Reporter:  Karen A. Morgan, CSR/RPR

Page 62

Q. Is there a reason why you didn't?

A. Because I didn't want to pursue working in the restaurant business. I wanted to work in the mortgage business.

Q. Okay. So you said about a year you worked for Demoulas? Maybe you didn't say it. How long did you say you worked for Demoulas?

A. Like around a year.

Q. And were you disciplined at any point working for Demoulas?

A. I don't remember.

Q. You don't remember?

A. I don't remember. I do not remember.

Q. Why did you leave Demoulas?

A. Because I wanted to move to Miami.

Q. You weren't terminated from Demoulas?

A. I basically quit.

Q. Okay. So when you say you basically quit, that seems to indicate that maybe there were some other reasons going on. What were they?

A. I told them that -- I didn't want to work there anymore. I told them that.

Q. Were you having difficulties with anyone at Demoulas at the time?

Page 63

A. No.

Q. Would their records indicate --

MR. DONCHESS: I have to take this.

MR. McCONNELL: Let's take a break.

(Brief recess.)

Q. So would their records indicate that you voluntarily quit?

A. I do not know what their records hold.

Q. You don't recall whether you were ever disciplined while you worked there; is that correct?

A. I don't think I was disciplined there, no.

Q. Now, when was it that you moved to Miami the first time?

A. I don't remember the exact date.

Q. But it was sometime a year and a half or so before you got the Tewksbury Home Depot job; correct?

A. After I left Demoulas, I went to Miami, stayed there for like a year and a half and then came back here.

Q. And immediately started working for Home Depot?

A. Yes.

Q. And so when was it that you started at Home Depot?

Page 64

1   A. I believe it was in July 2001.
2   Q. And so it would have been sometime around the
3   beginning of the year 2000 that you moved to Miami
4   then?
5   A. I'm very lost about the time frame about
6   going to Florida and going back. I don't have a clue.
7   Q. But your sole reason for moving to Miami was
8   just because you wanted to live there?
9   A. Yes.
10  Q. Did your son or your child who is now nine
11  years old move with you and your girlfriend or not?
12  A. In 2001?
13  Q. Yes.
14  A. They were still in the Dominican Republic.
15  They weren't here.
16  Q. Where did you work before Demoulas?
17  A. I held a temporary job at the Gillette
18  Company. I don't know if -- I'm bad with time frame.
19  I don't know if it was after -- after Demoulas that I
20  worked for Gillette. Yes, it was after Demoulas that I
21  worked for Gillette. I don't remember who I worked for
22  before Demoulas.
23  Q. So after Demoulas you worked for Gillette?
24  A. Yes.

Page 65

1   Q. And through a temp agency?
2   A. Yes.
3   Q. For how long did you work?
4   A. A few months.
5   Q. What did you do for Gillette?
6   A. Packing merchandise and machine operator.
7   Q. Was that at the Fort Devens operation?
8   A. I think it was Wilmington or North Andover.
9   Q. North Andover. Did you work for a company
10  called Marks and Rosenthal?
11  A. What is the name?
12  Q. Marks and Rosenthal.
13  A. I don't think so, no.
14  Q. Did you work for a temp agency called
15  Endicott and Colby?
16  A. I think I did once, yes.
17  Q. And that is how you got placed during the
18  Gillette work?
19  A. I don't remember.
20  Q. And so why did you not work at Gillette
21  anymore?
22  A. The hours and also they were letting people
23  go. They were like letting -- laid off everybody.
24  Q. Were you ever disciplined while you worked at

17 (Pages 62 to 65)

anyone when you started at Home Depot or was it just
your brother-in-law who said come on?
    A.   Basically that was it.  He just told me to
come to work for him.  That was it.
    Q.   Was it a full-time or a part-time job?
    A.   Full-time.
    Q.   And what department were you assigned to when
you started work?
    A.   Paint department.
    Q.   When you say you worked in the paint
department, were you an associate selling paint?
    A.   No.
    Q.   What was your position in paint?
    A.   Stocking merchandise and receiving the
merchandise and stocking them.
    Q.   Was this an evening position you worked at
the whole time you were at Home Depot?
    A.   Yes.
    Q.   And when I say evening, was it an overnight
position when the store was closed?
    A.   Yes.
    Q.   So although you were in the paint department
did you work on the freight crew?
    A.   Sometimes we worked with the freight crew.

    Q.   But were you considered a freight team
associate do you know?
    A.   I don't know.  I just worked for the paint
department.  I don't know what they consider what
there.
    Q.   Did the department supervisor in paint
oversee your work or did the freight department
supervisor oversee your work?
    A.   We had -- at the time when I came in it was
Mike Condo first who was overseeing the work.
    Q.   Mike Condo, C-O-N-D-O?
    A.   At first.
    Q.   So he was your first supervisor when you
started Mike Condo; is that correct?
    A.   Yes.
    Q.   How soon after you started did Mr. Carter
leave the Tewksbury Home Depot?
    A.   I don't remember.  A few months after that.
    Q.   What was your rate of pay when you started at
Home Depot?
    A.   Fifteen dollars.
    Q.   That was per hour?
    A.   Yes.
    Q.   Was it a 40-hour a week job?

1       A.   Yes.
2       Q.   Did you receive any other benefits?
3       A.   No.
4       Q.   What were your duties when you began at Home
5   Depot?
6       A.   What did I do?
7       Q.   Yes.
8       A.   I received the merchandise, stocked the
9   merchandise on the shelves.  That's about it.
10      Q.   Now there was a receiving department as well
11  in the store; is that right?
12      A.   Yes.
13      Q.   And that department also worked at night;
14  correct?
15      A.   Yes.
16      Q.   And they would take in the merchandise into a
17  back receiving room in the store; is that correct?
18      A.   They get it off the truck and would place in
19  the receiving department the merchandise.
20      Q.   And as part of your position, did you go get
21  the merchandise from receiving and bring it out to the
22  floor or did someone from receiving bring it from the
23  receiving department and bring it to the department?
24      A.   Sometimes we will do it.  Sometimes they had

1   other people do it.
2       Q.   Did you ever have to do the down stocking or
3   the moving of merchandise in a department other than
4   paint?
5       A.   Yes.
6       Q.   When was that?
7       A.   Where?
8       Q.   When did that occur that you did down
9   stocking or moving of freight in departments other than
10  paint?
11      A.   Whenever we got the job done in the paint
12  department, sometimes we were moved to another
13  department to help out.
14      Q.   So although your primary responsibility was
15  paint, is it correct to say that you could be assigned
16  to do stock work in other departments as well?
17      A.   Yes.  We could have been assigned other
18  departments.
19      Q.   In fact you often were assigned to other
20  departments if there wasn't enough work in paint or if
21  you were needed somewhere else; correct?
22      A.   Yes.  That's correct.
23      Q.   So you say Mike Condo was your initial
24  supervisor; is that right?

21 (Pages 78 to 81)

Page 90

1    A.  Yes.
2    Q.  And did you have a positive relationship with
3    Mr. Condo?
4    A.  I don't know what you call positive.  Just
5    work for him, you know.
6    Q.  Well, you called him after you left so you
7    didn't have a negative relationship with him?
8    A.  Correct.
9    Q.  Now, you received a performance notice in
10   November of 2002 regarding attendance.  Do you remember
11   that?
12   A.  What did you say?
13   Q.  You received a performance notice about
14   attendance issues in November 2002 about four months
15   after this evaluation.
16   A.  I don't remember.
17       MR. McCONNELL:  Mark this, please.
18       (Exhibit No. 4 marked
19       for identification.)
20   Q.  I have placed before you, Mr. Sang, a
21   document that has been marked as Exhibit No. 4 to your
22   deposition.  I'll ask if you recognize this document.
23       (Witness perused document.)
24   A.  Yes.

Page 91

1    Q.  And is that your signature on the lower
2    left-hand corner?
3    A.  Yes.
4    Q.  Do you recognize whose signature it is in the
5    lower right-hand corner?
6    A.  It says Donald Kitchens but I don't
7    recognize.  Yes.  It says Donald Kitchens.
8    Q.  Okay.  Well, Mr. Kitchens was a department
9    supervisor in freight; is that correct?
10   A.  Yes.
11   Q.  And he was your supervisor in November 2002;
12   correct?
13   A.  Yes.
14   Q.  And by this time Mr. Condo had moved on and
15   wasn't the freight department supervisor any longer;
16   correct?
17   A.  Yes.
18   Q.  And do you remember when Mr. Kitchens gave
19   you this performance notice?
20   A.  I don't remember the exact date but I know I
21   got it.
22   Q.  Did you have a meeting with him about this
23   document?
24   A.  I don't recall when we met.

Page 92

1    Q.  Do you remember what he told you was his
2    concern?
3    A.  No.
4    Q.  Did he speak to you about being late on a
5    regular basis?
6    A.  No.
7    Q.  So where it says on 11/14/02 I spoke with
8    Mr. Sang about being late on a regular basis and we
9    agreed to move his start time to 21:30, are you saying
10   you didn't have a meeting with Mr. Kitchens about his
11   perception that you were late on a regular basis?
12   A.  I don't know.  I just remember that he handed
13   me this over but I don't remember.  I don't remember
14   talking to him about it on a regular basis.
15   Q.  Well, you remember talking to him about it at
16   least one time though about you being late?
17   A.  When he handed this over, that's the only
18   time I remember talking to him.
19   Q.  Do you remember him moving your start time to
20   21:30 or 9:30 p.m.?
21   A.  This was done a few times.  They changed the
22   start time.  They change it a few times while I was
23   there.
24   Q.  Do you remember specifically Mr. Kitchens in

Page 93

1    November of 2002 changing your start time to 9:30?
2    A.  I don't remember.
3    Q.  Do you remember showing up 20 minutes late to
4    work on November 18, 2002?
5    A.  No.
6    Q.  When he gave this to you, what did he tell
7    you was the problem?
8    A.  I don't recall the conversation.
9    Q.  But you do recall getting this?
10   A.  Yes.
11   Q.  And you remember signing it?
12   A.  Yes.
13   Q.  Do you remember him stating to you in some
14   manner Nelson needs to be here and ready to work at his
15   appointed time?
16   A.  No.
17   Q.  You understood you had to be on time for
18   work.  That's fair to say; correct?
19   A.  I need to be on time to work.
20   Q.  You understood that that was important to the
21   company that you were on time to work, that you come on
22   time and leave on time?
23   A.  I know I have to be on time to work.
24   Q.  Is it your testimony you were never late for

24 (Pages 90 to 93)

Page 94

work?

2    A.   No.  I didn't say I was never late.  I didn't
3  say that.
4    Q.   So there were occasions when you were late
5  for work?
6    A.   Yes.
7    Q.   You just don't remember Mr. Kitchens having a
8  specific discussion about that with you when he handed
9  this notice to you?
10    A.   I don't remember.
11    Q.   Okay.  Then just one last thing on Exhibit
12  No. 4.  Do you know why you didn't write anything in
13  Section F of this document?
14    A.   When I got this, I didn't agree with it but I
15  still sign it and just hand it over to whoever I talked
16  to this wasn't fair for me.
17    Q.   If you thought it wasn't fair, is there a
18  reason you didn't write anything in Section F?
19    A.   I didn't know I could write anything on any
20  of the reviews.  I didn't know I could write anything.
21  I just signed it over and hand it to him but I didn't
22  agree with it.
23    Q.   Did you tell him at that time you didn't
24  agree with it?

Page 95

1    A.   I think I did mention something to the
2  matter.
3    Q.   Do you remember what he said?
4    A.   No, I don't remember what he said.  I just
5  wasn't happy about it.
6    Q.   You knew it was a negative thing to have in
7  your file?
8    A.   Yes, but I knew it wasn't coming from him.  I
9  had a feeling this wasn't coming from him.
10    Q.   What gave you the feeling it wasn't coming
11  from him?
12    A.   Because this guy Donald Kitchens he was there
13  for probably like a month.  He was there for like about
14  a month and he wouldn't do anything without an okay
15  from Mr. Johnson or whoever was the store.  Mostly
16  Mr. Johnson.
17    Q.   Mr. Kitchens didn't work for Mr. Johnson;
18  correct?
19    A.   No.  That's not correct.  To me what I saw
20  Mr. Kitchens wouldn't do anything.  He would like most
21  of the time talk to Mr. Johnson about what to do, how
22  to do it and basically he wouldn't do anything without
23  maybe talking to Johnson.
24    Q.   You came to that conclusion from seeing Mr.

Page 96

1  Kitchens talking to Mr. Johnson or did someone tell you
2  this?
3    A.   No.  I seen it and everybody knew that most
4  of the time Johnson run the store.
5    Q.   Well, let me ask you.  Mr. Johnson was in
6  charge of the receiving area; is that correct?
7    A.   He was in charge of the receiving area but he
8  still basically was the person running the store.
9    Q.   Well, there was a manager on duty in the
10  evenings as well though.  Mr. Johnson wasn't at the
11  manager level.  He was a supervisor; correct?
12    A.   In paper probably he wasn't supposed to be in
13  charge but everybody knew who was in charge of the
14  store.
15    Q.   And so you said you believed it didn't come
16  from Mr. Kitchens.  Who did you believe it came from?
17    A.   I had a feeling it came from Brian Johnson.
18    Q.   What led to you that conclusion?
19    A.   Because we -- I knew that we weren't liked by
20  Mr. Johnson.
21    Q.   When you say we, who are you talking about?
22    A.   I talking about me and my other co-worker
23  also.
24    Q.   Who was that?

Page 97

1    A.   His name is Marcos.
2    Q.   Marco Urena?
3    A.   Mm-mm.
4    Q.   U-R-E-N-A?
5    A.   Mm-mm.
6    Q.   You have to say yes, please.
7    A.   Yes.  Sorry.
8    Q.   That's okay.  You have done a good job so
9  far.  What leads you to believe that Mr. -- well, you
10  knew Mr. Kitchens was your supervisor.  He was the
11  freight superior; correct?
12    A.   He was supervising us.
13    Q.   Okay.  And he was the freight team
14  supervisor; is that correct?
15    A.   He was supervising us.  I don't know his
16  title.
17    Q.   Okay.  And he was the one who set your
18  schedule; correct?
19    A.   I'm not sure who set the schedule.
20    Q.   Okay.  For what reason -- strike that.  Let
21  me ask you.  You received another review in January
22  2003 from Eric Lacam; is that correct?
23    A.   Another review.  I don't know who gave me the
24  other review.  I don't know.  I can't tell you.

25 (Pages 94 to 97)

Nelson Sang

1    Q.   You don't remember the meeting going over it?
2    A.   No.
3    Q.   Do you remember anyone going over with you
4    the key development needs?
5    A.   I don't remember who it was, no.
6    Q.   Do you remember someone going over those with
7    you?
8    A.   I don't remember. I don't remember.
9    Q.   Do you remember anyone telling you you had
10   gone over the acceptable number of absences in the past
11   six months?
12   A.   No.
13   Q.   Did you agree or disagree with this
14   evaluation?
15   A.   I disagree.
16   Q.   And again is there a reason why you didn't
17   write anything under associate comments?
18   A.   I never was told I could write any comments
19   there. I never -- this is the first time I see that
20   you could write there.
21   Q.   Did you get along with Mr. Lacam?
22   A.   Just normal. Normal.
23   Q.   Was he a co-worker of yours?
24   A.   Yes.

1    Q.   Prior to becoming a supervisor?
2    A.   Yes.
3         MR. McCONNELL:  It is quarter past 12. I
4    think I have about an hour or an hour and a half to
5    finish up. Do you want to take a quick lunch break?
6         MR. DONCHESS:  Definitely.
7         (A break was taken for lunch.)
8    Q.   We are back on the record again. Mr. Sang,
9    you understand you're the oath you took this morning;
10   correct?
11   A.   Yes.
12   Q.   Although looking at Exhibit 5 you don't
13   recall the meeting that went over this, you do
14   understand you did receive the review?
15   A.   Yes.
16   Q.   Correct?
17   A.   Yes.
18   Q.   You understood that it was an overall
19   performance code of D; correct?
20   A.   Yes.
21   Q.   Now, let me ask you. It says under business
22   unit component the number 38. Is that the department
23   38? Do you know what department 38 is at Home Depot?
24   A.   I think they're referring to the night crew,

1    to the whole night crew team.
2    Q.   Where it says under title fright team
3    associate, is that an accurate -- do you understand
4    that to be accurate as to what your title was at that
5    time?
6    A.   It says freight team associate but we were
7    like working most of the time in the paint department.
8    Q.   Okay. Now, at some point soon after you
9    received your review in Exhibit 5 you learned that you
10   were going to be let go from Home Depot; is that
11   correct?
12   A.   Yes.
13   Q.   How is it that you learned you were going to
14   be let go?
15   A.   How? I think I was called into the office.
16   Q.   Do you remember who called you into the
17   office?
18   A.   No.
19   Q.   Who was there when you got to the office?
20   A.   I don't remember who was there.
21   Q.   Was Mr. Nolan there?
22   A.   I think, yes. I'm not sure but I think he
23   was there. I'm not sure.
24   Q.   And what were you told when you got to the

1    office?
2    A.   I told that I was being let go because of the
3    business, that we were doing a great job in the
4    department but things were slowing down.
5    Q.   Do you remember who told you that?
6    A.   Paul Nolan.
7    Q.   Do you remember anything else Mr. Nolan said
8    during this meeting?
9    A.   Yes. He told me that I was going to be
10   rehirable. I could work at any store or I could come
11   back to the same store and work for him because he
12   wanted us back.
13   Q.   Were you aware -- were there other associates
14   in the room called in at the same time or were you met
15   with individually?
16   A.   I don't remember. I don't remember.
17   Q.   Now, were there others in the room besides
18   Mr. Nolan and you just don't remember who they were or
19   were you just alone with Mr. Nolan?
20   A.   There were people coming in and out. I
21   remember that but I don't remember who was standing
22   behind me. I didn't look behind me.
23   Q.   Was Mr. Lacam in the room?
24   A.   I don't remember. He could have been coming

27 (Pages 102 to 105)

Page 106

1  in and out but I don't remember if he was.
2      Q.  Was Mr. Johnson in the room?
3      A.  No, Mr. Johnson wasn't in the room.
4      Q.  Did you understand that others were being let
5  go at the same time as you?
6      A.  No.  I didn't know.
7      MR. McCONNELL:  Mark this, please.
8          (Exhibit No. 6 marked
9          for identification.)
10     Q.  I have placed in front of you, Mr. Sang, a
11 one-page document marked as Exhibit No. 6 to your
12 deposition called discipline notice at the top.  Is
13 that your signature at the bottom of the page where it
14 says associate receiving discipline notice?
15     A.  Yes.
16     Q.  Was this provided to you by Mr. Nolan at your
17 meeting where he informed you that you were being let
18 go?
19     A.  I don't remember.  I can't say.  I don't
20 know.
21     Q.  Do you remember seeing this document before
22 today?
23     A.  I think I seen copies in some files I have at
24 home.

Page 107

1      Q.  Is it your testimony that you didn't
2  understand from your meeting with Mr. Nolan that your
3  job performance had to do with why you were selected to
4  be let go?
5      A.  Repeat that again, please.
6      Q.  Sure.  Did Mr. Nolan tell you during the
7  meeting that it was in part because of your job
8  performance that you were selected to be let go?
9      A.  I wouldn't remember discussing that but I
10 remember him mentioned that he was happy with the job
11 that we were doing in the paint department.  However,
12 things were slowing down and that was the reason that
13 he let me go.
14     Q.  You see where it is checked under here other.
15 It says poor job performance and under the state of
16 improvement required of associate it says at this point
17 Nelson is being terminated from Home Depot for poor job
18 performance.  Do you remember reading that at the time
19 when this document was presented to you?
20     A.  I don't remember going over this with him.
21 However, I did when we went through this.
22     Q.  You're pointing to Exhibit 5 now.
23     A.  Yes.  I didn't agree with this.
24     Q.  You didn't agree with that?

Page 108

1      A.  I did not agree with it.  I didn't sign it
2  when it was handed over to me.
3      Q.  You're holding up Exhibit No. 5 which is your
4  January of '03 performance evaluation; correct?
5      A.  Yes.
6      Q.  You said you didn't agree with it when it was
7  given to you and you said you didn't sign it.
8      A.  I did not sign it when it was given to me.
9      Q.  When did you sign it?
10     A.  I think I sign it early in the morning like
11 around 6:30.  I don't remember exact time but it was
12 early in the morning.
13     Q.  You don't remember who gave Exhibit No. 5 to
14 you?
15     A.  I don't remember who gave it to me
16 originally.
17     Q.  You do not?
18     A.  I don't remember.
19     Q.  So you said you didn't agree with your
20 performance appraisal.  How is that connected to
21 whether or not you received Exhibit No. 6 when you were
22 terminated approximately nine or ten days later?
23     A.  How is it connected?
24     Q.  Yes.

Page 109

1      A.  Well, I don't know.  Just probably that was
2  handed over with this here.  I don't know but I know
3  that I didn't agree signing this.
4      Q.  You didn't agree signing the annual
5  performance appraisal which is Exhibit No. 5?
6      A.  Yes.  I don't know if that came -- if they
7  gave me this together I don't know but I just remember
8  I refuse -- I think this was done at the same time I
9  believe and as you can see here that's 1/15.  Yeah.  I
10 refused to sign this document and I think this was
11 given to me at the same time.
12     Q.  You believe they were given to you at the
13 same time?
14     A.  Yes.
15     Q.  Is there a reason why the date of 1/6/03 is
16 next to your signature on the performance evaluation
17 which is Exhibit No. 5 and the date of 1/15/03 is next
18 to your signature on Exhibit No. 6, the discipline
19 notice which reflects your termination?
20     A.  No.  I don't know.  I just I believe this was
21 given -- the date I was terminated I think it was given
22 to me together.  I'm not sure but it could have been.
23     Q.  Okay.  So you understood the two were
24 connected, the fact that you got a D and improvements

8 (Pages 106 to 109)

Page 122

1  Mike Condo was there, he would send people from other
2  departments to help us.  Now when Mike left and
3  Mr. Johnson took over, they would not send people to
4  help us out.
5      Q.  Mike left and Mr. Kitchens took over;
6  correct?
7      A.  Yes, but for a very short time.
8      Q.  Then Mr. Kitchens left and Mr. Lacam took
9  over; is that correct?
10     A.  They took over but the man in charge was
11  Mr. Johnson.
12     Q.  So you said your last review reflected some
13  concerns.  Let me read what it says under leader
14  summary assessment.  You can tell me where you think
15  that it's reflected.  Nelson has been employed at The
16  Home Depot for almost two years.  Nelson although a
17  good worker when present has over the acceptable limit
18  of absences during the past six months.  Although he
19  has been employed for almost two years, Nolan should
20  have more knowledge than presently displays.  Eddie
21  presently -- and Eddie is you as well; correct?  That
22  refers to you, Eddie?
23     A.  Yes.
24     Q.  Eddie presently has great knowledge of the

Page 123

1  paint department but will be cross trained in every
2  department throughout the store.
3      A.  I'm not talking about this one.  I'm talking
4  about this one with the check marks that was done when
5  he said I got a D.  I believe I got a D for get things
6  done, okay, and all this check marks over here I
7  immediately disagree and I refuse to sign it because it
8  wasn't right.
9      Q.  So that's Page 2 of Exhibit 5 is what you're
10  referring to?
11     A.  Yes.
12     Q.  Okay.  Did Brian Johnson ever make a comment
13  to you about your national origin?
14     A.  Not to me directly but I have heard that he
15  makes comments about it.
16     Q.  So not to you directly.  Who has told you
17  Mr. Johnson made comments about your national origin?
18     A.  There were a few other co-workers.
19     Q.  Who?  I need to know who those people are.
20     A.  Co-workers.  I couldn't come up -- I barely
21  remember --
22     Q.  Did Mr. Urena --
23     A.  Kitchens.  I remember Kitchens but I don't
24  even recall the other guys' names, the co-workers who

Page 124

1  worked with me.
2      Q.  Did Mr. Urena tell you?
3      A.  Mr. Urena.  We had an incident where we heard
4  Mr. Johnson refer and say some comments.
5      Q.  Did you hear Mr. Johnson make comments about
6  your national origin or did someone else tell you?
7      A.  No.  There was one time when I heard him
8  saying something to our national origin.
9      Q.  When did this occur?
10     A.  I don't remember the exact date when this
11  occurred.
12     Q.  How long before your termination did it
13  occur?
14     A.  I can't really say.  I can't give you a time
15  frame because I don't remember.
16     Q.  Okay.  Tell me about the incident where you
17  heard him say something about your national origin
18  where you heard it.
19     A.  What I heard.  What I heard I was working on
20  an aisle in the paint department.  Mr. Urena was
21  working on another aisle and was working close from the
22  main aisle where Mr. Johnson was going back and forth
23  and I heard him say fucking spic.  That's what I heard.
24     Q.  You heard Mr. Johnson say this?

Page 125

1      A.  Yes.
2      Q.  Did you see Mr. Johnson when he said this?
3      A.  I saw him when he went by.
4      Q.  Did you see him when he said this?
5      A.  I saw him when he went by.
6      Q.  So you didn't see him when he said it?
7      A.  I saw him when he went by and he said it.
8      Q.  So you did see him when he said it?
9      A.  Yes.
10     Q.  You saw him articulate those words?
11     A.  Yes.
12     Q.  And how close to him were you when you heard
13  this?
14     A.  I was close.
15     Q.  Who close?
16     A.  I don't know.  Maybe like from here to the
17  wall over there.
18     Q.  Would you approximate that at 25 feet?
19     A.  Or less because I was pretty close to the
20  main aisle.  I think it was less.
21     Q.  Well, what's accurate?  Is it from where
22  you're sitting to the wall on the other side of the
23  room or my estimation of 25 feet?
24     A.  Like from that third chair right there from

Nelson Sang

1 where I was facing at the time. I don't remember.
2      Q.    And so it's your testimony that you saw
3 Mr. Johnson on this forklift say the words fucking
4 spic?
5      A.    I did.
6      Q.    And you heard him say that?
7      A.    I did.
8      Q.    Do you know what he was referring to?
9      A.    He was referring to Marco and me.
10      Q.    Who do you know that?
11      A.    We were the only one around there.
12      Q.    Did he look at you?
13      A.    I don't know if he looked at me. I knew it
14 was him that just went by but I don't know if he looked
15 at me.
16      Q.    How do you know he was referring to you and
17 Mr. Urena? Wouldn't he then say fucking spics in the
18 plural and not fucking spic?
19      A.    I don't know. I just heard it and I went
20 over the aisle and asked Marcos if he heard what I
21 heard.
22      Q.    So he was going by on a forklift, a moving
23 forklift which might or might not have had freight.
24      A.    Yes.

1      Q.    You might have been turned toward the
2 merchandise placing it on the shelf or might not have
3 been. Mr. Johnson was moving by and you remember
4 specifically that you saw him and you saw him say
5 fucking spic and you're convinced that he was referring
6 to you and Mr. Urena?
7      A.    Yes.
8      Q.    You went over to see Mr. Urena then; is that
9 correct?
10      A.    Yes.
11      Q.    And what did you say to him?
12      A.    I asked him if he heard what I heard.
13      Q.    What did he say?
14      A.    He said that he heard the same thing.
15      Q.    What did he say that he heard?
16      A.    Fucking spic.
17      Q.    So did you say did you hear him say fucking
18 spic or did you say did you hear what I heard?
19      A.    Did you hear what he just said?
20      Q.    What did Mr. Urena say?
21      A.    He said he just said fucking spic.
22      Q.    What's what you heard before you talked to
23 Mr. Urena or did you believe that you heard that after?
24      A.    No. That's what I heard also.

1      Q.    Did you complain to anybody about this?
2      A.    I did not complain but I was looking -- I did
3 manage to call -- not that but after I was terminated I
4 did try to call Atlanta for it.
5      Q.    When you say call Atlanta, what are you
6 referring to?
7      A.    To call the main office.
8      Q.    Was it the alert line you tried to call or
9 something else?
10      A.    I called some number there but I just like
11 say like I don't know. I didn't know what to do and
12 then I hang up and I call Jason Carter.
13      Q.    You went through an orientation when you
14 started at Home Depot; correct?
15      A.    I don't remember.
16      Q.    You knew that Home Depot had policies against
17 discrimination; correct?
18      A.    I don't know. I think they do. All works
19 have discrimination laws.
20      Q.    You saw in the lunch room or somewhere else
21 in the back of the store there were posters up that
22 said it's illegal to discriminate?
23      A.    I never stood there to read all the things
24 that were posted there.

1      Q.    Did you ever receive an employee handbook or
2 associate's guide about the rules of the store?
3      A.    I think I could have but usually from time to
4 time we were called in in the back room to start
5 signing papers, sign them, sign them, hand them over.
6          MR. McCONNELL: Mark this, please.
7          (Exhibit No. 7 marked
8          for identification.)
9      Q.    I place before you a document that has been
10 marked as Exhibit No. 7 to your deposition, Mr. Sang,
11 which is a two-page document. The first page appears
12 to be a cover with the term 2001 associate orientation
13 guide. On the second page there is a section called
14 respect for all people. Have you ever seen this
15 before?
16      A.    I don't remember seeing this.
17      Q.    In the middle of the second paragraph there
18 is something called the alert line and an 800 number
19 where it says to report any harassment or issue of
20 disrespect and remain anonymous, call the alert line at
21 1-800-286-4909. It is your responsibility as a Home
22 Depot associate to report any activity that may violate
23 the company's respect policy. Is this the number that
24 you called do you remember?

35 (Pages 134 to 137)

Urena, et al.
vs.
Home Depot, et al.

## Deposition of Marcos Urena

Volume 1

August 3, 2005
pp 1-182

**Jones Reporting**
C O M P A N Y

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 34

1    Q.   Nelson Sang?
2    A.   Yes.
3    Q.   And he also worked at Demoulas with you;
4    correct?
5    A.   He then after -- he was, I believe, at
6    that time.  I don't know what he was doing.  He was
7    going to his mother's, whatever, and then he got the
8    job over there, Demoulas Warehouse, yes.
9    Q.   So he came to Demoulas after you did?
10   A.   Yes, sir.
11   Q.   And did he help you get your job at
12   Academy Manor?
13   A.   No, sir, it was somebody else.
14   Q.   But you did work at the same time as him
15   at Academy Manor?
16   A.   Yes, we used to work together, yes.
17   Q.   And then you worked again together at
18   Demoulas?
19   A.   Yes, sir.
20   Q.   And did you work part-time or full-time at
21   Demoulas?
22   A.   No, Demoulas was full-time.
23   Q.   And how long did you work at Demoulas?
24   A.   That was close to almost eight years, sir.

Page 35

1    Q.   And full-time?
2    A.   Yes, sir.
3    Q.   And what did you do at the warehouse?
4    A.   I was a selector.
5    Q.   Selector?
6    A.   Selector, yes, sir.
7    Q.   And is that you have to pull --
8    A.   You have a jack, a power jack, and you
9    have double pallet jack, you grab a pallet, you
10   get -- they give you an order, so you go aisle by
11   aisle looking for the products that is going to be
12   shipped to the stores.
13   Q.   And what was your rate of pay at Demoulas?
14   A.   When I started it, it was 9.45, 9.50.
15   Q.   Per hour?
16   A.   Yes, sir, that's at the beginning when I
17   started.
18   Q.   How about when you left?
19   A.   When I left, I was close to $15.
20   Q.   Were you ever disciplined while you were
21   at Demoulas?
22   A.   No, sir.
23   Q.   And did you quit Demoulas or were you
24   terminated?

Page 36

1    A.   I quit letting them know that I couldn't
2    do the job no more, it was getting too hard for me.
3    Q.   And why did you let them know that it was
4    getting too hard for you?
5    A.   I'd been selecting for already almost
6    eight years, so my back was, like, really hurting,
7    it was getting sore, and I used to tell them, I
8    can't do this job anymore, and I'm sorry; so
9    eventually after me letting them know and telling
10   them, they simply just let me go.
11   Q.   So they ultimately let you go because of
12   your report that it was too physically demanding?
13   A.   Yes, I was telling them constantly, I just
14   can't do this job no more.  They were very good at
15   me for that portion of, like, me letting them know,
16   so it was just, basically, good terms of leaving the
17   company.
18   Q.   What year did you leave Demoulas; do you
19   remember?
20   A.   I don't remember, sir, what exactly year.
21   Q.   How long did you have between Demoulas and
22   starting at Home Depot?
23   A.   It was awhile, sir, that I know.
24   Q.   Did you have any jobs in between Demoulas

Page 37

1    and Home Depot?
2    A.   No, sir, no, I didn't.
3    Q.   Are you related to Nelson Sang?
4    A.   No, sir.
5        MR. McCONNELL:  I'm going to mark this
6    as an exhibit.
7        (Application marked as Exhibit No. 1
8    for identification.)
9    Q.   I've had placed before you, Mr. Urena,
10   Exhibit 1 to your deposition, which is a two-page
11   document.  Do you recognize this document?
12   A.   No, sir.
13   Q.   If I refer you toward the top where it
14   says, it's sort of cut off, but it appears to say,
15   "Home Depot USA, Inc., Employment Application,
16   Entered 6/20/2001"; does that refresh your memory at
17   all about whether you recognize this document?
18   A.   So this is, what, just my application that
19   I filled out at Home Depot?
20   Q.   Well, let me ask you this.  Did you fill
21   out an application when you started at Home Depot?
22   A.   At Home Depot; yes.
23   Q.   And it was on a computer screen; is that
24   right?

10 (Pages 34 to 37)

Page 50

1  married yet, but it's close to being married to
2  Mr. Carter.
3      Q.  And that's Tania Sang?
4      A.  That's Tania Sang.
5      Q.  And that's Mr. Sang's sister?
6      A.  Mr. Sang's sister, yes.
7      Q.  And so Mr. Sang told you he'd put a good
8  word in for you with Mr. Carter; is that right?
9      A.  Yes, sir.
10         MR. McCONNELL:  Why don't we take
11  about five minutes?
12         (Recessed at 10:55.)
13         (Resumed at 11:00.)
14     Q.  We're back on the record.  I remind you,
15  Mr. Urena, that although we take breaks today, you
16  understand that you're still under the oath that you
17  took this morning; correct?
18     A.  Yes, sir.
19     Q.  So did you talk to anyone when you came
20  into Home Depot and filled out the application?
21     A.  If I spoke with somebody?
22     Q.  Yes.
23     A.  At the store?
24     Q.  Yes.

Page 51

1      A.  I went back to the room, yes, and I spoke
2  with Jason Carter, and he told me, Go fill out an
3  application.
4      Q.  And then were you hired soon thereafter?
5      A.  A couple of days after, yes, he gave me a
6  call and saying, Yes, come on to work.
7      Q.  And what position were you hired into?
8      A.  Night crew.
9      Q.  And Mr. Carter offered you the position?
10     A.  Yes, sir.
11     Q.  And he was the store manager at the time;
12  is that right?
13     A.  Yes, he was.
14     Q.  And were you hired full-time or part-time
15  when you started?
16     A.  I was hired full-time.
17     Q.  And did you have a set shift that you
18  worked?
19     A.  A set shift?
20     Q.  Yes.  Set hours, from whatever time to
21  whatever time?
22     A.  Yes, it was nighttime, sometimes 9,
23  sometimes 9:30 until 6 o'clock in the morning.
24     Q.  So it was 9 or 9 or 9:30?

Page 52

1      A.  9, they used to keep changing it,
2  sometimes you came in earlier, sometimes later, it
3  used to depend on maybe "variating" on the season
4  that it was.
5      Q.  And it was also called the freight team?
6      A.  Yes, sir.
7      Q.  Is that another name for the night crew?
8      A.  Yes, freight team, night crew.
9      Q.  And so this was, you worked overnight,
10  then; correct?
11     A.  Yes, sir, overnight.
12     Q.  And did you ask to work on the third shift
13  or was that just the job available?
14     A.  It was the job that was available, night
15  crew.
16     Q.  And is that a time that the store is
17  normally closed --
18     A.  Yes, sir.
19     Q.  -- when you worked there?
20     A.  It's open from 9 till, at that time they
21  would leave, because it was summertime, they weren't
22  leaving until 11 o'clock, so the store used to be
23  open from 9 to 11 o'clock, so there used to be
24  customers until 9 o'clock, I mean, 11 o'clock.

Page 53

1      Q.  And then after that it was only Home Depot
2  employees?
3      A.  It was Home Depot employees, yes.
4      Q.  And what other employees worked at night
5  at Home Depot, not the names of people, but what
6  other types of activities went on at night at Home
7  Depot when you worked there?
8      A.  Just, basically, what type of job that was
9  done?
10     Q.  Let me strike that.  Is it correct that
11  there was a night operations manager who worked at
12  night?
13     A.  Yes, sir.
14     Q.  Who was like the store manager, but at
15  night?
16     A.  The store manager was not, never at the
17  night crew, no, sir.
18     Q.  So there was an assistant store manager
19  who worked at night; correct?
20     A.  Yes, sir.
21     Q.  And then there were, there was the night
22  crew, and then there were also receiving worked at
23  night, as well; correct?
24     A.  Yes, sir.

14 (Pages 50 to 53)

Page 54

1    Q.  And do you know, there was a department
2  supervisor in receiving; correct?
3    A.  Yes, sir.
4    Q.  And then there was a department supervisor
5  for the night crew, as well; correct?
6    A.  Yes, sir.
7    Q.  And then there were associates who worked
8  both in receiving and on the night crew?
9    A.  Associates that worked during the day and
10  nighttime, you're saying, sir?
11    Q.  No.  There were associates who worked in
12  the receiving department; correct?
13    A.  Yes.
14    Q.  And then there were associates who worked
15  on the night crew; correct?
16    A.  Yes, sir.
17    Q.  And those are all the people who worked on
18  the night shift?
19    A.  Yes, sir.
20    Q.  Can you describe what your job was on the
21  night crew when you worked at Home Depot, what did
22  you have to do?
23    A.  We used to go and get freight from
24  receiving to pack it out at the floor.

Page 55

1    Q.  So you went to the back of the store to
2  the receiving area; is that right?
3    A.  Yes.
4    Q.  And then did you use pieces of equipment
5  to take the --
6    A.  Yes, it was a hand jack.
7    Q.  Okay.  Did you also have responsibilities
8  to download in departments, to take freight that was
9  up in the upper shelves and put it down to where the
10  customer could reach it?
11    A.  Ah, yes, when I was certified to do so,
12  yes, I was able to do so.
13    Q.  Did you receive certifications to use
14  different lift equipment?
15    A.  Yes, sir.
16    Q.  And at the time you left Home Depot what
17  certification, which lift equipment were you
18  certified to use?
19    A.  It was the OP, I could have used the
20  ladder, the OP, that's a machine that you get on
21  top, it has a pallet jack, you lift up a pallet, and
22  it could lift you up, and you could ride over a
23  certain level, so you could be riding and move
24  anywhere you want to, basically.

Page 56

1    Q.  And the OP is the order picker?
2    A.  The order picker, yes, sir.
3    Q.  Did you have a license to use the
4  forklift?
5    A.  No, sir.
6    Q.  But you could use the pallet jack?
7    A.  Yes, everybody could use the pallet jacks,
8  yes, sir, it's no power.
9    Q.  Any other equipment that you could
10  operate?
11    A.  The ladder, the OP and just the pallet
12  hand jack.
13    Q.  Power hand jack?
14    A.  Hand jack, I don't mean to say power.
15    Q.  The pallet jack?
16    A.  The pallet jack, sorry.
17      MR. McCONNELL:  Let's mark this as an
18  exhibit.
19      (Job description marked as Exhibit No.
20  2 for identification.)
21    Q.  I've had placed in front of you,
22  Mr. Urena, Exhibit No. 2 to your deposition, which
23  is a document called Freight Team Associate Job
24  Description, and it's a three-page document.  And

Page 57

1  I'd like you to just really just briefly review this
2  document and tell me whether or not in your
3  experience this describes what a person on the
4  freight team did at Home Depot when you worked
5  there?
6      MR. DONCHESS:  And I'm telling you to
7  read it before you answer the question.
8    Q.  That's fine.  I don't want to try to trick
9  you in any way.  If you can review this and tell me
10  whether or not it generally describes the
11  responsibilities of a freight team associate.
12    A.  It's very large for me to read now.
13      (Witness perused document.)
14    A.  To tell the truth, I'm reading too fast,
15  and I won't probably get all this.
16    Q.  That's okay.  Let me ask you this, did
17  your job include stocking merchandise on the
18  shelves?
19    A.  Yes, sir.
20    Q.  Using appropriate safety procedures when
21  organizing merchandise?
22    A.  Yes, sir.
23    Q.  Merchandising new items as directed?
24    A.  Merchandising?

15 (Pages 54 to 57)

1    Q.   Placing out new items as directed?
2    A.   Yes, sir.
3    Q.   Building end caps and promotional
4  displays?
5    A.   Ah, not building end caps, no, just most
6  of the time just packing out the freight that's back
7  in receiving.
8    Q.   Okay.  Is it correct that when you worked
9  at Home Depot there was something called the SPI
10  program, S P I?
11    A.   Yes, that's like knowledge, they teach you
12  a lot of things from the store.
13    Q.   Let me ask you, were you ever told that by
14  the time that the night crew was done the store is
15  supposed to look in grand opening shape in the
16  morning for new customers to come in?
17    A.   Yes, that's how it should always look.
18    Q.   That was the theory behind getting the
19  freight out?
20    A.   Yes, sir.
21    Q.   So when you walked into Home Depot, it
22  should be fully stocked as if it were the grand
23  opening?
24    A.   If you walked in at 6 a.m. in the morning,

1  that's how it should look, yes, sir.
2    Q.   And that was the goal of the night crew
3  every night?
4    A.   Yes, sir.
5    Q.   Let me ask you to look at the second page
6  of this, where it says, "Physical job requirements."
7  In your experience did your position require
8  bending, stooping, reaching, twisting, lifting,
9  pulling and moving items?
10    A.   Yes, sir.
11    Q.   Did it include responding to the public
12  address system announcements that were made at
13  night?
14    A.   What does that mean, sir?
15    Q.   There are speakers in the store; correct?
16    A.   Yes, they do.
17    Q.   At times people would speak over the
18  speaker system to ask someone to do something or to
19  get someone's attention; correct?
20    A.   Yes, sir.
21    Q.   And so you had to be able to respond to
22  that?
23    A.   Yes, sir.
24    Q.   And that you had to walk and stand in your

1  job; correct?
2    A.   Walk and stand, what?
3    Q.   You had to be able to walk and stand in
4  place?
5    A.   Oh, yes, sir, of course, yes.
6    Q.   And you had to be able to read reports,
7  tickets, labels on freight?
8    A.   Yes, sir.
9    Q.   And you also had to be able to climb
10  ladders in order to obtain stock?
11    A.   Yes, sir.
12    Q.   Who was your supervisor when you started
13  on the night crew?
14    A.   It was Mike Condo.
15    Q.   C O N D O?
16    A.   C O N D O, Condo, yes.
17    Q.   And was he the department supervisor for
18  the night crew?
19    A.   He was, I don't remember if he was like
20  the big supervisor, but he was the one that was
21  working with us, yes.
22    Q.   And do you know who the night operations
23  manager was when you started?
24    A.   Uhmm, Greg Morris.

1    Q.   And then was there a supervisor in
2  receiving, do you remember, when you worked on the
3  night crew?
4    A.   Yes, sir.
5    Q.   And who was that?
6    A.   Brian Johnson.
7    Q.   Now, it's true you didn't work in
8  receiving at any time; did you?
9    A.   Oh, no, sir.
10    Q.   That was a separate operation of getting
11  the merchandise off the trucks into the store?
12    A.   We had to go back to receiving to go grab
13  the freight, so you do need to go back to receiving,
14  yes, sir.
15    Q.   So you had to coordinate with the
16  receiving people?
17    A.   Like "coordinate"?
18    Q.   Make sure you worked in harmony with them?
19    A.   You could say that, yes, you walk in
20  there, grab a pallet jack, and grab your freight, go
21  back to the floor, yes.
22    Q.   Is it true sometimes the receiving people
23  assisted in getting merchandise out into the floor?
24    A.   That they are bringing -- that the people

16 (Pages 58 to 61)

Page 66

1    Q.  It happened in the summer of '02?
2    A.  No, sir.  No, it was the following year.
3  I got hired in '01, and it wasn't that year that I
4  got hurt, it was the following year.
5    Q.  It was in '02 you got hurt?
6    A.  Yes, sir.  '02 -- I just really want to go
7  back and see.  I'm concerned, wait, I'm sorry.
8    Q.  Okay.
9    A.  '01 I got hired, 6/15.  Yes, it was in
10  '02, sir.
11    Q.  And did you have to have an operation?
12    A.  Yes, I did.
13    Q.  How soon after you injured yourself did
14  you have your operation?
15    A.  Very soon, a couple of weeks, just, I just
16  couldn't even walk, it was just very, very painful.
17    Q.  What was the diagnosis?
18    A.  I had a torn meniscus cartilage.
19    Q.  And so did they do arthroscopic surgery on
20  your knee?
21    A.  Yes, they did.
22    Q.  And when was that surgery?
23    A.  It was, I remember that it was in the
24  summertime, sir.

Page 67

1    Q.  I'm going to place a document in front of
2  you and ask you if that refreshes your recollection
3  as to the date of your surgery?
4    A.  Where would it say that, sir?
5    Q.  I'm going to refer you to a line that
6  says, "Procedure date," that says, "7/1/02."
7    MR. DONCHESS:  7/10/02.
8    Q.  I'm sorry, I'm reading upside down,
9  7/10/02.
10    A.  7/10/02.
11    Q.  Does that refresh your recollection as to
12  whether or not it was on or about July 10th?
13    A.  Yes, it does, sir.
14    Q.  And do you recall now that it was on or
15  about July 10th that you had your surgery?
16    A.  Yes, sir.
17    Q.  Once you hurt yourself at home how long --
18  were you able to work after that at all?
19    A.  I went to work, but I just couldn't, I
20  told them that I can't, so I needed to have that
21  surgery done.  I spoke with Mike Condo, and I had to
22  go to have my surgery because I couldn't do it.
23    Q.  Did Mike Condo tell you you could have the
24  time off for the surgery?

Page 68

1    A.  Yes, sir.
2    Q.  Did you have to speak with anyone at human
3  resources?
4    A.  No, sir.
5    Q.  You just spoke to Mr. Condo?
6    A.  Yes, sir.
7    Q.  And he gave you the time off?
8    A.  Oh, yes, sir.
9    Q.  And how long did you have off for your
10  surgery before you came back to work?
11    A.  That was 7/10, the surgery was, probably
12  two weeks until I got it scheduled to be done, so
13  I'd say probably, roughly, two months.
14    Q.  Total that you were out of work?
15    A.  Yes, sir.
16    Q.  Did you hurt your knee riding a jet ski or
17  moving a refrigerator?
18    A.  No, sir, it was moving a refrigerator.
19    Q.  Is there a reason why the medical document
20  would state that you were injured while riding a jet
21  ski?
22    A.  Ah --
23    MR. DONCHESS:  Object.
24    Q.  Do you know of a reason?

Page 69

1    A.  No, sir.
2    MR. McCONNELL:  Can we go off the
3  record for about five minutes?  I want to decide
4  whether to make some copies.
5    (Recessed at 11:20.)
6    (Resumed at 11:28.)
7    MR. McCONNELL:  We're back on the
8  record.  I'm going to mark two different groupings
9  of medical documents that your attorney has provided
10  me, Mr. Urena.  Why don't we mark them as 3 and 4.
11    (Medical document, Doctor Brady marked
12  as Exhibit No. 3 for identification.  Medical
13  document, Merrimack Valley Associates marked as
14  Exhibit No. 4 for identification.)
15    Q.  I'm placing before you, Mr. Urena,
16  Exhibits 3 and 4 to your deposition, which, do those
17  appear to be medical records that you recognize
18  related to your knee injury?
19    A.  Yes, sir.
20    Q.  Now, if we can look at Exhibit No. 4
21  initially, I believe this exhibit is in reverse date
22  order, so the last page is the earliest.  At the top
23  under "History," it says -- well, first of all, was
24  your doctor Doctor Brady, Johnson, Jones or

Page 74

1    Q.   And then you went and gave that doctor's
2  note to Mr. Condo; is that your testimony?
3    A.   Yes, I did, yes, sir.
4    Q.   And did you return to work full-time or
5  just part-time?
6    A.   Full-time, sir.
7    Q.   And just to clarify for the record, do you
8  recognize Exhibit No. 3 to be the other medical
9  documents related to your knee surgery that your
10  attorney has provided to us?
11    A.   Yes, medical meniscus tear.
12    Q.   Do you recognize this group of documents,
13  this other group that I have here?
14    A.   This one right here (indicating)?
15    Q.   Exhibit No. 3, yes.
16    A.   That I see personally now, no, sir.
17    MR. McCONNELL:  Okay.  Off the record.
18    (Discussion off the record.)
19    MR. McCONNELL:  Mr. Donchess and I
20  just had a discussion that he recognizes that
21  Exhibit No. 3 is a copy of documents that were
22  provided by Mr. Donchess relating to Mr. Urena's
23  medical situation.
24    MR. DONCHESS:  That's correct.

Page 75

1    Q.   At some point Mr. Condo stopped being your
2  direct supervisor, is that right; you said he went
3  and got another position?
4    A.   Yes, he got, I believe he got transferred
5  or he left; he just was not working with us.
6    Q.   Is it your recollection when you came back
7  he was still your supervisor, when you came back
8  from your knee injury?
9    A.   Yes.
10    Q.   And you specifically recall giving him the
11  doctor's note?
12    A.   Yes, sir.
13    Q.   Did you ever talk to any human resource
14  person about your medical restrictions?
15    A.   No, sir.
16    Q.   Who was the human resource person, do you
17  know, at the time?
18    A.   I believe it was, in the morning time it
19  was Terry, her name was Terry, she was the human
20  resources.
21    Q.   And that's Terry Dyer?
22    A.   Yes, sir, I believe so, yes, sir.
23    Q.   But you never had a conversation with her
24  about your medical condition?

Page 76

1    A.   No, sir.
2    Q.   Just Mr. Condo?
3    A.   Just directly to Mr. Condo, yes, sir.
4    Q.   And you say at some time Mr. Condo left;
5  did someone take Mr. Condo's place?
6    A.   Yes, sir.
7    Q.   And who was that?
8    A.   There were several people, like, after
9  him.
10    Q.   Do you remember what their names were?
11    A.   Well, one of them, actually, it was Greg
12  Morris.
13    Q.   Well, Greg Morris was the manager at
14  night, correct, he was the night ops manager; is
15  that right?
16    A.   Yes.
17    Q.   And so he was Mr. Condo's boss; right?
18    A.   Yes.
19    Q.   So did Mr. Morris fill in doing direct
20  supervision of you for some time after Mr. Condo
21  left?
22    A.   Yes, because they were trying to get
23  bosses to go in to work, so, basically, there was a
24  period that Mr. Brian Johnson was also, too, taking

Page 77

1  care of the night crew, yes, sir.
2    Q.   And that's at a time after Mr. Condo left
3  and there was no one filling in?
4    A.   Yes, sir.
5    Q.   And so your recollection is that
6  Mr. Johnson helped direct your work during some of
7  that time?
8    A.   You could say that way, yes, sir.
9    Q.   But he was still in the receiving area
10  during that time, too; right?
11    A.   Not during that, he used to go and walk
12  the floor, like, he was the supervisor, basically,
13  sir.
14    Q.   And for how long a period of time did you
15  understand Mr. Johnson was the supervisor?
16    A.   After Mike Condo left I believe he assumed
17  command of the night crew.
18    Q.   Who told you that he did?
19    A.   Nobody actually told us, he was actually
20  just, like, uhmm, just, you know, saying what to do,
21  so I figured that he's the boss, that's all.
22    Q.   Well, he was always a supervisor; correct?
23    A.   Yes, sir.
24    Q.   When you worked there?

JONES REPORTING COMPANY
617-451-8900

Page 78

1    A.   Yes, sir.
2    Q.   And so he always had the ability to direct
3 you, if necessary, is that right, even if Mr. Condo
4 was in the building?
5    A.   At that time, no, because then there was,
6 we had a boss, so, but, when that didn't happen,
7 then he assumed, he took over.
8    Q.   Now, were you ever denied any time off
9 that you requested related to your knee injury?
10    A.   If I was denied, no, sir.
11    Q.   Were you -- did anyone ever discuss with
12 you that were tardy or late for work?
13    A.   No, sir.
14    Q.   That was never discussed with you at all?
15    A.   No, sir.
16    Q.   You said your hours were either 9 p.m. or
17 9:30 p.m. until 6 in the morning?
18    A.   Yes, sir.
19    Q.   And you also had time, a break for lunch;
20 is that right?
21    A.   Yes, sir.
22    Q.   And lunch was in the middle of the night;
23 correct?
24    A.   Yes, sir.

Page 79

1    Q.   And that was usually at 2 o'clock or 2:30?
2    A.   2 o'clock, it depends, sometimes it was
3 2 o'clock, sometimes 2:30, just depends on the
4 night.
5    Q.   And that was for a half an hour?
6    A.   Yes, sir, and we also got a 15 minute
7 break, the 9 o'clock to lunch, and then after lunch
8 to the end of the night.
9    Q.   You got two 15-minute breaks?
10    A.   Yes, sir.
11    Q.   But you didn't punch out for the breaks?
12    A.   Yes, sir, we did.
13    Q.   For the break or the lunch?
14    A.   Just for the lunch.
15    Q.   Not for the 15-minute?
16    A.   Not the 15-minute, no, sir.
17    Q.   And so you'd have to punch out and punch
18 back in; correct?
19    A.   Yes, sir.
20    Q.   And you understood that there was a time
21 swipe system that was kept, correct, that kept track
22 of your hours?
23    A.   It was no wipe, it was a punch-in.
24    Q.   You punched in your number?

Page 80

1    A.   Your Social Security, yes, sir.
2    Q.   And that was at a station that was in the
3 back of the store?
4    A.   Yes, sir.
5    Q.   And you understood that you were paid only
6 for the time that you worked; correct?
7    A.   Yes, sir.
8        MR. McCONNELL:   I'll mark the next
9 exhibit, please.
10        (Punch detail report, 11/18/02 through
11 11/24/02 marked as Exhibit No. 5 for
12 identification.)
13    Q.   I'm placing before you, Mr. Urena, what's
14 been marked as Exhibit No. 5 to your deposition,
15 which at the top of the first, it's a multi-paged
16 document, the top of the first page it says, "Punch
17 detail report," and then there is some words that
18 say "Redacted," but there's a section related to
19 you, where your name is typed in, "Marcos Urena."
20 Have you ever seen documents like this before?
21    A.   No, sir.
22    Q.   If I can just show you on the first page,
23 it says, "In," it says, "Monday, 11/18," and then it
24 says, "In, 21:34, Out, 02:00, In, 02:34," and then,

Page 81

1 "Out, 05:58."  Do you see that, do you follow along?
2    A.   This area right here (indicating)?
3    Q.   Where it says, "Monday, 11/18"?
4    A.   11/18, yes.
5    Q.   It says, "In, 21:34"?
6    A.   It says, "02:34."
7    Q.   Okay, on the far left where it says,
8 "Monday, 11/18"?
9    A.   Okay, "21:34."
10    Q.   Do you understand that to be 9:34 p.m.?
11        MR. DONCHESS:   Well, objection.
12    Q.   If you know?
13        MR. DONCHESS:   If you understand this
14 document, you can testify about it.
15    A.   I do not understand the document itself
16 right now, but if --
17    Q.   Okay.  Well, you understood you only got
18 paid for hours that you worked; correct?
19    A.   Yes, sir.
20    Q.   And so if you -- and that was done by the
21 quarter hour, do you know, that you got paid for
22 every quarter hour that you were in?
23    A.   No.  We used to get paid weekly.
24    Q.   Okay.  But when the hours were tracked on

21 (Pages 78 to 81)

Marcos Urena

Page 86

1    A.  No, sir.
2    Q.  Now, you were reviewed in January of 2003;
3  correct?
4    A.  There was many reviews, sir, I just can't
5  tell you.
6    Q.  Do you recall being reviewed in or about
7  or on or about January 6th, 2003?
8    A.  Could you take me by when I started
9  working?
10    Q.  Well, let me say two weeks before you were
11  terminated, approximately, two weeks before you were
12  terminated?
13    A.  That if I remember that review?
14    Q.  Do you remember being reviewed?
15    A.  Yes, sir.
16    Q.  And then who conducted that review?
17    A.  Brian Johnson.
18    Q.  Did anyone else, was anyone else present?
19    A.  Yes, uhmm, what was his name?
20    Q.  Was it Eric Lecam?
21    A.  Eric Lecam, yes, sir.
22        MR. McCONNELL:  If you could mark
23  this, please.
24        (Summary marked as Exhibit No. 6 for

Page 87

1  identification.)
2    Q.  Now, before we review Exhibit No. 6, at
3  some point Eric Lecam became the department
4  supervisor for the night crew; correct?
5    A.  Yes, sir.
6    Q.  Or the freight team?
7    A.  Yes, sir.
8    Q.  And that happened towards the end of the
9  year in 2002, right before you received this review,
10  or shortly before?
11    A.  Yes, that was when, just, basically, after
12  my two weeks that I got fired, yes, sir.
13    Q.  So Eric had recently become the department
14  supervisor?
15    A.  It was Mr. Brian Johnson, yes, sir, it was
16  Mr. Brian Johnson, because he was the one that did
17  my review.
18    Q.  I understand that that's what you're
19  saying.  I'm not -- leave the review aside for a
20  second.
21    A.  Okay, sir.
22    Q.  I'm asking you whether several weeks
23  before you were let go is when Mr. Lecam became your
24  department supervisor?

Page 88

1    A.  Not supervisor, he was just, like, saying,
2  like, the helper of what he was going to do.
3    Q.  So you didn't understand that he became
4  the department supervisor?
5    A.  No, he did not, no, no, he did not.
6    Q.  No one ever told you that he did; is that
7  your testimony?
8    A.  I don't know if he was, but I know
9  Mr. Brian Johnson was our boss at that time.
10    Q.  Well, let me ask you, he sat in on your
11  review; correct?
12    A.  Yes, he did.
13    Q.  And in your experience in receiving a
14  review at Home Depot did a fellow associate ever sit
15  in on your review with you?
16    A.  Not a fellow associate, no.
17    Q.  Did you ask why Mr. Lecam was at your
18  review?
19    A.  No, I did not.  No, I did not ask.
20    Q.  But you understood at that time he was
21  just a fellow associate?
22    A.  Not a fellow associate, probably he could
23  have been, he was saying, like, what to do, do this.
24    Q.  Well, that's a supervisor; isn't it?

Page 89

1        MR. DONCHESS:  Well, wait a minute.
2  Objection.
3    A.  You're confusing me right now.
4    Q.  Okay, I don't mean to confuse you.
5        MR. DONCHESS:  First of all, Marcos
6  has to wait until Attorney McConnell finishes, but I
7  would request, but I think you're interrupting him,
8  I object to that.
9    Q.  I'll try not to interrupt, and I'll try to
10  get a full question out before you answer.
11        MR. DONCHESS:  You've got to wait
12  until he finishes before you answer, okay.
13        THE WITNESS:  Okay.
14    Q.  So, let me ask you, at the time that you
15  were reviewed in January of 2003 did you understand
16  that Mr. Lecam could direct your work?
17    A.  No.
18    Q.  Or tell you what to do?
19    A.  No.
20    Q.  So at that point you didn't understand
21  that he was a department supervisor?
22    A.  No, sir.
23    Q.  Like Mike Condo used to be?
24    A.  No, sir.

23 (Pages 86 to 89)

Page 98

1    Q.   And the evaluation you got in each of
2  those areas; correct?
3    A.   Yes, sir.
4    Q.   And whether you got a C or a D or Not
5  Applicable in each of those areas; correct?
6    A.   Yes, sir.
7    Q.   And you said he didn't focus on attendance
8  with you; is that right?  He didn't say anything
9  about your attendance to you; did he?
10   A.   No, sir.
11   Q.   Did Mr. Lecam say anything during this
12 meeting?
13   A.   No, sir.
14   Q.   Did you ask why Mr. Lecam was attending
15 the meeting?
16   A.   No, sir.
17   Q.   Did anyone ever tell you why Mr. Lecam was
18 attending the meeting?
19   A.   No, sir.
20   Q.   Mr. Lecam was a coworker of yours on the
21 freight team or on the night crew; is that right?
22   A.   Yes, sir.
23   Q.   And he was on the freight team for some
24 number of months before this, right, at least?

Page 99

1    A.   He was even working even before we started
2  working there, yes, sir.
3    Q.   And you said that he had the ability to
4  direct you in some ways, is that right, direct what
5  your activities were?
6    A.   Just minor stuff, do this, help us, you
7  know, yes, sir, you could say that.
8    Q.   How did the meeting end, what was said at
9  the end of the meeting?
10   A.   What was said?
11   Q.   At the end of your evaluation?
12   A.   From my part?
13   Q.   Yes, what did you say?
14   A.   I said it was not fair.
15   Q.   And what, if anything, did Mr. Johnson or
16 Mr. Lecam say?
17   A.   Nothing, it was just not fair, simple as
18 that.
19   Q.   Now, at some point within a couple of
20 weeks you learned that you were being let go from
21 Home Depot; is that right?
22   A.   Yes, sir.
23   Q.   How did you learn that?
24   A.   How did I learn that?

Page 100

1    Q.   How did you find out?
2    A.   How did I find out?  Well, they just
3  simply, just fire us.
4    Q.   So someone had to tell you; correct?
5    A.   Yes, Paul Nowlan.
6    Q.   Mr. Nowlan, N O W L A N, Mr. Nowlan was
7  the store manager at the time; is that right?
8    A.   Yes, sir.
9    Q.   And did he call you into his office or did
10 he come and see you on the floor; where was it?
11   A.   It was one day that we were going to walk
12 in to work, and they told me, You have to go into
13 the office, so that's when  he see me.
14   Q.   And so you met with Mr. Nowlan?
15   A.   Yes, I did.
16   Q.   Did you meet by yourself with Mr. Nowlan?
17   A.   Yes.
18   Q.   And what did he say to you?
19   A.   Basically, that we have to let you go
20 because you got a D on your review, and that turns
21 into your termination.
22   Q.   And did he say that there were a number of
23 people being let go?
24   A.   Not to me, no, directly, no.

Page 101

1    Q.   And he said that they were letting you go
2  because you received a D; correct?
3    A.   I received, yes, sir, and that's an
4  evaluation for termination.
5    Q.   And you understood D to mean improvement
6  required?
7    A.   At the time a D for me was, well, I know
8  he gave me a bad review, so I kind of let it go,
9  that's okay, a D, a D, all right, that's fine, but I
10 did not know that that was going to turn into my
11 termination.
12   Q.   So Mr. Nowlan said, We're going to let you
13 go because you got a D on your evaluation?
14   A.   Yes, sir.
15   Q.   And what did you say, if anything?
16   A.   I told him that this was not fair at all,
17 and that it was just, it was just unfair truly on
18 all that was said on this review that caused my
19 termination.
20   Q.   So you told him the review didn't
21 accurately reflect your performance?
22   A.   120 percent.
23   Q.   That it didn't reflect your performance?
24   A.   Yes, sir.

26 (Pages 98 to 101)

Page 106

1  Q.  He laughed?
2  A.  He laughed in my face.
3  Q.  Did he say anything to you?
4  A.  He said, "There's nothing I can do."
5  Q.  Did he say anything else to you?
6  A.  No, sir.
7  Q.  Let me focus then again, after you were
8  let go did you speak to any other supervisors or
9  managers at Home Depot after your meeting with
10  Mr. Nowlan?
11  A.  Not that I remember, no, sir.
12  Q.  Why do you believe you were terminated
13  from Home Depot?
14  A.  For my national origin, sir.
15  Q.  And what leads you to the conclusion that
16  your national origin is the reason that you were let
17  go from Home Depot?
18  A.  Because I got my poor review to get fired
19  for that reason.
20  Q.  So you understood it was your review was
21  the reason you were let go, but --
22  A.  It was the reason of why this paper was
23  done that caused my fire.
24  Q.  And what leads you to believe --

Page 107

1       MR. DONCHESS:  Just for the record,
2  when he's saying "this paper," he's picking up
3  Exhibit 6.
4       MR. McCONNELL:  That's fine.
5  Q.  What leads you to believe that it was your
6  national origin that led you to get the evaluation
7  you did?
8  A.  It was from Mr. Brian Johnson.
9  Q.  Well, what leads you to believe that your
10  national origin played any role in your evaluation?
11  A.  Well, he hates me; he hate me and Eddie.
12  Q.  Okay.  Well, let me ask about you.  What
13  leads you to believe that Mr. Johnson hated you at
14  that time?
15  A.  Well, it was his character, the way he is.
16  Q.  Okay.  I'm going to have to ask you to be
17  more specific than that.  What words or deeds were
18  done by Mr. Johnson that led you to believe that he
19  didn't like you because of your national origin?
20  A.  Well, there was a big incident prior,
21  probably a month and a half before we got fired,
22  Mr. Brian Johnson was driving a forklift, he almost
23  hit me.  If I would not move away from his path, I
24  would have got hit.

Page 108

1  Q.  Okay.  So there was an incident at work
2  one evening --
3  A.  Yes.
4  Q.  -- where Mr. Johnson was driving a
5  forklift?
6  A.  Yes.
7  Q.  And you were in the path of the forklift;
8  is that right?
9  A.  Yes, sir.
10  Q.  And you moved out of the way?
11  A.  Yes, sir.
12  Q.  And these forklifts have this beeping
13  noise at Home Depot; correct?
14  A.  Probably sometimes they work, sometimes
15  they don't.
16  Q.  Okay.  Well, let me ask you, in your
17  experience at Home Depot the forklifts when they're
18  in operation beep?
19  A.  They're supposed to beep, yes.
20  Q.  Okay.  And at night there are no customers
21  in the store; correct?
22  A.  Not at all.
23  Q.  So it's your testimony that -- is it your
24  testimony that you don't remember whether or not the

Page 109

1  forklift that Mr. Johnson was driving was beeping or
2  not?
3  A.  That if I remember that it was beeping?
4  Q.  Do you remember if it was beeping or not?
5  A.  No, I don't, no.
6  Q.  But somehow you saw the forklift coming or
7  heard it coming and moved out of the way of the
8  forklift?
9  A.  No.  The forklift was going to hit me, and
10  I moved out of the way.
11  Q.  Okay.  All right.  Fine.
12  A.  Okay, sir.
13  Q.  And what about this incident led you to
14  believe that Mr. Johnson didn't like you because of
15  your national origin?
16  A.  Because he yelled, "You fucking Spic."
17  Q.  So you heard Mr. Johnson yell out?
18  A.  As soon as he passed by me, that if I
19  didn't move, he would have hit me, he just said
20  that.
21  Q.  And where was it that this incident took
22  place in the store?
23  A.  It was in the middle aisle.
24  Q.  In the middle aisle; where were you at the

Marcos Urena

Page 134

1 operations manager was Mr. Morris?
2      A.   Greg Morris, yes, when I started working
3 at Home Depot.
4      Q.   Yes.  And then you said your department
5 supervisor when you started was Michael Condo?
6      A.   Mike Condo.
7      Q.   And you said that the receiving department
8 supervisor when you started was Mr. Johnson?
9      A.   Yes, sir.
10      Q.   So there are three supervisory people on
11 in the evenings if all the positions are filled;
12 correct?
13      A.   Yes.
14      Q.   And a manager and two department
15 supervisors?
16      A.   Yes, sir.
17      Q.   Okay.  So I asked you who was the manager
18 at the time that this incident occurred, and you
19 said you believed it was either Mr. Morris or
20 somebody who came right after him, who you can't
21 remember, but you described him as light skinned?
22      A.   He's very light skin, yes, sir.  He came
23 from Iowa.
24      Q.   A white individual who is very pale?

Page 135

1      A.   Just a dark -- a person, I just can't
2 remember his name right now, sir, I'm sorry about
3 that.
4      Q.   No, that's fine.  The whole time that you
5 were there the department supervisor for the
6 receiving area was Mr. Johnson, correct, for the
7 year and a half that you were there?
8      A.   Yes, sir.
9      Q.   And then there was a department supervisor
10 over the freight team, which you were on, who at
11 first was Mr. Condo; correct?
12      A.   Yes.
13      Q.   And then after that you haven't been able
14 to identify anyone, you said you weren't sure
15 whether it was Mr. Kitchens or not, and then you
16 denied knowing that it was ever Mr. Lecam; correct?
17           MR. DONCHESS:  Objection.
18      A.   You have to understand that Mr. Brian
19 Johnson used to come and tell us what to do, too, so
20 there was many bosses, because he would have told us
21 what to do, like, you know, sir.
22      Q.   It's true that he was a supervisor; right?
23      A.   Yes.
24      Q.   And any supervisor who was on duty could

Page 136

1 instruct you on what to do?
2      A.   If you have the power, yes.
3      Q.   But you understood that Mr. Johnson was
4 the department supervisor for receiving?
5      A.   Which he took over the last -- when, when
6 this thing started, all this situation, it was two
7 weeks before I got fired that Mr. Mike Condo has
8 left, that the other person that was in charge of
9 the night crew, he was going, too, so the only
10 person that was in charge of night crew was
11 Mr. Brian Johnson.
12      Q.   So you're saying your understanding at the
13 time that you were terminated is there was no
14 department supervisor for the night crew?
15      A.   Yes, sir, there was, it was Mr. Brian
16 Johnson.
17      Q.   That was your understanding, that he was
18 filling --
19      A.   Yes.
20      Q.   -- that he was filling both roles at that
21 point?
22      A.   Yes, sir.
23      Q.   And you testified you did not know that
24 Mr. Lecam had received that role?

Page 137

1      A.   He used to tell us to do this, do that,
2 but I never heard, like, you know, said, This is
3 your boss.
4      Q.   Yet Mr. Lecam sat in on your evaluation,
5 your final evaluation?
6      A.   Yes, he did, sir.
7      Q.   And in your experience had a fellow
8 associate ever sat in on an evaluation with you
9 before?
10      A.   No.
11      Q.   You said you received many?
12      A.   That I received -- let me fix this.
13      Q.   Okay.
14      A.   Mr. Lecam said that he was present when I
15 was receiving my review, yes.  He never actually
16 said anything.  You know, so I'm just saying, since
17 he sometimes bosses, like, you know, possibly
18 Mr. Brian Johnson tells him, like, Go tell this
19 person to do this and do that, well, I'm sure he's
20 got to be there present because he's coming into to
21 maybe becoming one.
22      Q.   So how did you get knowledge that he was
23 coming into becoming a supervisor?
24      A.   Well, he always wanted to, I guess, you

35 (Pages 134 to 137)

# In The Matter Of:

*Marcos Urena and Nelson Sang    v.*
*Home Depot U.S.A., Inc. and Brian Johnson*

---

*Paul J. Nowlan*
*Vol. 1, September 29, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File NOWLAN.V1, 109 Pages*
*Min-U-Script® File ID: 1342908218*

# Word Index included with this Min-U-Script®

aul J. Nowlan

ol. 1, September 29, 2005    Case 1:03-cv-10242-MEL    Document 11-4    Filed 12/15/2005    Page 2 of 14    Home Depot U.S.A., Inc. and Brian Johnson

Page 3

[1]     EXHIBITS, Continued
[2] NO.     DESCRIPTION     PAGE
[3] 8    Letter dated February 10, 2004, to    81
    MCAD from Danielle L. Meagher, with
[4]    attachments
[5] 9    Home Depot document entitled "New    85
    Associate Review" for Nelson Sang,
[6]    Bates Nos. D0019-20
[7] 10    Home Depot document entitled    86
    "Performance and Development
[8]    Summary" for Nelson Sang, Bates Nos.
    D0014-15
[9]
[0] 11    Home Depot document entitled    89
    "Associate Performance Notice" for
    Nelson Sang, Bates No. D0011
[1]
[2] 12    Home Depot document entitled    93
    "Performance and Development
    Summary" for Nelson Sang, Bates Nos.
    D0001-02
[4] 13    Home Depot document entitled    104
    "Discipline Notice" for Nelson Sang,
[5]    Bates No. D0008
[6]
[7]
[8]
[0]
[2]
[3]
[4]

Page 4

**PROCEEDINGS**

[2]    MR. McCONNELL: The stipulations are to
[3] reserve all objections, except as to the form of the
[4] question, until the time of trial.

**PAUL N. NOWLAN**

[6] a witness called for examination by counsel for the
[7] Plaintiffs, having been satisfactorily identified by
[8] the production of his driver's license and being
[9] first duly sworn by the Notary Public, was examined
[0] and testified as follows:

**DIRECT EXAMINATION**
**BY MR. DONCHESS:**

[3]    Q: Joe might have gone over some of this, but
[4] ground rules-wise, first try to wait until I finish
[5] the question until you answer it —
[6]    A: Okay.
[7]    Q: — because Anne has to get everything
[8] verbatim. If we're talking at the same time, that's
[9] difficult. You have to articulate an answer, yes or
[1] no, as opposed to just nodding your head or
[2] whatever, because otherwise we don't really know
[3] what your answer is.
[3]    A: All right.
[4]    Q: If there's anything that's unclear or you

Page 5

[1] don't understand, just say so.
[2]    A: Yes.
[3]    Q: That's about it.
[4] All right. So could you give your name and
[5] address, please.
[6]    A: Sure. It's Paul Nowlan, 14 Lisburn Street,
[7] L-i-s-b-u-r-n, in Peabody, Massachusetts 01960.
[8]    Q: Could you briefly outline your educational
[9] background.
[10]    A: Yeah. I have a bachelor's of science
[11] degree from the University of Massachusetts out in
[12] Amherst.
[13]    Q: When did you get that?
[14]    A: From '90 to '94.
[15]    Q: What's your date of birth?
[16]    A: 3/1/72.
[17]    Q: Have you attended any postgraduate
[18] educational institution?
[19]    A: No.
[20]    Q: Where did you grow up?
[21]    A: In Peabody, Massachusetts.
[22]    Q: What has been your employment history since
[23] 1994?
[24]    A: Since '94, I worked one year with a plywood

Page 6

[1] wholesaler called Atlantic Plywood as a sales rep.
[2] After that one year I started with Home Depot in a
[3] management training program, worked with Home Depot
[4] until it would be 2003, I guess, two years ago. And
[5] I now work for Target.
[6]    Q: So is it accurate to say you worked for
[7] Home Depot for about eight years?
[8]    A: That's correct.
[9]    Q: What different positions did you hold in
[10] Home Depot?
[11]    A: I was an associate manager, which was that
[12] management training program. That was a two-year
[13] program that I completed in about a year. After
[14] that I was promoted to an assistant manager in
[15] several stores. I opened the Methuen Home Depot,
[16] was promoted to a comanager to the Waltham,
[17] Massachusetts, store. And then promoted again to
[18] store manager into Tewksbury.
[19]    Q: Where did you do your training as associate
[20] manager?
[21]    A: Danvers, Massachusetts.
[22]    Q: What did the training program consist of?
[23]    A: You would spend kind of like a documented
[24] amount of time in each area, receiving, sales floor,

Page 11

[1] A: They would basically — back then we would
[2] — receiving would take the trucks during the day,
[3] receiving would fill up during the day. Receiving
[4] would go home, the freight would stay in the back
[5] room until your overnight team came in, say, ten
[6] o'clock. They would empty receiving, bring in all
[7] the freight, put it on the shelves, put it in
[8] overheads or whatever. Just basically handle the
[9] freight.
[10] Q: You said that part of your responsibilities
[11] as operations manager were also the HR
[12] responsibilities for the store.
[13] A: Correct.
[14] Q: I think you also said that part of your
[15] responsibility was making sure reviews got done,
[16] performance evaluations?
[17] A: Yes.
[18] Q: Was that for the whole store or for certain
[19] teams or groups within the store?
[20] A: It was my responsibility really for the
[21] whole store. I don't know if Home Depot still does,
[22] but we would do reviews quarterly. So it would be
[23] my job to make sure that all the reviews for a
[24] specific quarter were done, administered on time.

Page 12

[1] Q: How often was each employee evaluated?
[2] A: Twice a year, once monetarily, once
[3] nonmonetarily.
[4] Q: Was there a process that Home Depot
[5] prescribed as far as doing the evaluation, who had
[6] input, how it was supposed to be conducted?
[7] A: Yes.
[8] Q: How the employee was going to be talked to,
[9] et cetera?
[10] A: Well, I don't know what you mean by how
[11] they were spoken to. But what we would do is, as I
[12] mentioned, their reviews were done quarterly, so we
[13] would have a list of, say, 30 associates that were
[14] due that cycle. We would do something called a
[15] roundtable, which means the management team would
[16] sit down, you'd have the 30 people, for instance, on
[17] the docket that we would discuss as a team and rate,
[18] based upon input. As I mentioned before, as a, say,
[19] for instance, hardware assistant manager, I would
[20] partner with my department head and get feedback on
[21] different names of how people are doing.
[22] I would bring that information with me to
[23] the roundtable, and then at the roundtable I would
[24] discuss it with the team on how we would rate

Page 13

[1] people. From there we would determine a rating.
[2] Then it was up to each assistant manager to write
[3] the review and administer the review to the
[4] associate.
[5] Q: Who was part of the roundtable?
[6] A: The management team, all the salaried
[7] managers.
[8] Q: But who does that include?
[9] A: That would include the store manager. Back
[10] then there was no HR. So it would be the operations
[11] manager, or if there is an HR, the HR would be
[12] involved. And then any of the merchants, all the
[13] merchants, the assistant managers for lumber and
[14] hardware and like electrical, garden.
[15] Q: Typically how many people were involved at
[16] that level in a single store?
[17] A: Anywhere — depending upon the volume of
[18] the store, I guess it would probably be anywhere
[19] from six to eight, six to ten, depending upon the
[20] volume, how many higher-volume stores had more
[21] managers.
[22] Q: What, in approximate terms, was the range
[23] of the number of employees who would work in any one
[24] store?

Page 14

[1] A: Geez, I would say anywhere from 150 to 225
[2] maybe. And the quarterly review cycles would depend
[3] upon your anniversary date, so obviously there would
[4] be some review cycles that had more than others, as
[5] you're reviewing people.
[6] Q: Back to your employment history for a
[7] minute, I take it that after you left Home Depot,
[8] you said in 2003, you said you went to Target.
[9] A: Yes.
[10] Q: Do you remember what time of the year that
[11] was?
[12] A: Summertime. I think my start date with
[13] Target was August.
[14] Q: What job did you take with Target?
[15] A: Store manager. Store team leader is what
[16] it's called at Target.
[17] Q: What store?
[18] A: Salem, New Hampshire.
[19] Q: Have you remained at that store since 2003?
[20] A: Yes.
[21] Q: Why did you leave Home Depot?
[22] A: Better opportunity with Target.
[23] Q: Did you do anything in preparation for
[24] today's deposition?

Page 15

[1] **A:** In terms of what?

[2] **Q:** Did you review any documents?

[3] **A:** I reviewed a document — I didn't actually

[4] review the whole document, a deposition I think from

[5] Nelson Sang. I didn't review the whole document,

[6] though, I just read parts of it.

[7] **Q:** Did you review Marcos Uranus' deposition?

[8] **A:** No.

[9] **Q:** Did you review Brian Johnson's deposition?

[10] **A:** No.

[11] **Q:** Are you represented by Mr. McConnell in

[12] this case?

[13] **A:** Yes. He's representing me as a former

[14] employee of Home Depot, store manager of Home Depot.

[15] **Q:** Why did you review just Nelson Sang's and

[16] not Marcos Uranus' —

[17] **A:** I didn't have time.

[18] **Q:** — or Brian's?

[19] **A:** I got two of them sent. The first one I

[20] printed up was 177 pages; I didn't bother with the

[21] second one.

[22] **Q:** Going back to your position as operations

[23] manager in the roundtable, how did it typically

[24] work? Well, let me ask you this: I take it that

Page 16

[1] every assistant manager in the store is not

[2] responsible or is not familiar, excuse me, with the

[3] performance of every employee in the store; is that

[4] fair to say?

[5] **A:** To a point. I think to know everything

[6] about everybody, no. There are certain things that

[7] we would know, for instance. Attendance issues was

[8] usually one that stands out, mainly because you've

[9] got the schedule for today and the managers that are

[10] on that day are well aware of who was called out

[11] sick and who was not, because obviously you need

[12] these people to staff the store and guest service

[13] and whatnot.

[14] So maybe individual performance issues that

[15] had been discussed amongst maybe an employee and a

[16] supervisor, but the team communicated fairly well as

[17] far as standout performance problems or attendance

[18] problems, I'd say probably would be the two that

[19] everybody would kind of have an idea about.

[20] **Q:** What do you mean by "standout performance

[21] problems"?

[22] **A:** I guess employees that consistently had

[23] been counseled, okay, had been on corrective action,

[24] or whatever we call it at Home Depot, I forget the

Page 17

[1] name, but that had been disciplined on paper, okay.

[2] I think that was something that we communicated more

[3] about. Obviously, like I said, attendance issues

[4] were something that was communicated more. We had

[5] weekly staff meetings with the team, so there would

[6] be things that would come up in the staff meetings

[7] about performance amongst the team.

[8] **Q:** I think you suggested that typically the

[9] assistant manager for the department to which an

[10] employee was assigned would talk to the department

[11] supervisor of the department before bringing the

[12] employee's performance to the roundtable; is that

[13] correct?

[14] **A:** Yes, that's correct, yeah.

[15] **Q:** Is that the way, at least in your

[16] experience, most of the assistant managers did it,

[17] or is that the way you did it, or both?

[18] **A:** Most assistant managers would confer with

[19] their department heads about the reviews, just to

[20] get input, make sure everything is being discussed.

[21] **Q:** You said that in Methuen you were also the

[22] specialty sales manager?

[23] **A:** Yeah.

[24] **Q:** What is that?

Page 18

[1] **A:** That was a newly created position at the

[2] time, and it oversaw the special order departments

[3] like carpeting, tile, doors and windows. It was one

[4] department that we kind of tried to drive with

[5] customer service, because that type of business

[6] requires a little bit more than just going and

[7] buying a box of nails, and coordinating with the

[8] installers and the vendors and trying to drive sales

[9] using the credit promotions and things like that

[10] that Home Depot had offered.

[11] **Q:** For the time you were there in 1998, or

[12] for the time you were in Methuen, you said a year

[13] and a half to two years, how was that divided as

[14] between operations manager and specialty sales

[15] manager?

[16] **A:** I would probably say — probably say about

[17] half, pretty close to half and half.

[18] **Q:** Were there any sort of guidelines as to how

[19] many employees were supposed to get an A, a B, a C,

[20] a D rating?

[21] **A:** Kind of. What the company had is they had

[22] a chart that was not a set-in-stone chart, but it

[23] was a guide to kind of help — at that time there

[24] was kind of a new process that was rolling out. It

**Page 31**

[1] administer it or write it?

[2] **Q:** Write it and administer it and speak to the
[3] employee.

[4] **MR. McCONNELL:** Object to the form. You
[5] can answer.

[6] **A:** Yes, they did. I don't know if I'm
[7] answering your question. Does that answer your
[8] question?

[9] **Q:** Yes.

[10] **A:** Okay.

[11] **Q:** Pretty direct.

[12] **A:** Okay.

[13] **Q:** One word, yes. Except your asking me made
[14] me lose my train of thought.

[15] You said that when an evaluation — what is
[16] the term that was used there, evaluation or review?

[17] **A:** Review.

[18] **Q:** You said at Home Depot a review is done
[19] every six months.

[20] **A:** Correct.

[21] **Q:** I take it, then, that the review is
[22] supposed to evaluate the performance of that
[23] employee over the span of that six-month period.

[24] **A:** Correct.

**Page 32**

[1] **Q:** If the employee had received counseling,
[2] documented counseling during the six months, was the
[3] manager doing the review supposed to go back and
[4] review that employee's file to look over what had
[5] occurred within the last six months?

[6] **A:** Yes.

[7] **Q:** If the employee had received favorable
[8] comment from managers in writing over the six-month
[9] period of the review, was the manager supposed to go
[10] back and look at those favorable comments as well?

[11] **A:** Yes.

[12] **Q:** If there were favorable or unfavorable
[13] comments in the file from managers for the
[14] appropriate six-month period, were those supposed to
[15] be incorporated in the review somehow?

[16] **A:** Yes.

[17] **Q:** I think you said you started as the store
[18] manager in Tewksbury in 2000?

[19] **A:** About that time, yes.

[20] **Q:** Do you recall who told you that you were
[21] going to get the store manager's job?

[22] **A:** I believe it was the district manager at
[23] that time, Don Kiesner.

[24] **Q:** And obviously it was a promotion?

**Page 33**

[1] **A:** Yes.

[2] **Q:** Although I forgot you were a comanager for
[3] a while.

[4] **A:** Yes.

[5] **Q:** Where were you comanager again?

[6] **A:** Waltham, Massachusetts.

[7] **Q:** How did the comanager role work?

[8] **A:** Basically, what had happened was Waltham
[9] was struggling, I guess if you want to put it in
[10] way, was a struggling store, and I was asked to go
[11] there to help fix things operationally and
[12] merchandising-wise. I was there for a few months,
[13] we made great progress, and then some other changes
[14] had come in other parts of the state that caused a
[15] chain reaction. So I guess Waltham was good enough
[16] at that point they felt I didn't need to be there as
[17] a co anymore, these other changes happened, and I
[18] ended up going to Tewksbury.

[19] **Q:** Who was the other comanager in Waltham?

[20] **A:** Mark Bramhall.

[21] **Q:** So after the months as a comanager, as you
[22] said, you went to Tewksbury?

[23] **A:** Correct.

[24] **Q:** You were the sole store manager there?

**Page 34**

[1] **A:** That's correct.

[2] **Q:** What are the responsibilities of a store
[3] manager?

[4] **A:** Just to uphold day-to-day operations as far
[5] as payroll, safety, make sure the customer service
[6] is correct, the store is presenting the way the
[7] company wants to present it, oversee all the
[8] assistant managers, make sure things are being done
[9] correctly, manage payroll. I don't know if I said
[10] manage payroll.

[11] **Q:** Does the store manager participate in the
[12] roundtables?

[13] **A:** Yes.

[14] **Q:** At Tewksbury how many assistant managers
[15] were there?

[16] **A:** I think it was seven.

[17] **Q:** Do you remember Greg Morris?

[18] **A:** Yes.

[19] **Q:** What kind of job did he do?

[20] **A:** He did a good job.

[21] **Q:** Do you remember a guy named Jonathan Horne?

[22] **A:** I know the name. I never worked with Jon
[23] Horne; I don't know him.

[24] **Q:** Did he come to the Tewksbury store on a

Page 59

[1] note or anything like that, you personally?
[2]    **A:** Me personally, I did not.
[3]    **Q:** Did you ever tell anyone to ask him for a
[4] doctor's note?
[5]    **A:** I can't recall.
[6]    **Q:** Are you sure you can't remember the
[7] identity of the manager who came to you and
[8] mentioned attendance problems?
[9]    **A:** No. To expand on it a little more, as we
[10] talked about earlier, there was somewhat of a
[11] hand-off between the overnight team and the dayside
[12] team coming in, say six in the morning or whenever
[13] that was. If there were issues with attendance,
[14] usually in the hand-offs, you would have
[15] communication of who called out, who was there and
[16] stuff like that.
[17]    So whoever was in with me in the morning on
[18] a given day where you called out or I called out,
[19] like that would be discussed who wasn't there. So
[20] it may not be one individual who came and said,
[21] "These people were out," it could have been anyone
[22] on the management team who was opening with me in
[23] the store that day.
[24]    Does that answer your question a little bit

Page 60

[1] better?
[2]    **Q:** When there was a performance problem, an
[3] employee was supposed to be coached, correct?
[4]    **A:** Correct.
[5]    **Q:** Are you aware of whether or not any manager
[6] ever coached Mr. Urena regarding attendance?
[7]    **A:** I believe he was.
[8]    **Q:** Who was that?
[9]    **A:** I don't remember the name on the document,
[10] but I believe I was shown a document that had a
[11] coaching for attendance. Attendance/punctuality I
[12] think is what it was.
[13]    **Q:** I wanted to show you a performance review
[14] from January of 2003. Let me ask you this question,
[15] though, before we get into that. When an employee
[16] was roundtabled, did the managers decide what the
[17] rating was going to be?
[18]    **A:** Yes.
[19]    **Q:** A, B, C, D?
[20]    **A:** Correct.
[21]    **Q:** If the managers decided a certain rating
[22] and then the person doing the review, actually
[23] writing it, was going through the individual
[24] qualities, the individual ratings —

Page 61

[1]    **A:** Yes.
[2]    **Q:** — and came up with a different conclusion
[3] than the roundtable had dictated, was anything
[4] supposed to be done at that point?
[5]    **A:** Yeah. The reviews were all entered into a
[6] computer system after they were administered. They
[7] were entered by the human resource manager. The
[8] human resource manager was involved in the
[9] roundtable, so when we would go through and discuss
[10] however many people we discussed and came up with an
[11] overall performance rating, all that was documented
[12] by hand during the meeting.
[13]    Once that was completed, we'd kind of break
[14] and then everybody would then at that point write
[15] the reviews, administer the reviews. They would
[16] kind of go back to HR again as almost like a
[17] gatekeeper; those reviews would then be entered.
[18] And if we discussed somebody was a D and they all of
[19] a sudden got an A, that would have gotten caught at
[20] that time and the HR would have seen that. And then
[21] — that never really happened, that never happened.
[22] But HR would see that, and obviously then at that
[23] point, we would have to kind of deal with the person
[24] who wrote it, administered the review and say,

Page 62

[1] "Look, this isn't what we discussed" and kind of go
[2] down that road.
[3]    **Q:** Was there an HR person in the Tewksbury
[4] store while you were a store manager?
[5]    **A:** Yes.
[6]    **Q:** In January 2003?
[7]    **A:** Yes.
[8]    **Q:** Who was that?
[9]    **A:** Terry Dyer.
[10]    **Q:** You're saying during these roundtables,
[11] Terry Dyer kept notes?
[12]    **A:** Yeah. The roundtable, what we would do is
[13] we'd sit in a room like this with a grease board. I
[14] would stand at the grease board. Terry would have
[15] all the files, as you asked before, and the list of
[16] names of people that we would be discussing. We
[17] would talk about those individuals. We would have
[18] the file to go over any type of corrective action or
[19] good performance notices, as you asked before.
[20]    One of the things that we did is the group
[21] would discuss, and generally the person that did
[22] most of the talking about the individual would be
[23] that assistant manager for that team person. The
[24] group would come up with a consensus, we'd all

Page 63

[1] agree, we'd go with that rating. I'd write the
[2] rating on the grease board to communicate with
[3] everybody, so everybody is on the same page. Terry
[4] would write that down on the list. So this is kind
[5] of like her master list that she would, for
[6] instance, go off of and she would keep that with her
[7] on file.
[8]    Q: So she made notes during these meetings and
[9] she kept them?
[10]    A: Yeah, she would keep them, certainly. It
[11] wasn't notes of discussion; it was just notes of
[12] review ratings.
[13]    Q: Now, would you take a look at the review
[14] that I just showed you, which is Marcos Urena as of
[15] January 2003. And my first question is, have you
[16] seen that before, the written version of it?
[17]    A: Yes.
[18]    MR. DONCHESS: Can we mark that as the next
[19] exhibit.
[20]    (Document marked as Nowlan
[21] Exhibit 5 for identification)
[22]    Q: When did you see it before?
[23]    A: Today.
[24]    Q: Had you seen it before today?

Page 64

[1]    A: No.
[2]    Q: Who showed it to you?
[3]    A: Jim (sic).
[4]    Q: Mr. McConnell?
[5]    A: Mr. McConnell, yes.
[6]    Q: Do you see how in the "Overall Performance
[7] Code" there's a "C" with a "D" written over it?
[8]    MR. McCONNELL: Objection. You can answer.
[9]    A: I guess it could be taken that way, yeah.
[10]    Q: Was there a roundtable on this, this
[11] review?
[12]    A: Yes.
[13]    MR. McCONNELL: Objection.
[14]    Q: Do you remember it?
[15]    A: No.
[16]    Q: You have no memory of it at all?
[17]    A: No.
[18]    Q: During that time when Greg Morris was gone,
[19] Kitchens — this is right around when Kitchens was
[20] fired —
[21]    A: Um-hum.
[22]    Q: — LeCam was taking over, who was handling
[23] the assistant manager function in terms of talking
[24] about a person in the freight team's performance

Page 65

[1] during that period?
[2]    A: It was a consensus from the group. There
[3] was no assistant manager directly over that area
[4] during that time frame. So essentially what it was,
[5] it was communication from HR and the other assistant
[6] managers that we had would kind of discuss that
[7] team.
[8]    Q: Well, if you have no memory of the
[9] discussion of Marcos Urena at the roundtable, how do
[10] you know that it even happened?
[11]    A: It had to have happened.
[12]    Q: But you're surmising that based on normal
[13] procedure?
[14]    A: Correct.
[15]    Q: Because you have no memory of it happening
[16] one way or the other?
[17]    A: Correct.
[18]    Q: Do you ever recall talking with Mr. LeCam
[19] regarding Marcos Urena's performance?
[20]    A: Not so much his performance, his
[21] attendance. Again, it would be in the morning when
[22] I would see Eric, ask how the night went, what are
[23] we looking at for today, you know, and generally we
[24] always would discuss anything, who called out. "Did

Page 66

[1] you have any call-outs last night?" In the capacity
[2] of that's how the discussions would be.
[3]    Q: Was this when LeCam was the freight team
[4] supervisor or just as a freight team employee?
[5]    A: No, supervisor.
[6]    Q: Did you ever have any discussions with
[7] Donald Kitchens about Marcos Urena's performance?
[8]    A: Again, probably the same fashion I did with
[9] Eric.
[10]    Q: But do you remember that, or are you only
[11] surmising?
[12]    A: Specifically about these guys, I can't in
[13] my mind remember a specific conversation. I
[14] remember talking about these guys, these gentlemen.
[15]    Q: "These guys," who are "these guys"?
[16]    A: I'm sorry, Nelson and Sang. I remember
[17] talking about them —
[18]    Q: Well, just so we're — you said Nelson and
[19] Sang.
[20]    A: I mean Marcos.
[21]    Q: You mean Marcos and Nelson.
[22]    A: Marcos and Nelson. I remember having
[23] discussions about attendance. Specific discussions
[24] beyond that, I don't remember.

Page 67

[1] **Q:** Did you ever talk to Brian Johnson about
[2] Marcos Urena's performance?
[3] **A:** Again, I'm surmising, I don't recall, but
[4] between the three supervisors that would have been
[5] overnight managing that team, whether it would be an
[6] assistant manager. As I told you, there were
[7] sometimes assistants on overnight, or the managers.
[8] It was a common discussion that we had of how did
[9] the night go, who called out.
[10]      So, again, I can't recall the specific
[11] conversations I would have about it, but that is a
[12] topic of discussion, and I do remember both of these
[13] gentlemen were attendance problems.
[14] **Q:** Sticking with Marcos for a minute, just so
[15] I have your recollection correctly —
[16] **A:** Okay.
[17] **Q:** — you recall that there were times when
[18] one manager or another mentioned performance or that
[19] Marcos — excuse me. You recall that you at times
[20] spoke with one manager or another regarding the fact
[21] of Marcos' attendance or that he wasn't there.
[22] **A:** Yes.
[23] **Q:** But you don't remember whether it was
[24] Morris or Johnson or LeCam or Kitchens?

Page 68

[1] **A:** Not specifically, no.
[2] **Q:** When did you begin to understand — well,
[3] strike the question. It wasn't always true, was it,
[4] that people who got Ds would be fired?
[5] **A:** No, no. That isn't an automatic.
[6] **Q:** But at some point it was decided in
[7] Tewksbury the people who got a D would be fired?
[8] **A:** That's correct.
[9] **Q:** When did that happen?
[10] **A:** That happened probably two weeks after the
[11] reviews. Probably within two weeks to a month after
[12] the roundtable and the reviews were administered.
[13] **Q:** Who decided that?
[14] **Q:** Who decided the D situation, to terminate?
[15] **Q:** No. Who decided that people would be
[16] terminated and that the Ds would be terminated?
[17] **MR. McCONNELL:** Objection.
[18] **Q:** They might be different.
[19] **MR. McCONNELL:** You can answer.
[20] **A:** It was my understanding that direction came
[21] from Dan Kniep, I think it's K-n-i-e-p. That's what
[22] I was told.
[23] **Q:** Who is Dan Kniep?
[24] **A:** He was the regional president for Home

Page 69

[1] Depot.
[2] **Q:** Your boss was who?
[3] **A:** He was a district manager, Rick Flynn.
[4] **Q:** And you say your understanding was that
[5] something came from Dan Kniep?
[6] **A:** Correct.
[7] **Q:** What is your understanding — you
[8] understand that what came from Dan Kniep, what
[9] decision?
[10] **A:** Terminate the Ds.
[11] **Q:** How was that communicated to you?
[12] **A:** Verbally from my boss.
[13] **Q:** I want to show you another document which
[14] is some kind of termination documentation. My first
[15] question is, have you seen that before?
[16] **A:** Yes.
[17] **MR. DONCHESS:** Could we mark that as the
[18] next exhibit.
[19]      (Document marked as Nowlan
[20] Exhibit 6 for identification)
[21] **Q:** That was — was this filled out by you or
[22] by someone else?
[23] **A:** No, this is my writing.
[24] **Q:** You said that Marcos was being terminated

Page 70

[1] because of poor job performance, correct?
[2] **A:** Correct.
[3] **Q:** You mentioned his attendance and
[4] punctuality.
[5] **A:** Correct.
[6] **Q:** And you said his attendance led to him
[7] getting a D rating.
[8] **A:** Correct.
[9] **Q:** But did you ever go over his last
[10] performance evaluation before you wrote this up?
[11] **A:** No, I did not.
[12] **Q:** Do you recall who told you that — strike
[13] the question. Where did you get the — or how did
[14] you come up with the ideas expressed in the form
[15] here?
[16] **A:** What do you mean, the attendance and
[17] punctuality part?
[18] **Q:** Well, you wrote two sentences regarding —
[19] **A:** Right.
[20] **Q:** — Mr. Urena, right?
[21] **A:** Correct.
[22] **Q:** How did you come up with the ideas
[23] expressed in those sentences?
[24] **A:** I would have to say through the

Page 71

[1] communication through my assistant manager team.
[2] **Q:** Do you recall with whom — from where you
[3] got that?
[4] **A:** It would go back to the same conversations,
[5] knowing that he had an attendance problem. Not one
[6] specific conversation but several, knowing that he
[7] had called out the night before and not been there,
[8] type of thing.
[9] **Q:** But you have no, again, specific memories
[10] of who these conversations were with, correct?
[11] **A:** No.
[12] **Q:** Is this Eric LeCam's signature on the
[13] bottom?
[14] **A:** Eric — no. That's Marcos'.
[15] **Q:** Marcos is at the very bottom, you're
[16] correct, and above —
[17] **A:** No, that signature, "Manager Approval,"
[18] that's my signature and my printed name under it.
[19] **Q:** So where it says "Signature," that's your
[20] signature?
[21] **A:** That's correct.
[22] **Q:** Did Marcos come to meet with you regarding
[23] the termination?
[24] **A:** Yeah. Well, are you saying at the time of

Page 73

[1] **A:** Not specific memory of the conversation,
[2] no.
[3] **Q:** Just how you typically would do it?
[4] **A:** Correct.
[5] **Q:** How would you typically do it?
[6] **A:** In this situation here, I would have — we
[7] would have discussed the fact he had an attendance
[8] problem and that he was rated a D, and that at that
[9] time we were being directed to let go of the D
[10] performers within the building, and that I would
[11] have had to let him go for attendance and
[12] punctuality.
[13] **Q:** Do you recall whether you told him one way
[14] or the other whether he was rehirable?
[15] **A:** I don't recall that. Because this was a
[16] performance issue.
[17] **Q:** Now, could you look to the performance
[18] review, I think it's Exhibit 5.
[19] **A:** Got it.
[20] **Q:** In the performance review he is criticized
[21] for more than just attendance; fair to say?
[22] **A:** Yes.
[23] **Q:** It was more than just attendance.
[24] Certainly in the performance review, attendance is a

Page 72

[1] the termination?
[2] **Q:** Yes.
[3] **A:** Yes, I would have called him in the office,
[4] sat him down.
[5] **Q:** To tell him he was going to be fired?
[6] **A:** Correct.
[7] **Q:** What did you tell him?
[8] **A:** Probably, I don't remember specifically. I
[9] could surmise the conversation, but I don't remember
[10] exactly what I would say.
[11] **Q:** Before I ask you to surmise, I take it your
[12] testimony is you do not remember what you said to
[13] Marcos?
[14] **A:** Yes.
[15] **Q:** And you don't remember what Marcos said to
[16] you?
[17] **A:** No, I don't.
[18] **Q:** So basically, you're speculating about what
[19] you might have said?
[20] **A:** Yeah. Based upon the situation, I would
[21] speculate on how I would have talked to Marcos and
[22] how that conversation would have gone from my end of
[23] it, yeah.
[24] **Q:** But not based on memory?

Page 74

[1] significant issue; fair to say?
[2] **A:** Fair to say.
[3] **Q:** But there are other factors which led to
[4] his or which contributed to the D rating, correct?
[5] **A:** Correct.
[6] **Q:** At least as written up in the review?
[7] **A:** Correct.
[8] **Q:** Do you know why it was that Brian Johnson
[9] wrote the review?
[10] **A:** Again, I could put some things together of
[11] why specifically Brian wrote this review knowing
[12] that there was no assistant manager. I was never
[13] specifically directed to write specifically this
[14] person, but I couldn't say why specifically Brian
[15] wrote this review.
[16] **Q:** So you don't have a memory of why Brian
[17] Johnson wrote this review?
[18] **A:** Right.
[19] **Q:** But you suggested that, like you have in
[20] other — with respect to other of these facts, you
[21] could surmise or you have a theory?
[22] **A:** Um-hum.
[23] **Q:** Why do you surmise Brian Johnson wrote the
[24] review?

**A:** Eric was a new department head. Brian had been in that position as a department head for several years. He knew how to write reviews; he knew the format of reviews. With the absence of a manager, obviously we needed to write reviews and administer reviews to the folks. Brian was helping Eric and training Eric on how to write reviews.

**Q:** Why do you surmise that?

**A:** Mainly because I have a recollection of that kind of general thing happening during that time, and in order to get the reviews done, that is what would have to have been done to make sure they're written.

**Q:** Did Brian Johnson write any other reviews?

**A:** I can't recall; I don't know.

**Q:** In Eric LeCam's department?

**A:** I can't recall. I don't know if he did or not.

**Q:** Do you know why it was that Marcos got the Brian Johnson treatment or training?

**MR. McCONNELL:** Objection.

**A:** No. There's no specific reason why.

**Q:** Do you recall Marcos was supposed to get a D in the roundtable?

**A:** I can't definitively say that I remember him specifically getting a D.

**Q:** Do you remember at any time the knee injury issue, the knee operation coming up?

**A:** I don't remember the knee operation.

**Q:** Do you remember any manager bringing to your attention that, you know, he had a knee operation, he lifts stuff here, his knee is really sore at the end of the night, he can't come back the next day, stuff like that?

**A:** No.

**Q:** Nothing like that?

**A:** No.

**Q:** Has anyone ever complained to you about the way Brian Johnson has treated any employee other than these two people?

**A:** Not an employee. Mike Condo, who was a peer, they did not get along.

**Q:** What do you recall about — who brought this to you, Johnson or Condo?

**A:** No, it was Mike Condo.

**Q:** What did Mike say?

**A:** He would say things like Brian was stepping on his toes in term of leadership. And I think that

[1] came from the fact that they were just two very
[2] different people and the way they directed people
[3] was just different. The way they got to the end
[4] result was just different.
[5]   **Q:** Johnson, of course, had the receiving team?
[6]   **A:** Right.
[7]   **Q:** Which was a group of employees?
[8]   **A:** Correct.
[9]   **Q:** And Condo had the freight team?
[10]   **A:** Right.
[11]   **Q:** Which was a separate group of employees?
[12]   **A:** Right.
[13]   **Q:** How was it that Johnson was stepping on
[14] Condo's toes?
[15]   **A:** Even though they're separate departments,
[16] they're both there at the same time, and they both
[17] have to mesh well to make the night work, between
[18] receiving and getting the stuff out and guys coming
[19] back and taking more out or whatnot. So it's kind
[20] of like a left hand and right hand where they both
[21] need to be on the same page working together to be
[22] effective.
[23]   So there is an overlap there, not so much
[24] on the supervisory duties, but if one of them sees

[1] that one area is slowing down, they're certainly
[2] going to make a comment to the team and say, "Guys,
[3] can you pick this up" or "this area needs to get
[4] done a little quicker." And that could come from
[5] either direction.
[6]   **Q:** So if the freight team were — so if, in
[7] Johnson's opinion, the freight team were going too
[8] slow, he might mention that to the employees of the
[9] freight team?
[10]   **A:** He could have.
[11]   **Q:** Do you remember the specifics of what Mike
[12] Condo said regarding this general issue of Johnson
[13] stepping on his toes?
[14]   **A:** He would make comments that Brian would say
[15] things to Mike along the lines of, "You're not
[16] getting things done as quickly as you should.
[17] People are not working fast enough." So he would
[18] challenge Mike on his leadership skills, on how he
[19] would lead the team. And Mike as a peer, Mike took
[20] offense to that, I think, and would come to me and
[21] say that Brian was saying those things to him.
[22]   **Q:** How many times did Condo come to you?
[23]   **A:** Probably all told, maybe two times, maybe
[24] three times tops.

speed a little bit," that isn't necessarily
something you would do a formal coaching on, that
would be something to try and motivate, whatever,
pick it up a little bit so we can get this work
done.

Q: Well, did you ever hear that any manager
say that Marcos' low productivity and lack of
initiative resulted in repeated informal counseling?

A: I never heard that, no.

Q: So you have no personal knowledge to
support that at all?

A: No.

Q: How about the next paragraph? It says, "In
addition, the Complainant was asked to assist in
other areas of the store, in order to improve his
productivity and assist with the tasks assigned to
the Freight Team. Again, he failed to improve his
productivity." Have you ever heard a manager say
that about Marcos?

A: Yes.

Q: Who did you hear say that?

A: Eric LeCam and I have discussed that.

Q: When did you discuss that?

A: I can't put a specific date to it, but I

know that that was a conversation I had had.

Q: After or before Mr. LeCam became —

A: After. Sorry.

Q: Before or after Mr. LeCam became freight
team manager?

A: After he became freight team manager.

Q: The next — but you have no personal
knowledge to support that, correct?

A: I do not, no.

Q: The next paragraph says, "Finally,
following knee surgery in the summer of 2002, the
Complainant had repeated unexplained absences."

A: I see that.

Q: I think you said that you don't recall any
manager discussing Marcos' knee injury, correct?

A: I don't recall.

Q: Then it goes on to say, "After returning to
work on light duty, and later resuming his full duty
schedule, the Complainant was frequently absent
without the requisite doctor's note to substantiate
his absences." Do you recall any manager saying
that he was absent without the requisite doctor's
note to substantiate his absences?

A: No.

[1]    Q: And you don't have any personal knowledge
[2] of that, correct?
[3]    A: Correct.
[4]    Q: But if Marcos had not gotten a D rating, he
[5] would not have been terminated, fair to say, in
[6] January —
[7]    A: In January, at that time, no, he would not
[8] have.
[9]    Q: I wanted to show you a New Associate Review
[10] for Nelson Sang. Have you seen that before?
[11]    A: No.
[12]    MR. DONCHESS: Can we mark that as the next
[13] exhibit.
[14]    (Document marked as Nowlan
[15] Exhibit 9 for identification)
[16]    Q: Is there some kind of brief period of
[17] employment after which the supervisor makes an
[18] initial evaluation of the employee's performance?
[19]    A: 90 days.
[20]    Q: And then they do a new associate review?
[21]    A: That's correct.
[22]    Q: Let me show you another document. This is
[23] Mr. Sang's review for June of 2002. Have you ever
[24] seen that before?

[1]    A: No.
[2]    MR. DONCHESS: Why don't we mark that as
[3] the next exhibit.
[4]    (Document marked as Nowlan
[5] Exhibit 10 for identification)
[6]    Q: You would agree with me that for a manager
[7] to yell, "Spic, you fucking spic," at a Hispanic
[8] employee in the building during employment while
[9] work was going on would be totally inappropriate,
[10] correct?
[11]    A: Absolutely.
[12]    Q: Did you ever hear Johnson yell at any
[13] employees?
[14]    A: No.
[15]    Q: Did you ever hear that he had done that
[16] from anyone?
[17]    A: No.
[18]    Q: Are you sure that one of his motivational
[19] techniques was not to yell at other employees?
[20]    A: Yes, I'm sure. He did not yell at team
[21] employees.
[22]    Q: He was what, a positive reinforcer, Brian
[23] Johnson?
[24]    A: Brian spoke — he was direct. He was

Page 91

[1]   **Q:** But you said if a person was having trouble
[2] getting there at ten, let's talk about having him
[3] come in at 10:30.
[4]   **A:** Um-hum.
[5]   **Q:** Is that a "yes"?
[6]   **A:** I'm sorry. Yes.
[7]   **Q:** I infer from that that the start time is
[8] not all that important, if the solution to someone
[9] coming in after ten is to suggest that their start
[10] time be moved to 10:30.
[11]   **A:** Right, right. Really what we would hold
[12] people accountable for was their schedule. In the
[13] situation like this, if it's 10:00 or 10:30, the
[14] half-hour wouldn't — any half-hour would not make
[15] that much of a difference. If it meant — because
[16] what it would do is just push the person back, so
[17] he'd be here half an hour later in the morning to
[18] help clean up or whatever.
[19]   So we would change the schedule so we would
[20] be holding the person accountable for what their
[21] schedule was written for, and then that way it would
[22] also help this team member so they wouldn't run into
[23] more corrective action and disciplinary process and
[24] so forth.

Page 92

[1]   **Q:** Now, if after this Nelson continued to be
[2] late — strike the question. Can you tell whether
[3] this is the coach link, the counseling or the final
[4] counseling form?
[5]   **A:** I can.
[6]   **Q:** Which is it?
[7]   **A:** The type of notice there is X'd out verbal,
[8] so this was an initial conversation about us asking
[9] him to change his schedule to help. There was
[10] probably, again probably, conversation that had
[11] happened with just an employee and a boss saying,
[12] "Why are you late?" that led to this. Then once we
[13] got to this we discussed, "Okay, ask the team
[14] member, why can't you get here?" We'll push it back
[15] and go from there.
[16]   **Q:** But looking at this, can you tell whether
[17] this is a coaching or counseling?
[18]   **A:** This would be a coaching.
[19]   **Q:** Now, if Nelson continued to be late after
[20] this, wouldn't you assume that it would have been —
[21] a subsequent discussion would have been documented?
[22]   **MR. McCONNELL:** Objection. You can answer.
[23]   **A:** That is the progression. That's the
[24] progression, if this was a verbal, as it's checked

Page 93

[1] off for counseling. If he was continuing to be
[2] late, the progression would be to have more coaching
[3] and possibly onto paper.
[4]   **Q:** Standard procedure was that if Nelson
[5] continued to be late and needed to be talked to
[6] again, that that subsequent discussion would have
[7] been documented, correct?
[8]   **A:** It should have, yes.
[9]   **Q:** Let me give you back the document I showed
[10] you before. That is the January '03 performance
[11] evaluation of Nelson Sang.
[12]   **A:** Okay.
[13]   **Q:** Have you seen that before?
[14]   **A:** Yes.
[15]   **MR. DONCHESS:** Could we mark that as the
[16] next exhibit.
[17]   (Document marked as Nowlan
[18] Exhibit 12 for identification)
[19]   **Q:** When have you seen that before?
[20]   **A:** Today.
[21]   **Q:** But not before today?
[22]   **A:** That's correct.
[23]   **Q:** Do you remember the roundtable regarding
[24] Nelson Sang?

Page 94

[1]   **A:** I do not.
[2]   **Q:** So is it fair to say, then, you have no
[3] actual recollection of it occurring; you're just
[4] assuming it did occur based upon what usually
[5] happened?
[6]   **A:** That's correct.
[7]   **Q:** Do you ever remember it being discussed
[8] that Nelson needed to show more enthusiasm in his
[9] work?
[10]   **A:** Not with me, no.
[11]   **Q:** You can't remember anyone saying that to
[12] you?
[13]   **A:** That he needed more enthusiasm, no.
[14]   **Q:** Do you recall anyone saying that Nelson
[15] needed to cross-train in more areas of the store?
[16]   **A:** Yes.
[17]   **Q:** Who said that?
[18]   **A:** Eric LeCam and I discussed that.
[19]   **Q:** This was sometime after Eric LeCam became
[20] freight team supervisor?
[21]   **A:** That's correct.
[22]   **Q:** How did that discussion occur?
[23]   **A:** There was — I can't remember one specific
[24] one. There were a few. Probably two or three maybe

Page 95

[1] conversations that, as I would talk to Eric about
[2] performance of the team, it related to
[3] cross-training and getting out into other areas.
[4]    Q: In terms of cross-training, was this
[5] something that the manager was supposed to
[6] supervise, or was Nelson supposed to just start
[7] working in other areas of the store on his own?
[8]    A: The way the cross-training worked was, what
[9] we tried to do is have the folks working overnight
[10] learn as many departments as they could. The
[11] freight flow every night wasn't the same, so if
[12] paint on a Tuesday had 15 pallets, maybe on
[13] Wednesday they only had three. So therefore, after
[14] those three pallets, you would be moved to, say,
[15] hardware to do nails. The more that you could
[16] cross-train the guys on the team to learn different
[17] areas, they were more efficient because you just get
[18] more familiar with the stuff.
[19]    To answer your question, they would be
[20] directed by the overnight supervisor, the boss
[21] overnight, based upon freight flow of kind of where
[22] to go next.
[23]    Q: So wasn't the cross-training then within
[24] the — strike that. Did the supervisor have control

Page 96

[1] over the cross-training in that the supervisor tells
[2] them what department to work in at that particular
[3] time?
[4]    A: Yes.
[5]    Q: So if a department supervisor or
[6] supervisors had Sang always working paint, that's
[7] not really Sang's fault; fair to say?
[8]    A: Well, you would do that too. If Sang were,
[9] say, working paint because he knew it, you are more
[10] efficient as you know it, and then when the work was
[11] done, you would move somewhere else. We would also
[12] cross-train other people through in paint. Sang and
[13] Nelson wouldn't be all the time the only two guys
[14] that would — I mean, Marcos wouldn't be the only
[15] two guys that only worked in paint.
[16]    Q: Well, was this a criticism by LeCam, that
[17] Nelson needed to be cross-trained —
[18]    A: Yeah.
[19]    Q: — or just a comment, well, he should be
[20] taught other —
[21]    A: No. What it was, it was push-back that
[22] they didn't want to work in other departments.
[23]    Q: That's what you recall LeCam saying?
[24]    A: Yeah.

Page 97

[1]    Q: Do you recall any manager saying that
[2] Nelson needed to show more self-initiative?
[3]    A: No.
[4]    Q: Do you remember any manager saying that
[5] Nelson needed to use equipment more effectively?
[6]    A: No.
[7]    Q: There's a comment on here, "Needs to work
[8] closely with Ed overnight."
[9]    A: Yes.
[10]    Q: If I'm reading that correctly.
[11]    A: Yes.
[12]    Q: Is that the way you read it?
[13]    A: Yes.
[14]    Q: Do you know what "Ed" refers to?
[15]    A: Ed was the overnight operations manager
[16] that — he was an assistant manager and he was
[17] promoted into that position towards the tail end of
[18] when I was there.
[19]    Q: After Morris?
[20]    A: Correct.
[21]    Q: So you think he was overnight operations
[22] manager by January of '02?
[23]    A: When did Greg Morris leave, do you
[24] remember? I don't remember the specific dates.

Page 98

[1] There was some time in between Greg Morris and Ed
[2] Kutnewski, there were a couple of months in between
[3] there when we had no one.
[4]    Q: Who is Ed Kutnewski?
[5]    A: Ed Kutnewski is "Ed," and Ed was the
[6] operations manager.
[7]    Q: Where is he now?
[8]    A: I think he still works in Tewksbury as the
[9] operations manager.
[10]    Q: So based on this form — strike the
[11] question. This form suggests that Ed Kutnewski was
[12] the assistant manager supervising the freight
[13] training team as of January 5, '02; fair to say?
[14]    A: Yes.
[15]    Q: How would you determine when Ed started as
[16] the associate manager for — I used the wrong term.
[17] How would you determine when Ed started as the
[18] assistant manager, that is, the overnight operations
[19] manager for the Tewksbury store?
[20]    A: You'd have to look at his employee file;
[21] there would be an action notice which changes.
[22] Prior to that he worked in Methuen as an overnight
[23] team leader — department head and was promoted into
[24] Tewksbury as the operations manager. To find the

Page 103

[1]   Q: Did you ever ask Johnson about LeCam before
[2] you promoted LeCam?
[3]   A: Not that I can recall.
[4]   Q: How do you know that LeCam worked closely
[5] with Nelson and Marcos?
[6]   A: Did I say — well, I don't know if I said
[7] "closely," but they were on the same shift.
[8]   Q: But one freight team associate is assigned
[9] to paint, another one to hardware, correct?
[10]   A: Yeah, but — Eric — due to the leadership,
[11] the absence of leadership, Eric — there are times
[12] when people kind of assume a leadership role even
[13] though you're not the leader technically by title.
[14] Eric was one of those guys that I would say stepped
[15] up and kind of was a leader of his peers. So he was
[16] there for a while; he was experienced; he knew how
[17] the process worked. So it's not as if Eric was down
[18] in lumber all night with lumber, and Marcos and
[19] Nelson were in paint, and he never knew what was
[20] going on. It was never that separate.
[21]   Q: You don't know that as a matter of personal
[22] knowledge, do you?
[23]   A: Yeah.
[24]   Q: You weren't there?

Page 104

[1]   A: Well, I wasn't physically there. But by
[2] having discussions with Eric about how did we do,
[3] how was the night, you could tell he was global, he
[4] could speak to what was going on in the building.
[5]   Q: How much time passed between the firing of
[6] Kitchens and the decision to promote LeCam?
[7]   A: Not very long. I would imagine probably a
[8] few weeks.
[9]   Q: There is something else I wanted to show
[10] you. Do you remember — I want to show you this
[11] first. Do you recognize that document?
[12]   A: Yes.
[13]   Q: And you wrote it up?
[14]   A: Yes.
[15]   MR. DONCHESS: Can we mark that as the next
[16] exhibit.
[17]   (Document marked as Nowlan
[18] Exhibit 13 for identification)
[19]   Q: Again, you wrote a couple of sentences
[20] about Nelson.
[21]   A: Yes.
[22]   Q: Where did you get the ideas that you wrote
[23] on the form?
[24]   A: From my management team.

Page 105

[1]   Q: Do you remember specifically who?
[2]   A: Not specifically who.
[3]   Q: Then you met with Nelson in order to
[4] terminate him?
[5]   A: Correct.
[6]   Q: Do you have a memory of that meeting?
[7]   A: Not specifically.
[8]   Q: So you don't know — you don't have a
[9] memory of what you said to him, that is, Nelson, or
[10] what Nelson said to you?
[11]   A: That's correct.
[12]   Q: You surmise that you told him what?
[13]   A: That we'd have to let him go due to the
[14] fact that he was a D on his performance rating and
[15] that we had a direction to remove Ds from the
[16] store, and that the D rating was a result of
[17] attendance/punctuality.
[18]   Q: Do you recall whether you commented, one
[19] way or the other, on whether he was rehirable?
[20]   A: I do not recall that.
[21]   Q: Terry Dyer — or Dwyer?
[22]   A: Dyer, yes.
[23]   Q: — do you know what she did with the notes
[24] of the roundtables?

Page 106

[1]   A: I do not.
[2]   Q: Is she still at Home Depot?
[3]   A: I don't believe she is.
[4]   Q: Did she leave the Tewksbury store before
[5] you did?
[6]   A: After I did.
[7]   Q: Do you know where — have you heard where
[8] she went?
[9]   A: I have no idea.
[10]   Q: Elsewhere in Home Depot?
[11]   A: I think she left Home Depot.
[12]   Q: Other than Condo, did anyone else ever
[13] complain about Johnson?
[14]   A: No.
[15]   Q: I take it Nelson would not have been fired
[16] if he hadn't gotten a D rating in January 2003,
[17] correct?
[18]   A: That's correct.
[19]   Q: Did you have anything to do with
[20] orienting — I think the answer is going to be no,
[21] but I don't think you had anything to do with
[22] orienting Nelson or Marcos to their employment at
[23] Home Depot, correct?
[24]   A: No, I wasn't involved in that.

# In The Matter Of:

*Marcos Urena and Nelson Sang     v.*
*Home Depot U.S.A., Inc. and Brian Johnson*

---

*Donald G. Kitchens*
*Vol. 1, September 30, 2005*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File KITCHENS.V1, 45 Pages*
*Min-U-Script® File ID: 0646893201*

# Word Index included with this Min-U-Script®

Page 1

Volume I

Pages 1 to 45

Exhibits-None

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.   Superior Court Department

Civil Action MICV 2004-01659-L

MARCOS URENA and NELSON SANG,  :

Plaintiffs,                    :

vs.                            :

HOME DEPOT U.S.A., INC. and BRIAN   :

JOHNSON,

Defendants.

DEPOSITION OF DONALD G. KITCHENS, a witness
called on behalf of the Plaintiffs, taken pursuant
to Rule 30 of the Massachusetts Rules of Civil
Procedure, before Anne H. Bohan, Registered
Diplomate Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Morgan Brown & Joy, LLP, 200 State Street, Boston,
Massachusetts, on Friday, September 30, 2005,
commencing at 10:08 a.m.

PRESENT:

Donchess & Notinger, P.C. (by James W. Donchess,
Esq.) 402 Amherst Street, Suite 204,
Nashua, NH 03063, for the Plaintiffs.

Morgan Brown & Joy, LLP (by Joseph P. McConnell,
Esq.) 200 State Street, Boston, MA
02109-2605, for the Defendants.

Page 2

INDEX

WITNESS          DIRECT  CROSS

DONALD G. KITCHENS

BY MR. DONCHESS        3

EXHIBITS

None

Page 3

**PROCEEDINGS**

[1]
[2]    **MR. DONCHESS:** Mr. Kitchens, before we go
[3] on the record, just kind of the procedures of the
[4] deposition.
[5]    (Discussion off the record)
[6]        **DONALD G. KITCHENS**
[7] a witness called for examination by counsel for the
[8] Plaintiffs, having been satisfactorily identified by
[9] the production of his driver's license and being
[10] first duly sworn by the Notary Public, was examined
[11] and testified as follows:
[12]        **DIRECT EXAMINATION**
[13]        **BY MR. DONCHESS:**
[14]    Q: Could you state your name and address,
[15] please.
[16]    A: Donald Kitchens, 8 Marsh Street, Lowell,
[17] Massachusetts.
[18]    Q: What's your date of birth?
[19]    A: September 10, 1962.
[20]    Q: What is your educational background?
[21]    A: High school graduate.
[22]    Q: Lowell High School?
[23]    A: Waltham High.
[24]    Q: Oh, Waltham. And when did you graduate?

Page 4

[1]    A: 1980.
[2]    Q: Have you attended any college courses or
[3] anything like that?
[4]    A: No, I haven't.
[5]    Q: What's been your employment history since
[6] 1980?
[7]    A: I was in the Navy for three and a half
[8] years, worked in the electronics industry for the
[9] next eight years, and have done warehouse
[10] shipping/receiving, that type of stuff since.
[11]    Q: When did you start working for Home Depot?
[12]    A: I started working for Home Depot in
[13] September of 2000.
[14]    Q: Were you hired as a member of the freight
[15] team?
[16]    A: Yes, I was.
[17]    Q: Where had your previous job been?
[18]    A: I worked for Office Depot from '95 up until
[19] my hire date for Home Depot.
[20]    Q: Why did you leave Office Depot?
[21]    A: Home Depot offered me more money and was
[22] closer to my house.
[23]    Q: What was your job at Office Depot?
[24]    A: I was their overnight supervisor.

Page 5

[1]    Q: And you worked for Home Depot for how long?
[2]    A: Two and a half years.
[3]    Q: Until?
[4]    A: Until December of 2002.
[5]    Q: What jobs did you hold at Home Depot?
[6]    A: I was a member of the freight team for my
[7] first year of employment, at which time they asked
[8] me to go into receiving and work as part of the
[9] receiving crew.
[10]    Q: And then?
[11]    A: And then I took over the night crew as
[12] their supervisor.
[13]    Q: When you say night crew, is that the
[14] freight team?
[15]    A: That's the freight team.
[16]    Q: Do you recall when you took over the night
[17] crew?
[18]    A: September of 2002.
[19]    Q: You said you left Home Depot in December of
[20] '02?
[21]    A: Yes.
[22]    Q: Why did you leave?
[23]    A: There was an issue with loss prevention.
[24]    Q: What was that issue?

---

**Page 14**

**A:** Yes.

**Q:** But that often there wasn't a full crew?

**A:** It was never a full crew.

**Q:** Why wasn't it?

**A:** Medical leaves, leave of absence, people calling in daily. Attendance was a big issue.

**Q:** Did you work Monday through Friday?

**A:** Yes, we did.

**Q:** So the freight team didn't work weekends?

**A:** Not at all.

**Q:** Do you remember the names of the people who were assigned to the freight team?

**A:** No, I don't remember most of them. Eric LeCam, Eddie, Marcos. I don't remember their names, it was so long ago at this point.

**Q:** Did Eric have any problems with absenteeism?

**A:** No.

**Q:** At one point — strike the question. Did you ever talk to any of the managers or the other managers about the absenteeism in the freight team?

**A:** I spoke to Paul Nowlan about it.

**Q:** What did you tell him?

**A:** That it was out of control and we needed to

---

**Page 15**

[1] find a way of getting it under control.

[2] **Q:** What did Nowlan say?

[3] **A:** He advised me to stop writing people up.

[4] **Q:** Was there anything else to that discussion?

[5] **A:** No, not really.

[6] **Q:** How many times did you talk to Nowlan about

[7] it?

[8] **A:** Paul Nowlan and I discussed it probably

[9] three or four times over the two-week course.

[10] **Q:** Three or four times over what?

[11] **A:** A two-week course.

[12] **Q:** Two week what?

[13] **A:** Time frame.

[14] **Q:** Do you remember when that time frame was?

[15] **A:** The end of September/the beginning of

[16] October.

[17] **Q:** Did you talk to any of the other managers

[18] about it?

[19] **A:** Human resource manager.

[20] **Q:** Who was that?

[21] **A:** Terry Dyer.

[22] **Q:** What did you say to Terry Dyer?

[23] **A:** It was more what she said to me.

[24] **Q:** What did she say?

---

**Page 16**

[1] **A:** That we couldn't afford to write the people

[2] up.

[3] **Q:** Why?

[4] **A:** I don't know what her reasons were.

[5] **Q:** Was this a discussion that you initiated or

[6] that she did?

[7] **A:** She did.

[8] **Q:** After you discussed this with Nowlan —

[9] **A:** Yes.

[10] **Q:** — Dyer came to you?

[11] **A:** Right.

[12] **Q:** Did she instruct you not to write anyone

[13] up, or did she suggest it?

[14] **A:** She suggested I not write people up.

[15] **Q:** At that point had you written anyone up?

[16] **A:** I had written.

[17] **Q:** Who had you written up?

[18] **A:** Eddie, Marcos, and another gentleman that I

[19] had attendance issues with.

[20] **Q:** Who was the other gentleman?

[21] **A:** I don't recall his name at this point.

[22] **Q:** I want to show you what I think is

[23] something I think you will recognize. I'm going to

[24] show you Exhibit 11 from the Nowlan deposition. Is

---

**Page 17**

[1] that the write-up of Nelson?

[2] **A:** Yes.

[3] **MR. McCONNELL:** Let's go off for a second.

[4]    (Discussion off the record)

[5] **Q:** Nelson Sang had obviously the first name of

[6] Nelson, correct?

[7] **A:** Right.

[8] **Q:** But he also had the nickname of Eddie?

[9] **A:** Yes.

[10] **Q:** So when you speak about Eddie, you mean

[11] Nelson Sang?

[12] **A:** Nelson.

[13] **Q:** Now, the associate performance notice to

[14] Nelson Sang regarding attendance is dated in

[15] November, correct?

[16] **A:** This one is, yes.

[17] **Q:** What date in November is it?

[18] **A:** The 19th.

[19] **Q:** So it must have been after this that Ms.

[20] Dyer talked to you and suggested you not write

[21] employees up, correct?

[22] **A:** It was before this.

[23] **Q:** How do you know it was before that?

[24] **A:** This one here happened after I was informed

---

Page 18

[1] by Mr. Nowlan that I had to write him up. I had
[2] already written him up twice.
[3]     Q: Written who up twice?
[4]     A: Nelson.
[5]     Q: Do you know what happened to those notices?
[6]     A: I have no idea. They went to human
[7] resources.
[8]     Q: So what you say is that you wrote Nelson
[9] up, Ms. Dyer came to you and said, "Don't do that
[10] anymore."
[11]     A: Yes.
[12]     Q: Then Nowlan came to you and said, "Start
[13] writing people up again"?
[14]     A: Yes.
[15]     Q: Then you wrote what we've marked as Nowlan
[16] Exhibit 11?
[17]     A: Yes.
[18]     Q: The notice of November; is that correct?
[19]     A: That's correct.
[20]     Q: Now, you said you wrote Nelson, Marcos and
[21] another person, correct?
[22]     A: Another gentlemen, yes.
[23]     Q: Why only those three?
[24]     A: They were my three main issues for

Page 19

[1] attendance.
[2]     Q: You said that you were lucky to get ten out
[3] of 18 people.
[4]     A: Right. Most of them had leave of absences,
[5] medical leaves, things of that sort, temporary
[6] assignment to other stores for training or whatever.
[7]     Q: Marcos had had a knee operation, correct?
[8]     A: Earlier in the year, yes.
[9]     Q: And you say you wrote Marcos up?
[10]     A: Yes.
[11]     Q: Do you know what happened to that write-up?
[12]     A: I have no idea. Once I make a write-up, I
[13] have to submit it to human resources.
[14]     Q: Did you write up Marcos sometime prior to
[15] this write-up —
[16]     A: They were both written up —
[17]     Q: You have to wait until I finish the
[18] question.
[19]     A: I'm sorry.
[20]     Q: Did you write up Marcos prior to when Ms.
[21] Dyer suggested you not write people up anymore or
[22] after that?
[23]     A: I wrote them both up at the same time.
[24]     Q: Meaning what?

Page 20

[1]     A: Nelson and Marcos both received the same
[2] write-up at the same time.
[3]     Q: In November or previous? My real question
[4] is, when are you talking about?
[5]     A: The first one they got was the beginning of
[6] October.
[7]     Q: How many times do you say that you wrote
[8] Nelson up?
[9]     A: Three times in total.
[10]     Q: And Marcos how many times?
[11]     A: Also three times.
[12]     Q: And you say that two of the write-ups were
[13] before Dyer spoke with you?
[14]     A: Correct.
[15]     Q: And one of them was after?
[16]     A: Correct.
[17]     Q: Now, this notice says that — well, did you
[18] receive any training in the progressive discipline
[19] policy or the discipline process of The Home Depot?
[20]     A: From Terry Dyer, yes.
[21]     Q: The first stage was a coaching session,
[22] correct?
[23]     A: Coaching session.
[24]     Q: Then a counseling session, correct?

Page 21

[1]     A: Correct.
[2]     Q: Then a final counseling session?
[3]     A: Correct.
[4]     Q: And then termination, correct?
[5]     A: Correct.
[6]     Q: Why did you check "verbal" on Nowlan
[7] Exhibit 11, the November write-up, if it was the
[8] third write-up?
[9]     A: Because nobody could find the first two.
[10]     Q: How do you know that?
[11]     A: Because I went to Mr. Nowlan before doing
[12] this.
[13]     Q: Now, you said you knew Marcos had had a
[14] knee operation.
[15]     A: Correct.
[16]     Q: How did you know about that?
[17]     A: Just from talking to people in the store,
[18] talking to him, seeing what his medical limitations
[19] were when I took over the night crew. He had talked
[20] to me about it.
[21]     Q: What were his medical limitations?
[22]     A: Basically, he informed me he had had the
[23] surgery, that sometimes it would bother him, and I
[24] told him we would work around it.

Page 22

**Q:** Did he explain what he meant by sometimes it would bother him?

**A:** No. They would just be sore, hard to move.

**Q:** Did you tell him what you meant by "we'll work around it"?

**A:** That we would adjust his workload to deal with his knee.

**Q:** Adjust it in what way?

**A:** If need be, I could take him and put him in another area where he wouldn't be lifting heavy items.

**Q:** When you say move him to another area, from what area would you be moving him?

**A:** The paint department.

**Q:** In the paint department did he have to lift heavy items?

**A:** Yes.

**Q:** And did that bother his knee?

**MR. McCONNELL:** Objection. You may answer.

**A:** I couldn't tell you. He never came to me with an issue with it. And when I did try to move him from that department due to workload increase in other areas, he didn't want to move.

**Q:** Well, you testified that you discussed with

Page 23

him that if his knee bothered him, you would move him to another area.

**A:** Right, if needed.

**Q:** So why would moving him have anything to do with his knee?

**A:** If his knee was bothering him due to the workload in the heavy area, I could move him to light bulbs versus five-gallon paint jugs.

**Q:** Where did you get the idea that working with heavy items could bother his knee?

**A:** I've hurt my knees in the past, I know it can hurt, lifting five-gallon jugs of paint.

**Q:** Did Marcos suggest to you that lifting the paint hurt his knee?

**A:** He never came to me with an issue with it, no.

**Q:** How many times — when Marcos was absent, did you ever ask him why he was out?

**A:** It's not part of my responsibilities, no. If it was a medical reason due to his knee, it was up to him to bring me paperwork for it.

**Q:** Who said that? Who told you that, that it was his responsibility to bring medical paperwork?

**A:** My responsibility ends at getting a sick

Page 24

[1] call and logging it.

[2] **Q:** Who told you that?

[3] **A:** Terry Dyer.

[4] **Q:** Where did you log the sick calls?

[5] **A:** The sick calls always went through the

[6] phone center, and they would in turn notify

[7] department heads.

[8] **Q:** Was there any written record kept of the

[9] calls?

[10] **A:** Yes. They keep a very strict record of

[11] them.

[12] **Q:** So someone would call you and say,

[13] so-and-so is going to be out?

[14] **A:** Correct.

[15] **Q:** Your understanding from human resources was

[16] that you weren't supposed to ask about why the

[17] person was absent?

[18] **A:** Correct.

[19] **Q:** Did Marcos ever tell you that he was out

[20] because his knee was bothering him?

[21] **A:** Never.

[22] **Q:** Did he ever tell you anything about why he

[23] was out?

[24] **A:** No.

Page 25

[1] **Q:** Did you ever ask Marcos for a medical

[2] note?

[3] **A:** For his knee, yes. I asked him if he had

[4] any light-duty medical note. Nothing. He never

[5] gave me any kind of documentation for it. His knee

[6] surgery happened way before I took over night crew.

[7] **Q:** How long before?

[8] **A:** During the summer when he still worked for

[9] Mike Condo.

[10] **Q:** But his knee was still hurting when you

[11] took over?

[12] **MR. McCONNELL:** Objection.

[13] **Q:** You've already testified that his knee was

[14] still hurting when you took over.

[15] **MR. McCONNELL:** Objection.

[16] **Q:** Are you changing your testimony?

[17] **A:** No.

[18] **MR. McCONNELL:** Objection.

[19] **Q:** Was his knee still hurting — strike the

[20] question. Do you now claim that his knee wasn't —

[21] strike the question.

[22] Do you now claim that you didn't know that

[23] his knee was bothering him?

[24] **A:** No. I knew that it probably would. Knee

Page 30

Q: I'm going to show you an Associate Performance Notice of November 8th written by Jonathan Horne regarding Marcos Urena, and we've marked that as Exhibit 3 to the Nowlan deposition. My question is, have you ever seen that Associate Performance Notice of November 8th before?

A: (Witness reviews document) What was the question again? I'm sorry.

Q: Have you ever seen that before?

A: No, I have not.

Q: Did you know that Horne had written Marcos up for doing a fantastic job?

MR. McCONNELL: Objection. You can answer.

A: No.

Q: I want to show you a performance review done by Brian Johnson on Marcos Urena. We've marked that previously as Exhibit 5 to the Nowlan deposition. My question is, have you ever seen that before?

A: No.

Q: Have you ever done a performance review on an employee, or did you at Home Depot?

A: I don't recall actually.

Q: Do you see the section under — do you see

Page 31

the "Leaders' Summary"?

A: Yes.

Q: Do you see the last sentence which says, 'Understanding attendance issue is a result of knee surgery, Marcos has been instructed to see his doctor to have his knee reevaluated"?

A: Yes.

Q: Does that refresh your recollection about the cause of Mr. Urena's absences; that is, his knee surgery?

A: It was never brought to my attention that his absences during my time as his direct supervisor, that his knee was an issue of his attendance.

Q: Could you look down under "Associate Comments." I'll tell you that those were written by Mr. Johnson, not by Mr. Urena. But look at — do you see the sentence that says, "Attendance issue because of knee surgery last summer. After work sometimes the next day the knee is sore"?

A: I see it.

Q: Does that refresh your recollection about what Marcos reported to you concerning the reasons for his absences during the time when you were

Page 32

[1] supervising?

[2] A: No.

[3] Q: Well, apparently someone knew about this,

[4] but you're still claiming that you had no idea?

[5] MR. McCONNELL: Objection.

[6] A: I knew of his knee surgery, yes. We're

[7] going back over the same questions.

[8] Q: Well, apparently Brian Johnson knew about

[9] this.

[10] MR. McCONNELL: Objection.

[11] Q: And he wasn't even Marcos' supervisor, you

[12] say, correct?

[13] MR. McCONNELL: Objection.

[14] Q: So my question is, are you still claiming

[15] that you didn't know about it?

[16] A: Here it is: I knew he had surgery during

[17] the summer. I was his supervisor in the fall. When

[18] I did talk to him about absences, this was not the

[19] issue he was giving me (indicating).

[20] Q: What was —

[21] A: It was his knee. That wasn't the excuses

[22] he was giving.

[23] Q: What excuses —

[24] A: "My car wouldn't start." "I had a cold."

Page 33

[1] The knee was never brought up as the issue of being

[2] absent.

[3] Q: Well, I'm just trying to refresh your

[4] recollection or ask you if it is refreshed. The

[5] note here says, "After work sometimes the next day

[6] the knee is sore." It goes on to say that Marcos

[7] would see his doctor. So are you saying that Marcos

[8] told Brian Johnson about this but didn't tell you?

[9] MR. McCONNELL: Objection. He's testified

[10] at least twice as to what he said. He's testified

[11] twice as to whether or not this document in any way

[12] refreshes his recollection and both times he said

[13] no. It's getting to the point you're badgering the

[14] witness, Jim.

[15] If you can answer that —

[16] Q: Well, was Brian Johnson talking to Marcos

[17] about the reasons for his absences?

[18] A: He might have been at that point in time,

[19] yes. I couldn't tell you, I wasn't party to the

[20] conversation between the two of them.

[21] Q: Well, did you ever observe Brian Johnson

[22] talking to Marcos?

[23] A: No.

[24] Q: Have you ever read Marcos Urena's

Page 34

[1] deposition?
[2]    A: No.
[3]    Q: What reasons did Nelson Sang give you for
[4] his absences?
[5]    A: I don't remember. We're talking three
[6] years ago. Nelson and Marcos drove together, so if
[7] one was absent, the other was absent.
[8]    Q: You said that Marcos was also often
[9] assigned to the paint department.
[10]    A: They were both assigned to the paint
[11] department.
[12]    Q: Was there always paint work to do?
[13]    A: Always.
[14]    Q: Did it tend to be heavier work than in the
[15] other departments?
[16]    A: Heavier, physically heavy?
[17]    Q: Yes.
[18]    A: Yes. Sometimes it could be, yes, depending
[19] on what day of the week it was.
[20]    Q: Did you ever tell Marcos to work in another
[21] department?
[22]    A: Both of them have been told to work in
[23] other departments.
[24]    Q: By you?

Page 35

[1]    A: By me.
[2]    Q: What happened when you told Marcos to work
[3] in the other department?
[4]    A: They would take longer than normal to get
[5] the paint dealt with. By the time they got done
[6] with it, there wasn't enough time for them to
[7] actually go and do something.
[8]    Q: Did you ever write Marcos up for that?
[9]    A: No.
[10]    Q: Why not?
[11]    A: Because it was an issue we were going to
[12] work on together.
[13]    Q: Did you ever talk to anyone about it, any
[14] manager?
[15]    A: No. I felt we could deal with it
[16] one-on-one on ourselves. One time I had mentioned
[17] it to Paul Nowlan and told him that we were going to
[18] try to resolve that issue without having to go
[19] through paper trails. We were just going to try to
[20] work on other methods for them to pick up the pace.
[21]    Q: Did you talk with any other manager other
[22] than Paul Nowlan?
[23]    A: About that issue, no.
[24]    Q: How many times did you talk to Paul Nowlan?

Page 36

[1]    A: I don't recall.
[2]    Q: Looking to the Nowlan Exhibit 5, there is
[3] language there, "(Paperwork should be in file),"
[4] referring to the soreness of Marcos' knee. Did you
[5] create any paperwork regarding the fact that Marcos'
[6] knee was sore?
[7]    A: No, I did not.
[8]    Q: Did you ever see any paperwork to that
[9] effect?
[10]    A: I don't recall.
[11]    Q: Did you ever talk to Dyer, Terry Dyer,
[12] about Marcos' knee?
[13]    A: I don't recall.
[14]    Q: You say that Marcos would give you reasons
[15] why he was absent that didn't relate to his knee,
[16] correct?
[17]    A: Yes.
[18]    Q: How did the reasons for his absence come
[19] up?
[20]    A: He would just approach me and say, "I
[21] wasn't in last night, my car wouldn't start, I'm
[22] sorry. All right?" "It's fine." Just like anybody
[23] else.
[24]    Q: So when Marcos was absent, he did offer —

Page 37

[1] he did approach you and offer an explanation for his
[2] absence, correct?
[3]    A: On occasion, yes.
[4]    Q: Did Marcos ever offer a reason regarding
[5] any kind of illness or injury or anything like that,
[6] or was it always that his car broke down?
[7]    A: I can't say for sure, but I'm sure it was a
[8] cold or whatever else. People get sick, whatever.
[9]    Q: Do you remember each of these
[10] conversations —
[11]    A: No.
[12]    Q: — that you had with Marcos?
[13]    A: I don't recall each one of these. I had
[14] too many people to deal with.
[15]    Q: So how do you know that he never mentioned
[16] his knee to you?
[17]    A: I would probably remember it if it was a
[18] knee issue. It was mainly colds, my car wouldn't
[19] start, I didn't have a ride to work.
[20]    Q: So you think you probably —
[21]    A: Standard reasons.
[22]    Q: You think you probably would remember —
[23]    A: But I would remember something about his
[24] knee bothering him, yes.

Page 38

Q: You think that you probably would remember if Marcos had mentioned his knee.

A: Yes.

Q: Even though you didn't know that the knee absences might be protected by the Family Medical Leave Act, right?

MR. McCONNELL: Objection.

Q: Right?

A: Regardless of the Family Leave Act, that wouldn't have any bearing on whether I would recall him using that as a reason for being out.

Q: You said you had 18 people on the night crew; correct?

A: Listed for the night crew.

Q: And you were lucky if you got ten.

A: Correct.

Q: Which means on the average night, there were at least eight people absent?

A: For various reasons.

Q: Your testimony is, you remember what each of these people told you regarding all of these absences every night?

A: No. A lot of these people were on medical leave, family leave, for whatever reason, on loan

Page 39

to other stores. At any given day I can have three or four people on loan to another store for a week at a time, whether it be to set up a new store or to help get an old store squared away from other problems.

Q: So it was not a big deal for an employee to transfer at least temporarily to another store?

A: To another store, it's not unheard of, no.

Q: Did you know that Nelson asked to go to another store and was told no?

A: I did not know that.

Q: But some of these other freight team employees had temporary assignments, they were on loan?

A: On loan to other stores, on training, for whatever reason. It could be cashier's school, it could be department manager training, whatever it may be.

Q: Did you know that Marcos was Hispanic, that he was from the Dominican Republic?

A: Yes.

Q: That was no big secret, right?

A: No.

Q: Did you know that Nelson was Hispanic as

Page 40

[1] well?

[2] A: I never asked him. Could guess.

[3] Q: But I'm not asking you if you ever

[4] discussed it. Were you aware Nelson was also from

[5] the Dominican Republic?

[6] A: Yes.

[7] Q: In fact, they often spoke Spanish together,

[8] right?

[9] A: I would guess. I really don't — I don't

[10] recall, to tell you the truth.

[11] Q: How did you know Nelson was from the

[12] Dominican Republic?

[13] A: Because I've heard him talk about it.

[14] Q: And that was no big secret, was it?

[15] A: No.

[16] Q: Exhibit 5 says "Marcos has displayed the

[17] ability to be an effective achiever when packing out

[18] paint." Based upon your work with him, would you

[19] agree or disagree with that statement?

[20] A: He had the ability to be a really good

[21] worker. That was part of my issue with him, he had

[22] the ability to do the job when he wanted to.

[23] Q: Did anyone consult with you regarding —

[24] after your departure regarding Marcos' January 2003

Page 41

[1] performance review?

[2] A: No.

[3] Q: Did anyone consult with you after your

[4] departure regarding Nelson Sang's January —

[5] A: No.

[6] Q: — 2003 performance review?

[7] A: No.

[8] Q: Did you ever see — well, did you ever

[9] discuss either — did you ever discuss Marcos with

[10] Brian Johnson?

[11] A: No.

[12] Q: Did you ever discuss Nelson with Brian

[13] Johnson?

[14] A: No.

[15] Q: Did Brian Johnson ever — he had been your

[16] boss, right?

[17] A: Yes.

[18] Q: Did he ever offer suggestions as to how to

[19] handle the freight team?

[20] A: No, not to my recollection. I don't recall

[21] him doing that.

[22] Q: Do you have any explanation as to why Brian

[23] Johnson would know about Nelson's knee problem and

[24] you wouldn't?

# In The Matter Of:

*Marcos Urena and Nelson Sang    v.*
*Home Depot U.S.A., Inc. and Brian Johnson*

---

*Eric M. LeCam*

*Vol. 1, September 30, 2005*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File LECAM.V1, 82 Pages*
*Min-U-Script® File ID: 0584857096*

# Word Index included with this Min-U-Script®

Page 13

was the boss of the freight team then?

A: They had made the new position, which we know now is the night operations manager, which is an assistant manager. When I was originally on the freight team, it was what we called the night crew supervisor. We had a key carrying supervisor in the building with no assistant manager. When I went back overnight, we had the night operations assistant manager, and Michael Condo was the department supervisor.

Q: Who was the assistant manager?

A: Greg Morris.

Q: Mike Condo was the boss of the freight team until who took over?

A: Until Donald Kitchens took over.

Q: Then you took over after Kitchens?

A: Um-hum.

Q: What was the job of the freight team?

A: The job of the freight team is effectively pack out — pack down or pack out freight that comes in received through receiving for the day. Also as well as packing down freight from the overheads to fill out-of-stocks as needed, build end caps, sales promotions, stuff like that. Ensure the store is

Page 14

clean in the morning before the customers and making sure it is grand opening ready every day, as well as receiving being completely purged and clean, swept, all trash thrown away, and ready to receive freight for the next day.

Q: What's the job of receiving?

A: Receiving is to check in all freight, schedule deliveries, contact freight carriers for open P.O.s that we have not received that are late. Ensure all freight is detailed, detail received, which means keyed into our system so it's booked into our inventory, and monitor all hot P.O.s, which is out-of-stocks, special buys, special sales plan is what we call them, wing stacks, stuff like that, and communicate with department heads for inbound freight shipments that the department heads need to be communicated with about.

Q: What were the responsibilities of the freight team supervisor?

A: The freight team supervisor is to ensure all freight team associates stay productive, as well as ensure workload is complete in the morning, merchandising standards, cleanliness of the store, out-of-stocks filled, and giving direction to the

Page 15

associates to ensure that this workload does get done.

Q: What were the responsibilities of the night operations manager?

A: The night operations manager oversees receiving and the freight team, communicates with the daytime merchandising ASMs and the store manager about what tasks have come up during the day that the night crew should complete, administrative tasks, such as hiring needs, communication with the department supervisors on reviews.

Basically, what they are is a communication buffer between the dayside team and the overnight team, as well as discipline actions, stuff like that. What it does is it increases the supervision from going from a night crew supervisor to having a night crew supervisor and a night operations manager in the building to oversee the store's operations at night as well as physical security.

Q: When you were freight team manager, who was the night operations manager?

A: Eddie Kutnewski.

Q: Do you remember when he started?

A: He started I believe I think two weeks

Page 16

before January. I don't remember the exact date, but it was at the end of December.

Q: Then you said you became night operations manager.

A: I was night operations manager promoted out of Tewksbury to Danvers in March of 2004.

Q: So it wasn't because Ed left; it was because you went to another store?

A: Yeah, I went to another store in March. I was actually overnight by myself from September to late November as just the freight team supervisor. We didn't have night ops, it was just me.

Q: In Danvers?

A: In Tewksbury, towards the end of my tenure in Tewksbury.

Q: So you went to Danvers in 2005 —

A: 2004.

Q: When in 2004 again?

A: March.

Q: But in March — oh, I see. So you were the freight team supervisor on duty alone sometime in the fall of 2003?

A: Fall 2003.

Q: When did Mr. Kutnewski leave the position

Case 1:05-cv-10242-MEL    Document 11-6    Filed 12/15/2005    Page 3 of 5

---

Page 33

[1] mean, it was just inconsistent.
[2]    Q: Did you know that he had had a knee
[3] operation?
[4]    A: Yes.
[5]    Q: Did Marcos tell you that?
[6]    A: Yes.
[7]    Q: And he was out of work for a period of
[8] time?
[9]    A: Yes. I don't remember how long it was.
[10]    Q: Then he came back on light duty?
[11]    A: Yep.
[12]    Q: Did his knee bother him after he came back?
[13]    A: I believe it did a few times.
[14]    Q: What kind of worker was Eddie Sang?
[15]    A: Eddie had a lot of potential as well. He
[16] had a lot of knowledge of paint as well. He was
[17] inconsistent attendance-wise, performance-wise,
[18] productivity-wise. The biggest problem that I had
[19] with Eddie was when I would try — the thing is,
[20] we're not assigned to paint, we're not assigned to
[21] electrical, not assigned to hardware. We're the
[22] freight team. We work where the freight is. We
[23] have to move people as needed.
[24]    And when Eddie would be taken out of paint

---

Page 34

[1] and put into another area, he didn't like it, he
[2] didn't like that part of his job, and it really
[3] affected his performance, because he would just get
[4] angry and upset that he wasn't in paint or working
[5] with Marcos, that he would just basically stop
[6] productivity all together.
[7]    Q: Did you observe this when you were a
[8] freight team associate or when you were freight team
[9] supervisor?
[10]    A: Both.
[11]    Q: But if you only worked in paint once every
[12] two weeks, how do you know what Nelson's attitude
[13] was while he was working in paint?
[14]    A: Because also when we're work in electrical
[15] and that was slammed, and he would come over there
[16] and I'd be working over there with him and with the
[17] other people, he would just become nonexistent and
[18] be mad that he was put over there, just basically
[19] milk it.
[20]    Q: Was Marcos ever put in paint? Excuse me.
[21] Was Marcos ever put in electrical?
[22]    A: On occasion.
[23]    Q: How did he do?
[24]    A: Pretty much the same thing. They didn't

---

Page 35

[1] like being out of paint.
[2]    Q: How often did you work with Marcos in
[3] electrical?
[4]    A: Usually whenever we moved people to
[5] departments they weren't normally in, I would be
[6] over there with them.
[7]    Q: Why?
[8]    A: Why? Because I was one of the stronger
[9] workers on the team.
[10]    Q: So how often did you work with Marcos in
[11] electric?
[12]    A: I don't remember how many times it was. It
[13] may have happened often.
[14]    Q: Once a week? Once a month? Once a day?
[15]    A: Probably about two or three times a month.
[16]    Q: When you worked in paint with Marcos, how
[17] long would that be? The full night?
[18]    A: Yes.
[19]    Q: Or part of the night?
[20]    A: Usually about three quarters of the night,
[21] because towards the end of the night, I would be
[22] assigned on a reach truck to put everybody's
[23] overstocked pallets up in the overheads, which was
[24] usually a lot of paint. So I'd still be over there

---

Page 36

[1] while they were working and the rest of the store.
[2] So usually I'd work over there for about three
[3] quarters of the night, until about 4:30 or five
[4] o'clock, then I would get on the machine and put the
[5] rest of the freight overstock up again.
[6]    Q: Did you ever discuss Marcos? While you
[7] were a freight team associate, did you ever discuss
[8] Marcos with Brian Johnson?
[9]    A: No, not as an associate, only as a
[10] department head.
[11]    Q: When you became a department head, did you
[12] discuss Marcos with Brian Johnson?
[13]    A: Only during the review cycle, when we were
[14] sitting down writing the reviews.
[15]    Q: And what did you say?
[16]    A: I said there are positives, but there's a
[17] lot of negatives too.
[18]    Q: What did Brian Johnson say?
[19]    A: Brian was just showing me how to write a
[20] review and how to word it. I gave him my
[21] information as their boss on their reviews, and
[22] Brian just worded it and showed me how to write it.
[23]    Q: Did you ever discuss Nelson Sang with Brian
[24] Johnson?

---

Page 37

**A:** The same as before, only during the review cycle while he was showing me how to write reviews.

**Q:** During the review process what did you say to Brian Johnson about Nelson Sang?

**A:** Attendance issues, negative attitude toward helping the team in other areas of the store. Positive strengths were keeping paint fully packed out and packed down. Just negative attitude a lot of the time, and attendance was really killing the team.

**Q:** What did Brian Johnson say to you about Nelson Sang?

**A:** He didn't say anything about it. He just helped me write the reviews; he had no input.

**Q:** So before the Nelson Sang review, the two of you discussed Nelson Sang and his performance, and based on that discussion you wrote out the review; is that correct?

**A:** Yes.

**MR. McCONNELL:** Which person was that, Jim? I'm sorry.

**MR. DONCHESS:** Nelson Sang.

**Q:** Did you ever talk to Nelson about why he was absent?

Page 38

**A:** Usually, yeah. A lot of times it was, "My car won't start." "My girlfriend is not home." It was just oftentimes — it just became a constant, consistent thing once a week.

**Q:** Was this while you were an associate or while you were the —

**A:** Both.

**Q:** Let me get the question out first.

**A:** Go ahead.

**Q:** Was this while you were a freight team member or the freight team leader?

**A:** It was during both periods.

**Q:** Did Marcos ever talk to you about why he was absent?

**A:** Yes.

*Q. What did he say?

**A:** Occasionally it would be his knee, which was definitely understandable, you could tell he was in pain. But oftentimes it** —

(A telephone interruption)

**A:** You have to let me get the answer out.

**Q:** What?

**A:** You have to let me get the answer out.

**Q:** Go ahead with it.

Page 39

[1] **A:** What was the question again?

[2] **MR. DONCHESS:** Why don't you read what the

[3] question and answer were.

[4]    (Record read * to **)

[5] **A:** Oftentimes it would be after a night when

[6] we would pull him out of paint and put him in

[7] another area, he would get mad and he would call

[8] out, basically as a retaliatory example, you'd say.

[9] **Q:** Did he call you to say that he was going to

[10] be absent the next night?

[11] **A:** Sometimes they would call me. Occasionally

[12] — actually, usually they would call a manager first

[13] and then call me to tell me so I knew. Because

[14] communication in the store at the time was not very

[15] good.

[16] **Q:** When you said that Marcos called back in a

[17] retaliatory way, did he say that, or is that what

[18] you assumed?

[19] **A:** I assumed. It happened — it became very

[20] consistent with moving them to another area or

[21] moving Marcos to another area and the next night he

[22] would call out.

[23] **Q:** When Marcos was out because his knee hurt,

[24] did he tell anyone other than you about it?

Page 40

[1] **A:** Yeah. I believe Grant was there at the

[2] time; I don't think Eddie was there yet. But that

[3] much of that part of the situation I don't remember

[4] a lot of, when he was out and who he told. I

[5] believe he went through the HR manager, Terry Dyer,

[6] because all disability and leave of absence have to

[7] go through the human resource manager.

[8] **Q:** So there are times when Marcos was out and

[9] would discuss his absence with someone other than

[10] you?

[11] **A:** Yes.

[12] **Q:** And you weren't present during those

[13] discussions?

[14] **A:** Not always. Occasionally I would be, a lot

[15] of the time I would be, but there were times when he

[16] would contact another manager.

[17] **Q:** In terms of the times when you were present

[18] when Marcos was telling someone else like a manager

[19] about his absence, who else — what manager do you

[20] recall being involved in those discussions?

[21] **A:** Don Kitchens, Grant Coleman. Linda Allen,

[22] who was a daytime ops manager. She was the easy one

[23] who wouldn't ask questions when they were out, when

[24] people were out. But other assistant managers. A

Page 41

[1] lot of times I wasn't present because it was before
[2] my shift began at night.
[3]    Q: When does your shift begin?
[4]    A: Nine o'clock.
[5]    Q: Who did Marcos tell, other than you, when
[6] he had problems with his knee and he was out because
[7] of it?
[8]    A: Don Kitchens and Grant Coleman.
[9]    Q: You heard him tell Kitchens and Coleman
[10] that?
[11]    A: I heard him tell Don Kitchens one or two
[12] times. Like I said, this is so long ago, it's hard
[13] to recall everything. But, yeah, Grant would also
[14] have to be involved because he was the assistant
[15] manager overnight.
[16]    Q: Were you part of any — well, you came to
[17] know what a roundtable was, right?
[18]    A: Yes.
[19]    Q: You certainly — I'm sure you participated
[20] in those as the night team supervisor.
[21]    A: Um-hum, as well as night operations
[22] manager.
[23]    Q: Night operations manager.
[24]    A: I participated as a department head and as

Page 42

[1] a salary manager.
[2]    Q: Did you attend a roundtable regarding
[3] Nelson Sang?
[4]    A: I believe so.
[5]    Q: Who was there?
[6]    A: Paul Nowlan, who was the store manager.
[7] All the assistant managers. All of the department
[8] heads, daytime, nighttime. Every management figure
[9] in the store. What it is, a store manager will have
[10] a readout of all the reviews due for the review
[11] cycle, and what it is, he will read the name and he
[12] will go around the room and get everybody's input.
[13] That's how decisions are made on what ratings they
[14] get and leadership code and promotion, grow in
[15] position, stuff like that.
[16]    Q: I know you did this a lot as a night
[17] operations manager. When I asked you, did you
[18] attend for Nelson Sang, you said I think so.
[19]    A: Like I said, it was like four years —
[20]    Q: Wait. Do you have a memory, or are you
[21] assuming?
[22]    A: I don't have a memory of it.
[23]    Q: So is it fair to say, then, that you have
[24] no specific memory of attending a roundtable on

Page 43

[1] Nelson Sang but that it's possible that you did?
[2]    A: It's possible. But the memory, like I
[3] said, I don't have a memory of it at all. I'm not
[4] saying I didn't attend it, but I don't remember.
[5] I've been to so many of them that I don't remember
[6] who was on which one.
[7]    Q: Do you remember in early January of 2003
[8] attending a roundtable on Marcos Urena?
[9]    A: The same answer, I don't recall.
[10]    Q: Did you know Donald Kitchens wrote up
[11] Nelson Sang for absences?
[12]    A: No. I wasn't involved in discipline action
[13] at that point when Donald was still there.
[14]    Q: Did you ever hear about that?
[15]    A: They kept that stuff in-house. Associates
[16] didn't hear about it when people were written up.
[17] And even if I did hear, I don't pay attention, not
[18] when I was an associate.
[19]    Q: When you're doing a review — and let's go
[20] to Marcos — did you ever hear of Marcos being
[21] written up for attendance?
[22]    A: I believe I wrote Marcos up twice for
[23] attendance.
[24]    Q: After or before the review?

Page 44

[1]    A: I don't recall. I know I wrote him up
[2] multiple times.
[3]    Q: While you were supervisor?
[4]    A: Yes.
[5]    Q: You must have mentioned it in the review?
[6]    A: I believe so. Attendance was mentioned; it
[7] was about attendance.
[8]    Q: Have you seen this before, what we've
[9] marked as Nowlan Exhibit 11?
[10]    A: No. I didn't write this.
[11]    Q: But my question was, have you seen it
[12] before?
[13]    A: No.
[14]    Q: When you're reviewing an employee, the
[15] point is to review them back to their previous
[16] performance review, correct?
[17]    A: Yes.
[18]    Q: Because employees were reviewed every six
[19] months, and the point was to take it back to their
[20] last performance review, right?
[21]    A: Yes.
[22]    Q: When you were discussing the review process
[23] with Brian Johnson, did you discuss the fact that
[24] the review was supposed to cover six months?

Page 45

**A:** He discussed that with me.

**Q:** Did he suggest that it was a good idea to go back and look at the previous review?

**A:** Yes.

**Q:** Did he suggest it was a good idea to look at all the paperwork in the file that had been accumulated on the employee in the last six months?

**A:** Yes.

**THE WITNESS:** Can I speak? Am I allowed to.

**MR. McCONNELL:** You can complete your answer if you'd like.

**A:** Basically, with the files, we were not allowed access to the files at all. Our HR manager would not let us look at any information from the files. She would dictate the information to us, which is why I never saw this. I knew what they had but never knew — this was as a supervisor — I didn't know at the time it was given. But as a supervisor, she would dictate information to us about reviews and performance notices, but we were never allowed to see the documents.

**Q:** Just to be clear as to what you were talking about, when you said you never saw this,

Page 46

you're referring to Nowlan Exhibit 11, right?

**A:** Yes.

**Q:** Did you ask — did you or Mr. Johnson ask to see the file on Nelson Sang before his review was done?

**A:** I had asked Terry Dyer to see the files, and she would not let me see the files.

**Q:** So you never saw Nelson Sang's last review?

**A:** Like I said, I was dictated the review but never physically looked at it.

**Q:** When you and Mr. Johnson were doing a review, did you tell Mr. Johnson that you had asked for Nelson Sang's file and you couldn't get it?

**A:** Yes.

**Q:** What did he say?

**A:** I told him what was dictated to me about his history, his discipline action notices, what she had told me with the review, about his last review, and like the performance issues, development needs, key strengths, key development needs. And I took all that information that I was given from the HR manager, took it as to what I have witnessed and seen as my tenure overnight with them, with Eddie, and wrote it in the review. I used all that to

Page 47

[1] write the review.

[2] **Q:** In Marcos' case did you talk with HR about

[3] his prior review?

[4] **A:** Yes.

[5] **Q:** Did you learn that he had gotten a B the

[6] last time he was reviewed?

[7] **A:** Um-hum.

[8] **Q:** You have to say "yes."

[9] **A:** Yes.

[10] **Q:** What else did you learn? Strike the

[11] question. Did you learn that he had been written up

[12] for doing a good job by Jonathan Horne?

[13] **A:** I never saw that, no.

[14] **Q:** No one mentioned that to you?

[15] **A:** No one mentioned that to me. My HR manager

[16] did not tell me about that.

[17] **Q:** What else did she tell you about Marcos?

[18] **A:** I don't recall. It's been almost four

[19] years.

[20] **Q:** You said that today you had looked at

[21] Marcos' review.

[22] **A:** Yes.

[23] **Q:** Had you seen that between the time when it

[24] was issued and when — and today? Had you seen it

Page 48

[1] at any time between the time when it was issued and

[2] today?

[3] **A:** Not before today, no.

[4] **Q:** Did you see it when it was issued?

[5] **A:** Yes.

[6] **Q:** Let me show it to you now. I should give

[7] you the marked copy. This is Nowlan Exhibit 5.

[8] Now, it's written by Johnson, right?

[9] **A:** This one is written by Brian Johnson.

[10] **Q:** The words — well, do you see the "Leaders'

[11] Summary Assessment" —

[12] **A:** Yes.

[13] **Q:** — section at the top?

[14] **A:** Yes.

[15] **Q:** There are the words "Understanding

[16] attendance issue is a result of knee surgery, Marcos

[17] has been instructed to see his doctor to have his

[18] knee reevaluated." Were those your words, or were

[19] those Johnson's words?

[20] **A:** Both. We had told Marcos that if

[21] attendance was going to be an issue because of the

[22] knee that he probably shouldn't be working if it's

[23] going to hurt him, therefore, he should probably get

[24] put back on an LOA so your attendance — I mean, if

Page 49

[1] you're not going to be here, why stay on the active
[2] roster? Go on leave of absence; that way you're not
[3] going to hurt yourself.
[4]   Q: But I just want to get clear who came up
[5] with those words, the words "Understanding
[6] attendance issue is a result of knee surgery, Marcos
[7] has been instructed to see his doctor to have his
[8] knee reevaluated."
[9]   A: They came from both of us.
[10]   Q: Further on there are the words, "Attendance
[11] issue because of knee surgery last summer. After
[12] work sometimes the next day the knee is sore." Do
[13] you see those words?
[14]   A: Yes.
[15]   Q: Were those your words or Johnson's words?
[16]   A: That's an "Associate Comment." That is
[17] Brian. "Attendance issue because of knee surgery
[18] last summer."
[19]   Q: Let me clarify that. First of all, the
[20] handwriting, but also Johnson has testified that he
[21] wrote that, that that's his handwriting, under
[22] "Associate Comments"?
[23]   MR. McCONNELL: Objection. You said two
[24] things there, one which can be misconstrued. I can

Page 50

[1] go off and talk to you outside the room on it, but I
[2] can't leave that like that.
[3]   MR. DONCHESS: Fine. Let me reword it
[4] because I forget exactly what I said.
[5]   Q: Johnson has testified that's his
[6] handwriting under "Associate Comments."
[7]   A: Yeah.
[8]   Q: Do you agree — do you recall that Johnson
[9] wrote that out?
[10]   A: That part I don't recall. I don't remember
[11] that part at all, actually.
[12]   Q: Do you see the words, "Marcos will see his
[13] doctor, to review the status of his knee, reporting
[14] back to Home Depot with results"?
[15]   A: Yes.
[16]   Q: Did you ever ask Marcos for a doctor's
[17] note?
[18]   A: I don't recall.
[19]   Q: One way or the other, you don't recall?
[20]   A: No.
[21]   Q: Back up to the top, "Marcos has displayed
[22] the ability to be an effective achiever when packing
[23] out paint (which has become his comfort zone)." Do
[24] you see those words?

Page 51

[1]   A: Yes.
[2]   Q: Are those your words, or Mr. Johnson's
[3] words, or both?
[4]   A: Those are my words.
[5]   Q: Did you discuss that with Mr. Johnson?
[6]   A: Yes.
[7]   Q: Did he agree with it?
[8]   A: Yes.
[9]   Q: Then the language, "However, when asked or
[10] moved to other areas of the store has become
[11] demotivated after becoming a lot less productive."
[12]   A: Those are my words.
[13]   Q: Well, let me ask you the question: Are
[14] those your words, or Mr. Johnson's words, or both?
[15]   A: Those are my words.
[16]   Q: Did you discuss that with Mr. Johnson
[17] before he wrote out the review?
[18]   A: I discussed it while he was writing the
[19] review.
[20]   Q: Did he agree with it?
[21]   A: Brian never was out on the floor to see
[22] what they do. Brian is in receiving. That's a
[23] totally different aspect from the freight team.
[24]   Q: There's comments under "Key Development

Page 52

[1] Needs."
[2]   A: Yes.
[3]   Q: The first issue is "attendance," correct?
[4]   A: Yes.
[5]   Q: Was it your decision to put those words in
[6] the "Key Development Needs" —
[7]   A: Yes.
[8]   Q: — or was that Mr. Johnson's or both?
[9]   A: Both.
[10]   Q: Why did you put attendance first?
[11]   A: That's the first thing that comes to mind
[12] when it comes to — when it comes to development
[13] needs, attendance is something I don't put up with.
[14] You need to be there, period. You need to work at
[15] your job, period. Attendance is not tolerated.
[16] It's in no particular order; that's just the way it
[17] was written.
[18]   Q: Now, in the review you didn't put anything
[19] — you said "Understanding attendance issue is a
[20] result of knee surgery." You didn't say anything
[21] about any other reasons for any absences by Mr.
[22] Urena, correct?
[23]   A: Overall attendance, no.
[24]   Q: In terms of reasons for absence, you didn't

mention anything in the review other than Mr.
Urena's knee surgery, correct?

    **A:** Correct.

    **Q:** That was before the lawsuit, correct?

    **A:** What do you mean by that?

    **Q:** There was no lawsuit at that time, correct?

    **A:** When I wrote the review?

    **Q:** Yes.

    **A:** No.

    **Q:** Your memory of the situation at Home Depot
was better then than it is now; fair to say?

    **A:** What do you mean, my memory was what? When
it happened?

    **Q:** You looked at Mr. McConnell. Do you have
to look to him before you answer these questions?

    **MR. McCONNELL:** Objection.

    **A:** Excuse me?

    **MR. McCONNELL:** That's not a question.

    **Q:** You just looked at Mr. McConnell before
answering this question, right?

    **A:** You want me to look over there?

    **Q:** No. I want you to look — no, and you're
not to ask me questions. If you want to, go to the
judge. All right? My question was, you looked at

Mr. McConnell —

    **A:** Yeah.

    **Q:** — before you tried to answer that
question, right?

    **A:** Yeah. I'm not trying to get anything out
of him.

    **MR. McCONNELL:** I'll say for the record, I
didn't see him look at me.

    **MR. DONCHESS:** No, you didn't because you
were looking at the paper.

    **Q:** Do you see there's a "D" written over a "C"
under "Overall Performance Code"?

    **A:** Is that a "D" written over a "C," or is it
a cursive "D"?

    **Q:** Well, doesn't it look to you like there's a
"C" underneath, or you dispute that?

    **A:** I can't tell.

    **Q:** So are you saying you disagree with the
suggestion there's a "C" underneath or that you
can't tell either way?

    **A:** I can't tell either way.

    **Q:** Can you tell if there is something
underneath the "D"?

    **MR. McCONNELL:** Objection. You can answer

[1] him.

[2]     **A:** I can't tell if it's a cursive "D," if it's

[3] a "C." I can't tell if it's just the mark from a

[4] pen when you're writing a "D" or if there's

[5] something under there; it's inconclusive to me.

[6]     **Q:** Do you recall any discussion of a C rating

[7] at the time?

[8]     **A:** No, I do not.

[9]     **Q:** Who decided the D rating?

[10]     **A:** Myself and Brian.

[11]     **Q:** I want to show you Nelson's review. I have

[12] to find it.

[13]     Do you recall running into Nelson around

[14] the time his review was being done? Strike the

[15] question. Do you recall running into Nelson on the

[16] day his review was being done and telling him that

[17] — him asking you where Brian Johnson was?

[18]     **A:** Not at all.

[19]     **Q:** Do you remember telling him that Johnson

[20] was in the back doing Nelson's review?

[21]     **A:** No.

[22]     **Q:** I'm showing you Nelson Sang's review, but

[23] let me find my copy. You've seen that today

[24] already?

[1]     **A:** This one here? Yes, briefly.

[2]     **Q:** That one is in your handwriting?

[3]     **A:** Yes.

[4]     **Q:** The first sentence says, "Nelson has been

[5] employed at the Home Depot for almost two years."

[6]     **A:** Yes.

[7]     **Q:** Are those your words or Mr. Johnson's words

[8] or both?

[9]     **A:** These are my words.

[10]     **Q:** Then there's the language, "Nelson although

[11] a good worker when present has had over the

[12] acceptable limit of absences during the past six

[13] months." Are those your words, or Johnson's words,

[14] or both?

[15]     **A:** Those are my words.

[16]     **Q:** Did Johnson agree with those words?

[17]     **A:** Yeah. Like I said, Brian was not out on

[18] the floor to agree or disagree.

[19]     **Q:** The next sentence says, "Nelson should have

[20] more knowledge than presently displays."

[21]     **A:** Yes.

[22]     **Q:** Are those your words, or Johnson's words,

[23] or both?

[24]     **A:** Those are my words.

**Page 57**

[1]  Q: Did Johnson agree with those words?
[2]  A: Brian is in receiving; Brian neither
[3]  disagrees or agrees.
[4]  Q: Did he say anything about those words?
[5]  A: Brian was only there as a fixture to show
[6]  me how to word reviews and show me how to write a
[7]  review. He had very, very little input.
[8]  Q: But I take it you went over it with him as
[9]  you were writing it?
[10]  A: Yes, but the only thing we went over was
[11]  how to word it.
[12]  Q: Under "Key Development Needs" there is
[13]  "Needs to show more enthusiasm in his work." Do you
[14]  see that?
[15]  A: Yes.
[16]  Q: Are those your words, or Johnson's words,
[17]  or both?
[18]  A: Those are my words.
[19]  Q: Did you tell Johnson that Sang needed to
[20]  show more enthusiasm in his work?
[21]  A: When we were sitting down discussing how to
[22]  write a review, yes.
[23]  Q: What did Johnson say about that?
[24]  A: He neither agreed or disagreed.

**Page 58**

[1]  Q: Did he utter any words?
[2]  A: No. He told me how to word things. There
[3]  was no wording based on his view of the associate at
[4]  all.
[5]  Q: The words, "Eddie does a good job keeping
[6]  paint packed out and downstocked" — do you see
[7]  that?
[8]  A: Yes, I do.
[9]  Q: Were those your words, or Johnson's words,
[10]  or both?
[11]  A: Those are my words.
[12]  Q: Did Johnson agree or disagree with this?
[13]  A: He neither disagreed or agreed.
[14]  Q: There's the language "Work to become more
[15]  familiar with D28 and D27." Do you see that?
[16]  A: Yes.
[17]  Q: What are D28 and D27?
[18]  A: Department 28 is garden; Department 27 is
[19]  electrical.
[20]  Q: Whose thought was it that he should become
[21]  more familiar with D28 and D27?
[22]  A: That was myself and Eddie Kutnewski.
[23]  Q: What did Johnson have to say about that?
[24]  A: Johnson didn't have anything to say about

**Page 59**

[1]  those.
[2]  Q: Looking at the second page, the check
[3]  marks —
[4]  A: Yes.
[5]  Q: — did you make those?
[6]  A: Yes.
[7]  Q: No. 10, "Demonstrates inclusion.
[8]  Demonstrates understanding and respect for people of
[9]  all backgrounds." You gave him a D there, right?
[10]  A: Yes.
[11]  Q: Which means "Improvement Required." Is
[12]  that a "yes"?
[13]  A: Yes.
[14]  Q: What did Marcos do to suggest that he
[15]  didn't respect people of all backgrounds?
[16]  A: Marcos didn't do anything. You're looking
[17]  at Nelson's review.
[18]  Q: Excuse me. What did Nelson do to suggest
[19]  that he didn't respect people of all backgrounds?
[20]  A: Well, we had an Asian kid named James, and
[21]  the nickname that was made up for him by Nelson was
[22]  Teriyaki, and it offended a few people. He was
[23]  trying to be humorous, there was no harm intended by
[24]  it, but making comments like that in the workplace,

**Page 60**

[1]  really, it's something you want to stay away from.
[2]  Q: Did James ever complain about it?
[3]  A: Not really James but other associates of
[4]  the same background.
[5]  Q: Did anyone else use that nickname?
[6]  A: I don't believe so.
[7]  Q: Did Marcos?
[8]  A: I don't think so.
[9]  Q: Let's go to Marcos' review. When you gave
[10]  Marcos a C for performance under "Getting things
[11]  done" —
[12]  A: I don't have a copy of it, so I can't
[13]  explain it.
[14]  Q: Sorry. You gave Marcos a C for "Getting
[15]  Things Done," correct?
[16]  A: Yes.
[17]  Q: Did you discuss that rating with Johnson
[18]  before you decided — strike the question. Did you
[19]  discuss that rating with Johnson before you decided
[20]  to give him a C?
[21]  A: Yes.
[22]  Q: No. 2 is a D rating for "Customer Driven";
[23]  is that correct?
[24]  A: Yes.

**Page 65**

[1] where Nelson got a D. Do you see that?
[2]    **A:** Yes.
[3]    **Q:** Did you discuss that with Johnson before
[4] Nelson got the D?
[5]    **A:** Yes.
[6]    **Q:** There's No. 8, "Acts with Integrity."
[7] Nelson got a C?
[8]    **A:** Yes.
[9]    **Q:** Did you discuss that with Johnson before
[10] Nelson got the C?
[11]    **A:** Yes.
[12]    **Q:** There's No. 9, "Promotes Teamwork," where
[13] Nelson got a D.
[14]    **A:** Yes.
[15]    **Q:** Did you discuss that with Johnson before
[16] Nelson got the D?
[17]    **A:** Yes.
[18]    **Q:** There's "Demonstrates Inclusion" where
[19] Nelson got a D.
[20]    **A:** Yes.
[21]    **Q:** Did you discuss that with Johnson before
[22] Nelson got the D?
[23]    **A:** Yes.
[24]    **Q:** There's the "Self-Development," No. 11,

**Page 66**

[1] where Nelson got a D.
[2]    **A:** Yes.
[3]    **Q:** Did you discuss that with Johnson before he
[4] got the D?
[5]    **A:** Yes.
[6]    **Q:** There's "Safety Orientation" where Nelson
[7] got a C.
[8]    **A:** Yes.
[9]    **Q:** Did you discuss that with Johnson before
[10] Nelson got the C?
[11]    **A:** Yes.
[12]    **Q:** There's the "Punctuality/Dependability"
[13] score of D.
[14]    **A:** Yes.
[15]    **Q:** Did you discuss that with Johnson before
[16] Nelson got the D?
[17]    **A:** Yes.
[18]    **Q:** There's the "Enthusiasm," No. 14, where
[19] Nelson got a D.
[20]    **A:** Yes.
[21]    **Q:** Did you discuss that with Johnson before
[22] Nelson got the D?
[23]    **A:** Yes.
[24]    **Q:** Although there's the Side 1 and Side 2, is

**Page 67**

[1] it fair to say that actually you completed the Side
[2] 2 first?
[3]    **A:** Yes.
[4]    **Q:** Then turned it over and completed Side 1?
[5]    **A:** Yes.
[6]    **Q:** Was that true in Marcos' case as well, that
[7] — let's go back to identification. The same review
[8] we just went through is the January '03 review,
[9] which we've marked as Nowlan Exhibit 12?
[10]    **A:** Yes.
[11]    **Q:** Now looking back to Marcos, which is
[12] Exhibit 5, Nowlan Exhibit 5, did you follow the same
[13] procedure there? Even though the form says Side 2,
[14] you did the check marks Side 2 first?
[15]    **A:** Yes.
[16]    **Q:** I want to show you Nowlan Exhibit 1, Code
[17] of Conduct. Have you seen that before?
[18]    **A:** Yes.
[19]    **MR. DONCHESS:** Could we go off the record
[20] for a second.
[21]    (Recess)
[22]            **BY MR. DONCHESS:**
[23]    **Q:** When did you learn that Marcos and Nelson
[24] were going to be fired?

**Page 68**

[1]    **A:** I don't recall. The decision wasn't made
[2] at the time I wrote the review. I believe the
[3] decision came from higher-ups in the company on a
[4] RIF due to specific ratings of improvement required
[5] on reviews.
[6]    **Q:** Did you present the review to Nelson?
[7]    **A:** Yes.
[8]    **Q:** Who was present at the time?
[9]    **A:** I don't recall.
[10]    **Q:** Did you present the review to Marcos?
[11]    **A:** I believe I did, but I'm not quite sure.
[12] It may have been Eddie Kutnewski; I'm not positive.
[13] I know I put the input in for it, and Brian was in
[14] there with me, but I might have been off on the due
[15] date to present it, I don't remember.
[16]    **Q:** Do you recall if Brian Johnson was the one
[17] who talked about the review to Marcos?
[18]    **A:** I do not remember.
[19]    **Q:** Do you think you were present?
[20]    **A:** I remember Eddie's, but I don't remember
[21] Marcos' at all.
[22]    **Q:** So you don't know if you were there or
[23] not —
[24]    **A:** No.

---

Page 73

[1]  Q: Or the fact that there is a case?
[2]  A: I could care less, to be honest with you.
[3]  No. Paul Nowlan, yes. Well, he's not with Home
[4]  Depot, though.
[5]  Q: When did you discuss it with him?
[6]  A: We were subpoenaed on the same day.
[7]  Q: And you called him or something like
[8]  that?
[9]  A: He was my store manager at Target. I told
[10]  him I needed the time off on this day at this time,
[11]  and he said, "So do I."
[12]  Q: Did you say anything else?
[13]  A: No. He asked me what I remembered of it,
[14]  and I said, "I still remember a good portion of it."
[15]  He said, "I don't remember anything."
[16]  Q: Did you tell him what you remembered?
[17]  A: We talked briefly about it but not very
[18]  much.
[19]  Q: What did you say about it?
[20]  A: I told him I remembered why they were
[21]  terminated, I know it was a RIF, but I didn't know
[22]  whether — it was just passing stuff, it wasn't too
[23]  much. More or less, it was just a conversation
[24]  about getting the time off, not having to work the

---

Page 74

[1]  night before to get down here without falling asleep
[2]  driving down.
[3]  Q: Did you ever hear Johnson say anything
[4]  about Hispanic employees?
[5]  A: No. Brian is very professional.
[6]  Q: Did he know Marcos?
[7]  A: He knew who they were in passing. I don't
[8]  even know if he knew their names, to be honest with
[9]  you.
[10]  MR. DONCHESS: I don't have any other
[11]  questions.
[12]  MR. McCONNELL: I just have one or two
[13]  quick clarifications.
        CROSS EXAMINATION
        BY MR. McCONNELL:
[16]  Q: On the two evaluations that you've looked
[17]  through for Mr. Sang and Mr. Urena, where you went
[18]  through each of the 10 or 12 items on the second
[19]  page and you were asked for each one by Mr.
[20]  Donchess whether or not you discussed that with
[21]  Brian Johnson before that mark was made and you said
[22]  yes, when you say you discussed it with him, does
[23]  that mean the check marks and the decision on
[24]  whether to make it a B, a C or a D was based on

---

Page 75

[1]  anything other than your own observations and
[2]  conclusions?
[3]  A: What it was —
[4]  MR. DONCHESS: Objection to the form of the
[5]  question.
[6]  Q: You can answer.
[7]  A: What it was, the second part of the review
[8]  form was the one I was least familiar with, the
[9]  check marks, and what would go into rating certain
[10]  levels of ratings. And I would basically ask Brian,
[11]  "This is what I've observed with this like Question
[12]  No. 1." We'd go through the basics of, what does
[13]  that ranking mean? What does that certain specific
[14]  area entail? What is involved with that?
[15]      And I would tell him what I've observed
[16]  with those specific aspects of that question. And I
[17]  would basically tell Brian what I've observed from
[18]  that associate on the question, and therefore we
[19]  would go from there, and he would say, "Well, if
[20]  this is what you've observed over this period of
[21]  time, this is what they'd be ranked."
[22]  Q: Did he add any of his own observations in
[23]  at that time?
[24]  A: He didn't have any observations on Marcos

---

Page 76

[1]  or Eddie.
[2]  Q: At one point you stated that we decided
[3]  that D rating. I forget if it was for Mr. Sang or
[4]  Mr. Urena. I believe it was Mr. Urena. Is that
[5]  correct?
[6]  A: Yes.
[7]  Q: Is that your recollection of your
[8]  testimony?
[9]  A: "We" meaning — yes.
[10]  Q: Is it true that a rating came out of
[11]  roundtable or not?
[12]  A: Yes.
[13]  Q: So when you say we decided the D rate, was
[14]  the D rating decided only by you —
[15]  A: No.
[16]  Q: — and Mr. Johnson?
[17]  A: No. It was decided by we, meaning the
[18]  management team of the store as a roundtable.
[19]  Q: Okay. So the rating — let me ask it a
[20]  different way. Did you come up with the rating when
[21]  you filled out the evaluation, or did you know what
[22]  the rating was when you started to fill their
[23]  evaluation out?
[24]  A: The rating was already decided before we

---

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPT.
Civil Action MICV 2004-01659-L

---

MARCOS URENA and NELSON SANG,

   Plaintiffs,

v.

HOME DEPOT U.S.A., INC., and BRIAN
JOHNSON,

   Defendants.

---

### DEFENDANTS' RESPONSE TO PLAINTIFF, MARCOS URENA'S
### FIRST SET OF INTERROGATORIES

Defendant Home Depot, U.S.A. ("Home Depot" or "Defendant") by its undersigned

counsel, hereby responds to Plaintiff Marcos Urena's ("Mr. Urena's" or "Plaintiff's") First Set of

Interrogatories as follows:

#### General Objections

1.  Defendant objects to these Interrogatories to the extent they seek to impose

obligations in excess of those permitted or required under the Massachusetts Rules of Civil

Procedure.

2.  Defendant objects to these Interrogatories to the extent they seek information

protected by the attorney-client privilege, work-product doctrine, or other immunity from

discovery.

3.  Defendant objects to these Interrogatories to the extent they seek information

1



already in the possession of Plaintiff or information equally accessible to Plaintiff.

4.     Defendant objects to each of these interrogatories overly broad, unduly burdensome, unreasonably unlimited in time and scope, irrelevant, and not otherwise calculated to lead to the discovery of relevant information.

5.     These General Objections apply to each Interrogatory and are incorporated in each Response below whether or not specifically referenced therein.

## Answers and Specific Objections

### INTERROGATORY NO. 1:

Identify the person or persons answering these interrogatories.

### ANSWER:

These interrogatories were prepared by counsel and are verified by Colleen Hayes-Hilton, EEO Specialist for Defendant Home Depot.  They are answered upon her personal knowledge and responsive information provided by others.

### INTERROGATORY NO. 2:

Identify each person consulted with respect to these interrogatories.

### ANSWER:

Defendant objects to this interrogatory because it may seek information protected by the attorney-client privilege or work-product doctrine.  Subject to and without waiving these objections, *see* Response to Interrogatory No. 1.

### INTERROGATORY NO. 3:

Describe in detail all reasons for the termination of Mr. Urena's employment.

### ANSWER:

Following the holiday season, Defendant's Tewkbury store was required to reduce its staff. Those who had received a "D" rating on their most recent review, which was given before the decision to reduce staff had been made, were selected first for termination. Because Plaintiff had received a "D" rating on his most recent evaluation, he was terminated along with a number of other employees.

## INTERROGATORY NO. 4:

State each job or position title held by Brian Johnson from July 1, 2001 through January 31, 2003, state the dates during which Mr. Johnson held each such job or position title, and describe fully and in detail the job responsibilities of each such job position.

## ANSWER:

For the time period request, Mr. Johnson worked as a Receiving Supervisor at Home Depot's Tewksbury store. A copy of the Receiving Supervisor job description will be provided.

## INTERROGATORY NO. 5:

Describe any complaints of discrimination made against Brian Johnson or Eric LeCam. Indicate the name and address of the person making the complaint, the person or agency to whom the complaint was made. Include in your answer a description of the investigation conducted and the outcome of the complaint.

## ANSWER:

Defendant objects to this interrogatory because it is unclear in meaning. Without waiving this objection, Defendant states that, except for the complaints made by co-plaintiffs in this action, no complaints of unlawful employment discrimination have been made against Mr. Johnson or Mr. LeCam while they have been employed at Home Depot.

INTERROGATORY NO. 6:

Identify each person who was involved, directly or indirectly, in the decision to terminate Mr. Urena's employment and describe the role which each such person had in the decision.

ANSWER:

*See* Answer to Interrogatory No. 3.  Further answering, Defendant states that then-Tewksbury store manager Paul Nowlan terminated plaintiff as a result of that policy.

INTERROGATORY NO. 7:

State whether Brian Johnson had a direct or indirect role in the decision to terminate Mr. Urena's employment and describe Mr. Johnson's role in the decision.

ANSWER:

Although he had a role in executing Plaintiff's January 2003 evaluation, Mr. Johnson did not have a role in Home Depot's decision to terminate Plaintiff.

INTERROGATORY NO. 8:

Identify each person who was involved, directly or indirectly, in the evaluation of Mr. Urena which was issued in January, 2003, including in your answer all persons consulted with respect to the Mr. Urena's performance, and describe the role which each such person played in the preparation of the evaluation.

ANSWER:

At the time that Plaintiff's January 2003 review was drafted, Plaintiff's direct supervisor, Eric LeCam, had recently been promoted to a supervisory position, and accordingly, Mr. Johnson, who had more experience with personnel reviews, assisted Mr. LeCam with the drafting of the review.  Mr. LeCam's observations and documentary evidence from Plaintiff's record formed the basis of the review.

[*sic – There is no interrogatory no. 9*]

INTERROGATORY NO. 10:

State whether Brian Johnson was consulted with respect to the evaluation of Mr. Urena which was issued in January, 2003, and if so, identify the person who consulted him.

ANSWER:

*See* Answer to Interrogatory No. 8.

INTERROGATORY NO. 11:

Identify Supervisor Jonathan Horne, state the job or position he held in November, 2002, describe the duties of that job or position, state whether Mr. Horne is still employed by Home Depot, and if not, state his last known address and telephone number.

ANSWER:

Defendant objects to this interrogatory because it seeks information that is irrelevant to the current action and is not reasonably likely to lead to the discovery of admissible evidence. Without waiving this objection, Defendant states that in November 2002, Mr. Horne was the Night Operations Assistant Store Manager in Home Depot's Leominster store. Mr. Horne remains in Defendant's employ.

INTERROGATORY NO. 12:

Identify all supervisors who had supervisory authority over Mr. Urena at any time during 2002 or during January, 2003.

ANSWER:

Defendant objects to this interrogatory because it is overly broad. Defendant states that Store Manager and Assistant Store Managers all had supervisory authority over Plaintiff during his employ. At the time of his termination, Plaintiff's Department Supervisor was Eric LeCam.

5

## INTERROGATORY NO. 13:

State each job or position title held Eric LeCam from July 1, 2001 through January 31, 2003, state the dates during which Mr. LeCam held each such job or position title, and describe fully and in detail the job responsibilities of each such job or position.

## ANSWER:

From July 2001 through November 2001, Mr. LeCam was a Sales Associate. From November 2001 through December 2002, Mr. LeCam was a Freight Team Associate. From January 2003 through July 2003, Mr. LeCam was a Freight Team Supervisor. A copy of the job descriptions for these positions will be provided.

I, Colleen Hayes-Hilton, hereby state under the penalties of perjury that I have read the foregoing and believe the same to be true and correct based on my own knowledge and responsive information supplied to me by others.

Signed this __9th__ day of December 2004

_Colleen Hayes-Hilton_

Colleen Hayes-Hilton
EEO Specialist
Home Depot, U.S.A., Inc.

Respectfully submitted,

HOME DEPOT, U.S.A., INC.,

By Its Attorneys,

MORGAN, BROWN & JOY, LLP
One Boston Place
Boston, Massachusetts 02108
(617) 523-6666

_Joseph P. McConnell_

Robert P. Joy, Jr. (BBO No. 254820)
Joseph P. McConnell (BBO No. 566412)

Date: December __9__, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel for plaintiffs, James W. Donchess, Esq., 60 Main Street, Nashua, N.H. 03060, by first-class U.S. mail this ____ day of Deceember 2004.

_Joseph P. McConnell_

7

1

VOL. I

PAGES 1- 126

EXHIBITS 1- 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CA No. 05-10242MEL

MARCOS URENA and NELSON       )
SANG,                          )
                               )
      Plaintiffs               )
                               )
      vs                       )
                               )
HOME DEPOT U.S.A., INC., and   )
BRIAN JOHNSON,                 )
                               )
      Defendants               )

DEPOSITION OF BRIAN J. JOHNSON,
taken on behalf of the plaintiffs, pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Kathleen L. McCarthy,
Registered Professional Reporter, Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Morgan, Brown & Joy, LLP, 200 State
Street, Boston, Massachusetts, on Thursday, August
4, 2005, commencing at 10 a.m.

---

3

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 1 | Home Depot position statement re Marcos Urena | 35 |
| 2 | Home Depot position statement re Nelson Sang | 37 |
| 3 | Defendant's response to plaintiff Marcos Urena's first set of interrogatories | 37 |
| 4 | Defendant's response to plaintiff Nelson Sang's first set of interrogatories | 38 |
| 5 | Home Depot's Code of Conduct | 39 |
| 6 | Marcos Urena's performance review from January 2003 | 58 |
| 7 | Associate performance notice re Marcos Urena | 78 |
| 8 | Performance and development summary re Marcos Urena | 88 |
| 9 | New associate review re Marcos Urena | 90 |
| 10 | Performance and development summary re Nelson Sang | 95 |
| 11 | Associate performance notice re Nelson Sang | 97 |

---

2

APPEARANCES:

      DONCHESS & NOTINGER, P.C.
      (by JAMES W. DONCHESS, Esq.)
      60 Main Street
      Nashua, New Hampshire 03060
      for the plaintiffs.

      MORGAN, BROWN & JOY, LLP
      (by JOSEPH F. McCONNELL, Esq.)
      200 State Street
      Boston, Massachusetts 02109
      for the defendants.

I-N-D-E-X

Deposition of:                          Page

BRIAN J. JOHNSON

      EXAMINATION BY MR. DONCHESS          5

---

4

| No. | Description | Page |
|-----|-------------|------|
| 12 | Performance development summary re Nelson Sang | 98 |
| 13 | New associate review re Nelson Sang | 100 |
| 14 | Workplace Issues | 101 |

---

21

1   been store managers at that time?

2      A.   Greg Morris.

3      Q.   And I said store manager but I meant

4   assistant store manager.

5      A.   I understood.  Linda Allen.

6      Q.   What was -- do you recall what Rick

7   Jones's area of responsibility was?

8      A.   27, 28.

9      Q.   Those being what?

10     A.   Departments.

11     Q.   But what departments?

12     A.   Electrical and garden.

13     Q.   Do you recall what Mike Locante's

14  department was?

15     A.   21, 22 and 30, which is lumber, building

16  materials, mill work.

17     Q.   Do you recall what Greg Morris's area of

18  responsibilities were when he was an assistant

19  manager in Tewksbury?

20     A.   Night operations manager.

21     Q.   Do you recall what Linda Allen's areas of

22  responsibility were when she was an assistant

23  store manager in Tewksbury?

24     A.   She was operations manager.

22

1      Q.   And what does that mean?

2      A.   She ran the front end, vault, computer

3   room, service desk.

4           Greg Berute.  Because when you said

5   department 24, he was the manager of paint.  Greg

6   B-E-R-U-T-E, I believe.

7      Q.   He was an assistant store manager?

8      A.   An assistant.

9      Q.   And he had only paint as a

10  responsibility?

11     A.   I believe he had paint and plumbing.

12     Q.   And what was plumbing, do you recall?

13     A.   26.

14     Q.   Now, when a round table is done, what if

15  an assistant store manager has responsibilities

16  over departments where the employee does not work?

17  Does that assistant manager still participate in

18  the round stable?

19     A.   I can't answer your questions on round

20  table issues.  Prior to a few months back I had no

21  -- I wasn't given any knowledge of round table

22  discussions, how it works.

23     Q.   Well, how does it currently work?

24     A.   Now department supervisors are included.

23

1      Q.   Back in January of 2003 did assistant

2   managers typically present -- or did assistant

3   managers typically do the performance reviews on

4   the employees they were evaluating?

5      A.   In some cases they would.

6      Q.   And what happened in other cases?

7      A.   In other cases department supervisors

8   would have to write.

9      Q.   And how would the department supervisor

10  who was not part of the round table in January of

11  2003 know what to write?

12     A.   He is given the rating.  And there's an

13  open discussion on how to write the review.

14     Q.   Open discussion between who?

15     A.   Between that department supervisor and

16  the assistant manager.

17     Q.   Then would the assistant manager review

18  what the department supervisor had written before

19  the review was presented to the employee?

20     A.   Not in all cases.

21     Q.   Now, in 2003 you were a department

22  supervisor.  Correct?

23     A.   Correct.

24     Q.   When employees that you supervised were

24

1   being evaluated, how was it handled if the

2   assistant manager did not really have much

3   knowledge regarding the performance of the

4   employee being evaluated?

5      A.   Often they would seek my input.

6      Q.   And in January 2003 the assistant manager

7   whose responsibility was receiving was who?

8      A.   Greg Morris.

9      Q.   And do you recall in January of 2003 who

10  the department supervisor was for the freight

11  department?  Or, well, sorry.  I will ask you

12  that, but I'm really trying to ask you about the

13  assistant manager, and I said department

14  supervisor.  Who was the assistant manager who had

15  responsibility for the freight department in

16  January of 2003?

17     A.   I'm going to answer that question and say

18  Greg Morris, but I'm going to elaborate and say

19  there was a period of time, all right, that there

20  were or was no operations manager, and I don't

21  know if that's in the same time frame you are

22  talking.

23     Q.   And Greg Morris was the operations

24  manager?

29

1  in any departments, at least on the floor of the
2  store.  Is that correct?
3      A.  Any department supervisor has that right,
4  yes.
5      Q.  Did you have authority to direct other
6  department supervisors regarding their activity or
7  what should be done in their departments?
8      A.  Can you state that again?
9      Q.  Well, let's say you thought that in the
10  freight department things weren't being done
11  correctly.  Could you tell -- did you have
12  authority to tell the freight department
13  supervisor that things had to be done differently
14  than they were being done in his department?
15      A.  No.
16      Q.  Who were the freight department
17  supervisors in 2002?  Was Mike Condo one of them?
18      A.  Yes.
19      Q.  And do you recall who succeeded Mike
20  Condo?
21      A.  Donald Kitchens.
22      Q.  Do you recall who succeeded Kitchens?
23      A.  Eric LeCam.
24      Q.  Does Mike Condo still work for Home

30

1  Depot?
2      A.  I believe he does.
3      Q.  Where does he work?
4      A.  I believe in New Hampshire.  I don't know
5  which store.
6      Q.  Does Donald Kitchens still work for Home
7  Depot?
8      A.  Not that I'm aware of, no.
9      Q.  Do you know where he is?
10      A.  No.
11      Q.  Does Eric LeCam still work for Home
12  Depot?
13      A.  No.
14      Q.  Do you know where he is?
15      A.  No.
16      Q.  Do you know whether Donald Kitchens
17  resigned or was fired?
18      A.  No.
19      Q.  And do you know whether Eric LeCam
20  resigned or was fired?
21      A.  No.
22      Q.  Did you ever instruct Donald Kitchens
23  what to do in the freight department?
24      A.  Did I ever instruct Donald Kitchens what

31

1  to do?  No.
2      Q.  Did you ever instruct Eric LeCam what to
3  do in the freight department?
4      A.  No.
5      Q.  Do you know who made the decision to
6  promote Donald Kitchens?
7      A.  No.
8      Q.  And Eric LeCam?
9      A.  No.
10      Q.  Do you -- I assume you know who Marcus
11  Urena is.  Correct?
12      A.  I do after meeting him here.  Up until I
13  met him at the deposition I had a vague memory of
14  him.
15      Q.  Do you know who Eddy or Nelson Sang is?
16      A.  I do today.
17      Q.  Did you know -- well, the evidence in the
18  case is that Mr. Urena was fired in January of
19  2003.  The same with Mr. Sang.  Prior to January
20  of 2003 did you know who Mr. Urena was?
21      A.  I can't say that I did.
22      Q.  Prior to January of 2003 did you know who
23  Mr. Sang was?
24      A.  No.

32

1      Q.  Prior to January of 2003 do you think you
2  would have recognized Mr. Urena if you --
3      A.  Prior to 2003?
4      Q.  Prior to his firing, prior to the
5  depositions in this case, was Mr. Urena someone
6  you recognized as a Tewksbury Home Depot employee?
7      A.  I recognized him as an employee, but
8  putting a name to a face, I could not.
9      Q.  Did you recognize Eddy or Nelson Sang --
10  again, prior to January of 2003 -- as a Tewksbury
11  Home Depot employee?
12      A.  As an employee, but a name to a face,
13  again, I could not tell you who they were.
14      Q.  Did you ever instruct Mr. Urena prior to
15  January of 2003 regarding the specifics of what he
16  should do at any one time?
17      A.  There was on one occasion I remember
18  asking -- and I'm still getting the names and
19  faces confused there -- I believe it was Mr.
20  Urena, to go to the garden department to pack out
21  freight.  That happened to have been on a
22  particular evening that I was asked by Paul Nolan
23  if I would, you know, take care of the night crew
24  because there was no night supervisor that

33

1  evening.
2      Q.  Do you recall when that was?
3      A.  No.
4      Q.  Do you know what year it was?
5      A.  No.
6      Q.  So is it your testimony that only on one
7  occasion did you ever approach Mr. Urena and
8  direct him to do something?
9      A.  That is my testimony.
10     Q.  Did you ever go to the paint department
11  and direct Mr. Urena as to what to do there?
12     A.  No, I did not.
13     Q.  Are you sure of that?
14     A.  The best that I can recall, I never gave
15  them any type of direction.
16     Q.  Prior to mid-January of 2003 did you ever
17  given Nelson or Eddy Sang direction as to what to
18  do?
19     A.  No.
20     Q.  Prior to mid-January of 2003 did you ever
21  yell at Mr. Urena?
22     A.  No, I did not.
23     Q.  Prior to January, mid-January, 2003 did
24  you ever yell at Mr. Sang?

34

1      A.  No, I did not.
2      Q.  Now, you heard yesterday Mr. Urena
3  testify that you called him a fucking spic.
4  Correct?
5      A.  Yes, I did.
6      Q.  Did you do that?
7      A.  No, I did not.
8      Q.  Have you ever used the term spic at Home
9  Depot?
10     A.  No, I have not.
11     Q.  Have you ever at Home Depot said anything
12  derogatory regarding Hispanic people?
13     A.  No, I have not.
14     Q.  You are sure of that?
15     A.  I'm positive.
16     Q.  Never to any employee?
17     A.  Never.
18     Q.  Never to any other manager?
19     A.  Never.
20     Q.  And I take it that your testimony is that
21  you never called Nelson Sang a spic or a fucking
22  spic?
23     A.  No, I did not.
24     Q.  Do you have any opinion as to how other

35

1  employees at Home Depot could have developed the
2  idea that you didn't like Hispanic or African
3  American employees?
4      A.  No.
5          MR. McCONNELL:  Objection.
6      A.  (Continuing)  I do not.
7          MR. McCONNELL:  Go ahead.
8      Q.  I want to show you -- I'm showing you now
9  a copy of a position statement submitted by Home
10  Depot and I think yourself to the Commission
11  against Discrimination.  Do you recognize that?
12         Mr. Johnson, my first question is simply
13  do you recognize it?  I might go beyond it, but
14  right now that's all I'm asking about.
15     A.  I believe so.
16         MR. DONCHESS:  Why don't we mark
17  that as Exhibit 1.
18
19             (Exhibit No. 1, Home Depot position
20              statement re Marcos Urena marked)
21
22             (Recess taken.)
23
24     Q.  Now, Mr. Johnson, in referring to Exhibit

36

1  1, the Home Depot position statement, you affirmed
2  that it was true to the best of your knowledge,
3  information and belief.  Correct?  And that would
4  be on the unnumbered page 18, following page 17 of
5  the --
6      A.  That's my signature.
7      Q.  Did you review the position statement
8  before certifying that it was true to the best of
9  your knowledge, information and belief?
10     A.  I believe I did.  I'm not an attorney but
11  I believe I did.
12     Q.  Well, your certification says you
13  reviewed it.  Right?
14     A.  Yes, it does.
15     Q.  And were you being truthful when you said
16  that?
17     A.  I believe so.
18     Q.  The next thing I wanted to show you was
19  or is the Home Depot position statement with
20  respect to Nelson Sang.  And my question is, have
21  you seen that before?
22     A.  I believe so.
23         MR. DONCHESS:  Why don't we mark
24  that as Exhibit 2.

37

1
2          (Exhibit No. 2, Home Depot position
3             statement re Nelson Sang marked)
4
5      Q.  Looking at page 18 again, which is an
6  unnumbered page after page 17, do you see an
7  affirmation by you that you reviewed the position
8  statement and that it is true to the best of your
9  knowledge and belief?
10     A.  Yes.
11     Q.  And I take it you did review the position
12  statement before certifying that it was true to
13  the best of your knowledge and belief?
14     A.  I must have, yes.
15     Q.  I next want to show you something
16  entitled "Defendant's response to plaintiff Marcos
17  Urena's first set of interrogatories."  My
18  question there is, have you seen that before?
19     A.  I don't know.  I can't honestly say I
20  have or haven't seen this.
21          MR. DONCHESS:  Why don't we mark
22  that as Exhibit 3.
23
24          (Exhibit No. 3, Defendant's response

38

1             to plaintiff Marcos Urena's first
2             set of interrogatories marked)
3
4      Q.  So your testimony is you don't recall
5  or --
6      A.  I don't recall.
7      Q.  You might have seen it but you might not?
8      A.  Correct.
9      Q.  I next wanted to give you another
10  document entitled -- without giving you the formal
11  title -- they are Home Depot's answers to Nelson
12  Sang's interrogatories.  And my question with that
13  is, have you seen those before?
14     A.  I don't believe so.  I don't recall.
15          MR. DONCHESS:  Could we mark that as
16  Exhibit 4.
17
18          (Exhibit No. 4, Defendant's response
19             to plaintiff Nelson Sang's first set
20             of interrogatories marked)
21
22     Q.  I wanted to how you something entitled
23  "Code of Conduct."
24     A.  Yes.

39

1      Q.  Have you seen that before?
2      A.  Yes, I have.
3      Q.  What is it?
4      A.  It's a code of conduct.
5      Q.  And what's your understanding as to what
6  the code of conduct is?
7      A.  It's Home Depot's policy on how to act
8  with other associates, and it informs you what
9  work-related violations would be.
10          MR. DONCHESS:  Why don't we mark
11  that as the next exhibit.
12
13          (Exhibit No. 5, Home Depot's Code of
14             Conduct marked)
15
16     Q.  Just so that I'm clear, did you ever
17  assign Mr. Urena to a department outside the
18  freight department and supervise his work in that
19  other department?
20     A.  Well, that's a trick question.  You are
21  asking me, did I ever give direction to Marcos
22  Urena to work in another department?
23     Q.  Yes.
24     A.  Yes, I did.

40

1      Q.  Where did you --
2      A.  I requested he go to the garden
3  department because there was no freight in paint
4  on that particular evening.
5      Q.  At any other time other than the garden
6  department assignment, which you have testified
7  about already, did you ever direct Mr. Urena to go
8  to any department and work there and then
9  supervise his work?
10     A.  No, I did not.
11     Q.  And I take it the same is true for Nelson
12  Sang?
13     A.  That's correct.
14     Q.  You never sent him to another department?
15     A.  No, I did not.
16     Q.  And the garden department situation
17  didn't exist with Mr. Sang?
18     A.  No.
19     Q.  Looking back to Exhibit 5, the code of
20  conduct, have you ever read that?
21     A.  Yes, I have.
22          MR. DONCHESS:  Can we go off the
23  record for a second?
24          MR. McCONNELL:  Sure.

## DEPOSITION OF ...

57

1 Do you have any information to support
2 that statement?
3     A.  No.
4     Q.  Do you recall any manager making a
5 statement like that?
6     A.  I'm sure it was discussed, but, no, I do
7 not remember the actual conversation.
8     Q.  Do you have any personal knowledge of Mr.
9 Urena being asked by a manager to bring in a
10 doctor's note?
11     A.  No, I do not.
12     Q.  Did you ever ask him to bring in a
13 doctor's note?
14     A.  No, I didn't.
15     Q.  Did any manager say that he had asked Mr.
16 Urena to bring in a doctor's note?
17     A.  I have no knowledge of that.
18         MR. McCONNELL:  Could we take a
19 quick break?
20         MR. DONCHESS:  Yes.
21
22         (Recess taken.)
23
24     Q.  Mr. Johnson, is it fair to say that Eric

59

1     A.  Truthfully I don't remember, but I must
2 have, because my signature is on the bottom.
3     Q.  Who did you consult before preparing the
4 review?
5     A.  This review was done as a training tool
6 with Eric LeCam.
7     Q.  Who did you consult before preparing the
8 review?
9     A.  Eric LeCam.
10     Q.  Anybody else?
11     A.  Not that I'm aware of.  Not that I can
12 remember.
13     Q.  A training tool for Eric LeCam because he
14 had only been a supervisor for about one day.
15 Fair to say?
16     A.  That I don't know.  I don't recall that.
17     Q.  Why was it a training exercise for Eric
18 LeCam?
19     A.  Because certain reviews were due, and he
20 come to me because he had never written a review.
21     Q.  And what did he say?
22     A.  It's right here in front of you.
23     Q.  No, what did he say?  You said that Eric
24 LeCam came to you because he had never written a

58

1 LeCam did not become the supervisor of the freight
2 department until early January of 2003?
3     A.  I don't recall when he became supervisor.
4     Q.  Do you know who Jonathan Horne was?
5     A.  The name sounds familiar but I can't
6 place him.
7     Q.  Was he a supervisor at Home Depot?
8     A.  I'm not sure.
9     Q.  I want to show you Marcos Urena's
10 performance review from January of 2003.  Have you
11 seen that before?
12     A.  Yes, I have.
13         MR. DONCHESS:  Could we mark that as
14 Exhibit 6.
15
16         (Exhibit No. 6, Marcos Urena's
17         performance review from January 2003
18         marked)
19
20     Q.  Now, you prepared this review.  Is that
21 fair to say?
22     A.  I wrote this review.
23     Q.  And you presented it to Mr. Urena.
24 Correct?

60

1 review?
2     A.  He asked me for help in writing a review
3 because he had never actually sat down and
4 personally written reviews.
5     Q.  And how many reviews did you help him
6 with?
7     A.  I believe just this one.
8     Q.  No other employees?
9     A.  Not for the freight team, no.
10     Q.  Did you help him with employees outside
11 the freight team?
12     A.  No, no.
13     Q.  And what happened after Mr. LeCam said he
14 wanted assistance in how to prepare a review?
15     A.  We sat and had a discussion on this
16 individual.
17     Q.  Why didn't you just generally explain to
18 Mr. LeCam the form and allow him to go forward and
19 do the review?
20     A.  I don't know.
21     Q.  Now, you said before writing out the
22 review you had a discussion with Mr. LeCam
23 regarding this individual.  Is that correct?
24     A.  That's correct.

61

1    Q.  What did Mr. LeCam say?
2    A.  I can't recall the actual words but this
3  is -- in our discussion this is what formatted the
4  review.
5    Q.  And what did you say in the discussion
6  with Mr. LeCam?
7    A.  I don't recall what I said.
8    Q.  Had Mr. Urena been round-tabled by the
9  assistant managers and the manager of the store?
10   A.  I believe yes.
11   Q.  And did you discuss Mr. Urena's rating
12 with the managers?
13   A.  I hadn't, no.
14   Q.  Had Mr. LeCam, to your knowledge?
15   A.  Yes.
16   Q.  And what rating had the managers -- and
17 which manager did Mr. LeCam talk with?
18   A.  I can't answer that question.  I don't
19 know the answer.
20   Q.  There may have been a vacancy in the
21 night supervisor --
22   A.  May have been.
23   Q.  -- night manager's position.  Correct?
24   A.  Correct.

62

1    Q.  And what rating did Mr. LeCam tell you
2  was going to be given to Mr. Urena?
3    A.  A D.
4    Q.  Did he tell you that from the beginning?
5    A.  Yes.  That's why he was having a hard
6  time writing it.
7    Q.  Looking down at the bottom -- well, just,
8  so you understood from the first moment that
9  Marcos Urena was going to get a D.  Correct?
10   A.  Yes.
11   Q.  And that was from the beginning of your
12 discussion with Mr. LeCam.  Correct?
13   A.  Yes.
14   Q.  Before you began to write out the review.
15 Fair to say?
16   A.  Yes.
17   Q.  Looking at the bottom, overall
18 performance code --
19   A.  Yes.
20   Q.  -- there's, you see that there's a C
21 written underneath and a D written over it?
22   A.  I see the D, and there are marks, but I
23 can't confirm that's a C.
24   Q.  Well, can you confirm that it looks like

63

1  a C?
2    A.  It may have been.
3    Q.  Why would you have written a C for Mr.
4  Urena when you understood from the beginning th
5  he was going to get a D rating?
6        MR. McCONNELL:  Objection.
7    A.  I don't recall that.  I can't answer that
8  question.  I don't have the answer to that.
9    Q.  Are you denying that there is a C written
10 underneath the D in Mr. Urena's overall
11 performance code?  Are you denying that?
12   A.  No, I'm not denying that.  From the looks
13 of this exhibit that's what it appears to be.
14   Q.  And are you telling me you have no memory
15 as to why you wrote a C first and then a D over
16 it?
17       MR. McCONNELL:  Objection.
18   A.  That's what I'm telling you.
19   Q.  Can you think of any reason why, given
20 that you were going to be giving Mr. Urena a D
21 rating from the beginning, you would have
22 initially written a C under overall performance
23 code?
24       MR. McCONNELL:  Objection.

64

1    A.  It might have just been a mistake.  I
2  have no idea because I don't recall.
3    Q.  In what order did you fill out this form?
4    A.  It goes from top to bottom.
5    Q.  So you first filled out the leader
6  summary assessment?
7    A.  No, the performance and development
8  summary.
9    Q.  Well, you first put in his name and his
10 department.  Correct?
11   A.  Yes.
12   Q.  Well, let's go back.  This is a two-page
13 review.
14   A.  Right.
15   Q.  We have -- the actual form is a two-sided
16 sheet of paper, or two separate pages?
17   A.  It's a long sheet of paper that opens
18 into two.
19   Q.  And we do have two sheets here.  Are they
20 in the proper order?
21   A.  Yes, they are.  Side 2 you fill out first
22 when you are doing a review.
23   Q.  So that I had made the opposite
24 assumption.  So that page two of the review or

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

MARCUS URENA,

      Claimant

v.

HOME DEPOT U.S.A., INC. and BRIAN
JOHNSON,

      Respondents.

MCAD Docket Number: 03BEM02942
EEOC/HUD Number: 16CA400299

## STATEMENT OF POSITION AND AFFIRMATIVE DEFENSES

### Introductory Statement

On or about October 30, 2003, Marcus Urena (the "Complainant" or "Mr. Urena") filed a charge of discrimination with the Commission alleging that Respondent Home Depot U.S.A., Inc. ("Home Depot") discriminated against him in employment on the basis of his race, color, and national origin (Dominican Republic). On November 4, 2003, Mr. Urena moved to amend his charge to add Respondent Brian Johnson ("Mr. Johnson"). On November 14, 2003, the Commission attempted to serve a copy of the charge and Motion to Amend Charge of Discrimination on the Respondents. Unfortunately, such items never reached their destination because they were not addressed properly. Home Depot ultimately received a copy of the Charge on January 18, 2004. The Respondents now file their Statement of Position and Affirmative Defenses in response to the allegations.

The Complainant's charge should be dismissed for lack of probable cause. The objective evidence demonstrates that Complainant's employment with Home Depot was terminated for poor work performance and poor attendance after he had received previous warnings.

Moreover, the Complainant cannot establish any evidence of pretext because the Respondents acted solely on the basis of legitimate employment policies and practices that are uniformly enforced, and not on the basis of the Complainant's race, color, and/or national origin.

Finally, the Complainant has failed to allege any credible evidence of conduct which would rise to the level of actionable harassment.

## Specific Allegations and Response

Respondents Home Depot U.S.A., Inc. and Brian Johnson, by and through their undersigned attorneys, hereby respond to the Complainant's Complaint ("Complaint") as follows:

1.    The Respondents admit that the Complainant was employed by Home Depot in Tewksbury, Massachusetts and that the Complainant was terminated, as alleged in the first sentence of the unnumbered paragraph in the Complaint. The Respondents deny the remaining allegations stated in the first sentence of the unnumbered paragraph in the Complaint. Further answering, the Respondents state that the Complainant was hired on June 21, 2001 and terminated on January 15, 2003. The Respondents deny the allegations contained within the second sentence of the unnumbered paragraph in the Complaint. The extent to which the third sentence in the unnumbered paragraph in the Complaint contains allegations, the Respondents deny same.

2.    The Respondents lack sufficient information to admit or deny the allegations contained within the first sentence of paragraph one (1) of the Complaint.

2

3.    The Respondents deny the allegations contained within paragraph two (2) of the Complaint.

4.    The Respondents deny the allegations contained within paragraph three (3) of the Complaint.

5.    The Respondents deny the allegations contained paragraph four (4) of the Complaint.

6.    The Respondents deny the allegations contained within paragraph five (5) of the Complaint.  Further answering, the Respondents state that the Complainant was terminated in January of 2003 due to his poor work performance and poor attendance.

Respondents Home Depot and Brian Johnson, by and through their undersigned attorneys, hereby respond to the Complainant's Amendment to Charge of Discrimination ("Complainant's Amendment") as follows:

1.    The first sentence of paragraph one (1) of the Complainant's Amendment contains no allegations which require a response.  The extent to which a response is required, the Respondents deny same.  The Respondents deny the allegations contained within the second and third sentences of paragraph one (1) of the Complainant's Amendment.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Complainant's Complaint in whole or in part fails to state a claim upon which relief can be granted and should be dismissed pursuant to Mass. R. Civ. P. 12(b)(6).

3

## SECOND AFFIRMATIVE DEFENSE

Complainant Complaint is barred, in whole or in part, by the doctrines of waiver, laches, estoppel, and unclean hands.

## THIRD AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant is responsible for any harm suffered or loss incurred.

## FOURTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, by the applicable statute of limitations.

## FIFTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant has suffered no damages.

## SIXTH AFFIRMATIVE DEFENSE

Complainant has failed properly to mitigate damages, the existence of which the Respondents deny, as required by law.

## SEVENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because the Respondents' actions were at all times proper and lawful, in the advancement of legitimate business interests and responsibilities.

## EIGHTH AFFIRMATIVE DEFENSE

Complainant's damages, if any, are limited by statute.

## NINTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred in whole or in part because, at all relevant times, the actions of the Respondents were legal, proper, reasonable, and in conformity with all applicable Massachusetts and federal statutory, regulatory, and decisional law.

## TENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, by the exclusive remedy provisions of the Massachusetts Workers' Compensation laws.

## ELEVENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant has failed to exhaust his administrative remedies.

## TWELFTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant was terminated for legitimate non-discriminatory reasons.

## THIRTEENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant will be unable to show that the Respondents' reasons for terminating him are pretextual.

## FOURTEENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because the Complainant will be unable to show any evidence of discriminatory animus on the basis of national origin, race, and/or color.

## FIFTEENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant has failed to allege facts sufficient to recover compensatory and/or punitive damages, to the extent alleged, on his claims of discrimination under Chapter 151B.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Respondents are not liable to Complainant for liquidated or punitive damages, to the extent alleged, including but not limited to, because of the Respondents' good faith efforts to comply with all equal employment opportunity laws; the Respondents are also not liable for such damages because they did not act in bad faith and/or did not commit any knowing, wanton, intentional or malicious act, or authorized or ratified such an act.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Complainant failed to take advantage of preventative or corrective opportunities provided by the Respondents to avoid harm.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because Complainant's relationship with the Respondent Home Depot was terminable at will by either party.

## NINETEENTH AFFIRMATIVE DEFENSE

Complainant's Complaint is barred, in whole or in part, because there is no individual liability under Chapter 151B for race, color, and/or national origin discrimination.

## TWENTIETH AFFIRMATIVE DEFENSE

The Respondents reserve the right to amend this answer to modify their responses and add such affirmative defenses as warranted by additional investigation and discovery in this case.

WHEREFORE, Respondents request that:

1. Complainant's Complaint be dismissed;

2. Respondents be awarded costs and fees; and

3. Respondents be granted such other and further relief as the MCAD deems

   appropriate.

## Detailed Response to the Complaint

I.    **Factual Background**

   a.    *Home Depot*

Home Depot operates warehouse-style stores in the United States, Canada, Puerto Rico

and South America, where it sells a wide assortment of building materials and home

improvement products to *do-it-yourselfers*, as well as home improvement, construction and

building maintenance professionals. Home Depot's operating strategy emphasizes providing a

wide range of merchandise to its customers at competitive prices, while employing highly

knowledgeable, service-oriented personnel. Home Depot attributes its success to its strong

emphasis on both customer service and customer satisfaction.

   b.    *Equal Employment and Harassment/Discrimination Policies*

Home Depot does not tolerate discrimination. The Company is committed to ensuring

that its associates work in an environment built on mutual respect, free of harassment and

discrimination. In support of this commitment, Home Depot has a written Equal Employment

Policy and Harassment/Discrimination Policy, which states in pertinent part:

7

## Equal Employment Policy

*The Home Depot is committed to equal employment opportunity and encourages maximum achievement by all associates. The Company will not, under any circumstances, tolerate discrimination against an associate or applicant because of race, color, sex (gender), national origin, religion, age or disability with respect to any term, privilege or condition of employment including advertisement, recruitment, hiring, job assignments, transfers, promotions, compensation, training, discharge or company sponsored events. Any Home Depot associates who believe they have been discriminated against should promptly notify the Store Manager, Human Resource Manager, District Manager, Division Human Resource Manager, or Division VP of Human Resources.*

Home Depot prohibits retaliation against any associate who reports discrimination or otherwise opposes discrimination, including using its Open Door policy. Any associate who is found to have discriminated against another associate in violation of the Company's Equal Employment policy will be subject to disciplinary action up to and including termination of employment. (Copies of the Company's 2001, 2002, and 2003 Equal Employment and Harassment/Discrimination policies are attached hereto as Exhibit A.)

During New Hire Orientation, Home Depot's Equal Employment and Harassment/ Discrimination policies are discussed with all new associates. All associates receive a copy of an *Associate Orientation Guide* (employee handbook) during orientation, which contains these policies.

c.    *Respect for All People*

In further support of Home Depot's commitment to maintain a work environment of mutual respect that is free of discrimination and harassment, Home Depot has implemented a continuing training program entitled, *Respect for All People*, which emphasizes the importance of respect in the workplace. The *Respect for All People* training addresses the issues of harassment and discrimination in the workplace in detail. All employees, from senior executives

8

to hourly associates, are required to attend this training.[1]  In addition, the training also addresses the importance of accepting cultural differences, valuing the talents and uniqueness of others, and treating others they way they would like to be treated.  (A copy of the relevant section of the *Associate Orientation Guide* pertaining to the *Respect for All People* training, for 2001, 2002, and 2003, is attached hereto as Exhibit <u>B</u>).

d.    *Open Door Policy*

Home Depot is committed to providing a climate of two-way, open, honest and respectful communication, without fear of retaliation.  Therefore, we have an Open Door Policy whereby associates are encouraged to express their concerns to a member of management.  The Open Door Policy is addressed during New Hire Orientation and is contained in the Associate Orientation Guide, of which all associates receive a copy.  (A copy of this policy for 2001, 2002, and 2003 is attached hereto as Exhibit <u>C</u>).  The Open Door Policy provides a variety of avenues for associates to bring their concerns to management's attention.

e.    *Alert Line*

The Alert Line is a toll-free telephone number provided by Home Depot, so employees may report harassment or other concerns anonymously.  Associates are advised about the Alert Line during New Hire Orientation.  Information about the Alert Line is also contained in the Associate Orientation Guide.  (<u>See</u> Exhibit <u>C</u>.)

---

[1] During the training, employees are shown a video containing examples of workplace situations involving respect issues.  To ensure that employees clearly understand Home Depot's *Respect for All People* program, following the video, employees answer a series of questions and participate in a discussion about the video.

*f.    Home Depot's attendance policy*

In its 2002 Associate Orientation Guide, the attendance policy indicates that unexcused absences – absences taken without a satisfactory excuse, and excessive absences and tardiness, may lead to disciplinary action, up to and including termination. (Attendance policies for 2001, 2002, and 2003 are attached hereto as Exhibit D). Further, in practice, where an absence is medically-related, Home Depot requests a doctor's note substantiating the need for the absence.

*g.    Complainant's job history and performance*

On June 21, 2001, the Complainant began working as a night crew associate at the Tewksbury, Massachusetts Home Depot. In October of 2001, he became a freight team associate on the nightshift. His job responsibilities included moving unloaded freight items to the sales floor, unpacking freight, consolidating overstock items on pallets, and cleaning the areas in which he worked at the end of this shift.

In his annual review dated January 2, 2003, the Complainant received a "D" rating (the lowest on a scale of A – D). At the time that the review was drafted, the Complainant's direct supervisor, Eric LeCam, had recently been promoted to a supervisory position. Accordingly, Brian Johnson, Receiving Supervisor, who had more experience with personnel reviews, assisted Mr. LeCam with the drafting of the review. Mr. LeCam provided the feedback which formed the basis of the review; Mr. Johnson merely assisted with the drafting process.

The January of 2003 review reflected the Complainant's poor productivity, lack of initiative, inability to adapt to new areas of responsibility, and attendance problems. Freight team associates are expected to complete their assigned tasks as quickly as possible, enabling them to take on additional tasks. However, whether he had six pallets of paint to unload or ten pallets of paint to unload, the Complainant paced himself and took the same amount of time to

10

complete his work. His low productivity and lack of initiative resulted in repeated informal counseling.

In addition, the Complainant was asked to assist in other areas of the store, in order to improve his productivity and assist with the tasks assigned to the Freight Team. Again, he failed to improve his productivity.

Finally, following knee surgery in the summer of 2002, the Complainant had repeated unexplained absences. After returning to work on light duty, and later resuming his full duty schedule, the Complainant was frequently absent without the requisite doctor's note to substantiate his absences.

h.    *Termination of Complainant*

Due to a decrease in sales volume following the holiday season, Home Depot was required to reduce its staff. Those who had received a "D" rating on their most recent review, which was both drafted and given before the decision to reduce staff had been made, were selected first for termination. Having received a "D" rating on his most recent evaluation, the Complainant was terminated on January 15, 2003, along with seven other employees, five of whom were non-Hispanic and two of whom were Hispanic (including Complainant).

i.    *Allegations of harassment*

In his Amendment to Charge of Discrimination, the Complainant alleges that "Brian Johnson was the manager who harassed me, who called me a 'Spic,' and who gave me the bad review which led to my termination." However, Brian Johnson's role with respect to the Complainant's performance review was quite limited; he merely assisted a new supervisor with the drafting process. Further, it is noteworthy that Mr. Johnson was not the sole individual involved in the completion of the review. In addition, Mr. Johnson was not a direct supervisor of

11

the Complainant. Mr. Johnson is a Receiving Supervisor who works in a different department than the Complainant. Moreover, Mr. Johnson vehemently denies harassing the Complainant, calling the Complainant "Spic," and/or harboring any animus towards the Complainant's race, color, and/or national origin. It is also noteworthy that the Complainant never filed an internal complaint of harassment regarding Mr. Johnson at any point prior to his termination from Home Depot, despite Home Depot's well-published anti-harassment policy, Open Door policy, and anonymous Alert Line complaint procedure. Suffice it to say that the allegations of harassment and disparate treatment by Mr. Johnson are clearly spurious.

## II.     Legal Analysis – Disparate Treatment

### A.     The Complainant Cannot Establish A *Prima Facie* Case of Discrimination

As a preliminary matter, the Complainant's charge cannot stand because he cannot make out a *prima facie* case of discrimination. The Complainant alleges that Respondents discriminated against him based upon his race, color, and national origin. In order to make out a *prima facie* case of discrimination, the Complainant must show that: (1) he is a member of a protected class; (2) he satisfied the normal requirements of his position; (3) he suffered an adverse employment action; and (4) he was treated differently than those similarly situated but not members of the protected class. Graves v. Haartz-Mason, Inc., 23 MDLR 13, 16 (2001); see also Yusef v. Medical Weight Loss Clinic, Inc., 22 MDLR 72, 74 (2000). Here, the Complainant cannot establish a *prima facie* case of discrimination because he has failed to come forward with *any* evidence to demonstrate that he was satisfying the normal requirements of his position, or that similarly situated non-minority employees were treated differently than him.

Indeed, through informal verbal counseling, the Complainant had ample prior notice of his poor attendance and punctuality, and the need for improvement. He simply failed to improve in both areas. Accordingly, the Complainant cannot demonstrate that he was satisfactorily performing his job duties.

Moreover, the Complainant cannot prove that similarly situated non-minority employees were treated better than he was. Indeed, the Complainant has failed to present *any* evidence to establish disparate treatment. The Complainant was repeatedly counseled regarding his poor performance and punctuality. His failure to improve resulted in his "D" performance rating in January of 2003 which led to his termination. Likewise, other employees who failed to improve on their performance were given a "D" performance rating and were terminated on or near the same time as the Complainant (two Hispanics and five non-Hispanics). Accordingly, the Complainant was treated similarly to all other employees at Home Depot and has not presented any evidence to the contrary.

**B.    Home Depot Has Articulated A Legitimate And Nondiscriminatory Reason For Its Employment Decision**

Assuming *arguendo* that the Complainant can establish a *prima facie* case of discrimination, he cannot rebut Home Depot's legitimate nondiscriminatory reason for terminating his employment. Indeed, the Complainant's poor evaluation in January of 2003 had nothing to do with his race, color, or national origin. His review was based solely upon the fact that the Complainant had failed to improve his attendance/punctuality despite being verbally counseled previously. See Pho v. Modicon, Inc., 18 MDLR 148, 150 (1996) (no national origin discrimination found where employer terminated Complainant following decline in his

13

performance, demeanor, and attitude which were documented in his final performance review and the decision to change the Complainant's schedule).

While the Complainant may subjectively believe that his termination was somehow unfair, he has failed to provide *any* evidence to prove that the termination decision was a pretext for unlawful discrimination. Absent evidence that Home Depot's proffered reasons for terminating the Complainant were pretextual, its decision must stand. See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 (1st Cir. 1999) ("[c]ourts may not sit as super personnel-departments assessing the merits -- or even the rationality of employers' nondiscriminatory business decisions"); Hawkins v. Pepsico, Inc., 203 F.2d 274, 279 (4th Cir. 2000), *cert. denied* 121 S.Ct. 181 (2000) ("it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination").

### III.    Legal Analysis -- Harassment

The Complainant has failed to establish harassment because of his race, color, and/or national origin.  In order to prevail on such a claim, the Complainant must show that: (1) unwelcome comments, jokes, or other verbal or physical conduct of an ethnically hostile nature were made in the workplace; (2) such conduct had the effect of creating an intimidating, hostile, or offensive working environment or unnecessarily interfered with an individual's work performance; and (3) the employer knew or should have known of the conduct and failed to take remedial action. Consentini v. Peter Pan Bus Lines, Inc., 22 MDLR 352, 354 (2000).

In his Complaint, the Complainant alleges vaguely that Mr. Johnson used the word "Spic" and attempted to run "me down with a forklift." He fails to articulate with any specificity the timeframe of this allegedly harassing conduct.

14

Further, even if believed, the conduct alleged by the Complainant simply lacks sufficient severity or pervasiveness to create an objectively hostile or abusive work environment because of his race, color, or national origin. See Consentini, 22 MDLR at 354. For claims of discrimination to be actionable, the work environment must be pervaded by harassment and abuse. Id. The nature, frequency, context and target of any actions and remarks are important considerations in making the determination of whether a hostile work environment exists. Id. at 355. Here, the Complainant has failed to establish any pervasive course of conduct which could reasonably be construed as harassment because of his race, color, or national origin.

Finally, it is noteworthy that the Complainant neglected to file an internal complaint with Home Depot regarding Mr. Johnson's alleged harassing conduct. Home Depot publishes its EEO policy, Open Door Policy, and Alert Line procedures in its handbooks disseminated to employees at the outset of their employment. Further, the EEO policy is posted in several accessible areas of the store, including the timeclock area where employees punch in, the hallway outside of the breakroom, and inside the breakroom itself. If the Complainant's allegations of harassment are to be believed, it simply defies logic for the Complainant not to have availed himself of the complaint procedures articulated in Home Depot's well-publicized policies prior to his termination. Further, due to the lack of an internal complaint, Home Depot cannot be charged with awareness of the alleged harassment.[2] See also Consentini, 22 MDLR at 355 (even though Complainant did complain regarding not wanting to work with certain co-workers, because Complainant's vague complaint failed to raise alleged ethnic slurs by supervisor, there was no duty on behalf of employer to investigate and take adequate remedial action).

---

[2] Mr. Johnson was a department supervisor which is a non-management hourly position at Home Depot.

15

## IV.    Conclusion

The Complainant cannot establish that he was harassed and/or discriminated against by Respondents on the basis of his race, color, and/or national origin. For the reasons set forth above, the Commission should issue a finding of no probable cause and dismiss the Complainant's Complaint of discrimination against Respondents.

Attorneys for Respondents,

HOME DEPOT U.S.A., INC. AND
BRIAN JOHNSON

*Danielle Meagher*

Robert P. Joy
Danielle L. Meagher
MORGAN, BROWN & JOY, LLP
One Boston Place
Boston, MA 02108
(617) 523-6666

Dated: February 10, 2004